**MORITT HOCK HAMROFF & HOROWITZ LLP**

400 Garden City Plaza

Garden City, NY  11530

Telephone (516) 873-2000

Leslie A. Berkoff

lberkoff@moritthock.com

Lia M. Pistilli

lpistilli@moritthock.com

-and-

**PORZIO, BROMBERG & NEWMAN, P.C.**

(Mail to) P.O. Box 1997, Morristown, NJ  07962-1997

(Delivery to) 100 Southgate Parkway, Morristown, NJ 07960

Telephone (973) 538-4006

John S. Mairo

jsmairo@pbnlaw.com

**Proposed Attorneys for Debtor and Debtor-in-Possession**


**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

| | | |
|---|---|---|
| **In re:** | : | **Case No. 09-50723 (ESS)** |
| | : | |
| **20 Bayard Views, LLC,** | : | **Chapter 11** |
| | : | |
| **Debtor.** | : | |

----------------------------------------------------------- X


### DEBTOR'S MOTION FOR AN INTERIM ORDER (I) AUTHORIZING DEBTOR TO USE CASH COLLATERAL; (II) DETERMINING ADEQUATE PROTECTION IN CONNECTION WITH INTERIM AUTHORIZATION; AND (III) SCHEDULING FINAL HEARING ON USE OF CASH COLLATERAL

TO:    THE HONORABLE ELIZABETH S. STONG
       UNITED STATES BANKRUPTCY JUDGE

20 Bayard Views, LLC  ("**BV LLC**" or "**Debtor**"), by and through its proposed counsel, Moritt Hock Hamroff & Horowitz LLP and Porzio, Bromberg & Newman, P.C., moves for entry of an order pursuant to Sections 105, 361 and 363 of 11 U.S.C. §§ 101 *et. seq.* ("**Bankruptcy Code**"), Federal Rule of Bankruptcy Procedure ("**Bankr. R.**") 4001 and Local Bankruptcy Rule ("**LBR**") 4001-5: (i) authorizing the Debtor to use the cash collateral of W Financial Fund, LP

("**WFF**")  for an initial period; (ii) determining adequate protection; and (iii) setting a date for a

final hearing to consider entry of a final order (the "**Final Order**") approving Debtor's motion to

use the cash collateral (the "**Motion**"), and states as follows:

## Preliminary Statement

1.    The Debtor seeks to use cash collateral in which WFF has a lien.   The cash

collateral consists of monthly rental payments from leases held by the Debtor for its 37

condominium units and 40 parking spaces located at the Bayard Condominium Complex

(defined below).   Pursuant to agreements in force between the Debtor and WFF, the Debtor

collects and applies the rents, and the Debtor in actual practice has always applied the rents

first to the maintenance of its condominium units at the Bayard Condominium Complex, and

then paid over the balance to WFF to service the mortgage debt.

2.    By this Motion, the Debtor seeks to continue its pre-petition practice of paying

the condominium maintenance costs, which in turn protects the value of WFF's Collateral

(defined below).   The Debtor proposes that the balance of the cash collateral be utilized to pay

the costs of administering the bankruptcy case, which costs the Debtor expects to minimize by

obtaining a confirmed reorganization plan within 120 days of the bankruptcy filing.   During that

time, WFF and other known secured creditors are adequately protected because there is a

substantial equity cushion above their debt amounts.

## Jurisdiction

3.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.   This is

a core proceeding pursuant to 28 U.S.C. § 157 (b).   Venue of this proceeding and this Motion is

proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.   The statutory predicates for the

relief sought herein are Bankruptcy Code §§ 361 and 363, Bankr. R. 4001 (b) and LBR 4001-5.

None of the provisions identified in LBR 4001-5 are part of the relief requested herein.

## Background

**A.    Procedural History**

4.    On December 4, 2009 (the "**Petition Date**"), the Debtor filed a voluntary petition for

relief under Chapter 11 of the Bankruptcy Code.  The Debtor is operating its business as a debtor-in-

possession pursuant to Bankruptcy Code § § 1107 and 1108.  No trustee, examiner, or official committee

of unsecured creditors has been appointed to date.

**B.    Overview of Debtor's Business[1]**

**(i)    Creation of Bayard Condominium Complex**

5.    BV LLC was formed in 2005 for the purpose of acquiring and developing certain real

property located at 20 Bayard Street, Brooklyn, New York (the "**Property**").  In 2007, the construction of

a luxurious 62-unit residential complex was completed on the Property (the "**Bayard Condominium**

**Complex**").  The development of the Bayard Condominium Complex was financed by Fremont General,

which was later acquired by iStar Loans, LLC ("**iStar**").

6.    In addition to the Fremont/iStar financing, BV LLC invested approximately $16 million of

its own funds in connection with the development of the Bayward Condominium Complex.

**(ii)    Strong Early Sales**

7.    During the first quarter of 2008, BV LLC began closing on sales of some of the units and

residents started moving in.

8.    While BV LLC enjoyed brisk initial sales of its condominium units, sale momentum

slowed dramatically in the second half of 2008 due to the faltering economy and the attendant

---

[1] Unless otherwise noted, the paragraphs contained in Section B's "Overview of Debtor's Business" are derived from the Affidavit of Martin Ehrenfeld Pursuant To Local Bankruptcy Rule 1007-4, dated December 7, 2009 (the "**Ehrenfeld 1007-4 Affidavit**") [Docket No. 7].

widespread residential real estate decline.    By the third quarter of 2008, BV LLC had sold 24 of the 62 condominium units.  Following the Lehman Brothers bankruptcy filing in mid-September 2008, and due to the severely depressed real estate market, BV LLC decided it would be best to pursue rentals of the existing unsold condominium units.  BV LLC's lender at the time, iStar, although it had been paid down approximately $17 million of the $34 million funded, wanted to be replaced because of its intolerance to remaining a lender to a business relying upon a rental stream.

      **(iii)**      **Entry of W Financial Fund LLP ("WFF")**

      9.      In an extremely difficult credit environment, the Debtor was forced to find a replacement lender.

      10.      In October of 2008, WFF replaced iStar by virtue of the Agreement of Consolidation, Extension and Modification of Mortgage dated October 14, 2008 (the **"WFF Mortgage"**) which consolidated:    (i) the mortgage and note in favor of WFF dated October 14, 2008 in the amount of $100,000.00; and (ii) the remaining balance on a pre-existing mortgage and note in favor of iStar for $17,300,000.00.  The WFF Mortgage is annexed as **Exhibit A** to the Affidavit of Martin Ehrenfeld, as submitted in support of the Motion (the **"Ehrenfeld Cash Collateral Affidavit"**).

      11.      In connection with the WFF Mortgage, the Debtor executed in favor of WFF the Consolidated, Amended and Restated Note dated October 14, 2008 in the principal amount of $17,400,000.00 (the **"WFF Note"**, together with the WFF Mortgage, the **"WFF Loan"**).  The WFF Note is annexed as **Exhibit B** to the Ehrenfeld Cash Collateral Affidavit.

      12.      Concurrent with the execution of the WFF Mortgage on October 14, 2008, the Debtor entered into an assignment of leases and rents (the **"Lease Rent Agreement"**), which was expressly "made for the purpose of securing" the WFF Loan.  The Lease Rent Agreement is annexed as **Exhibit C** to the Ehrenfeld Cash Collateral Affidavit**.**

**(iv)    Despite Rental Success, Debtor Is Cash Flow Negative**

13.    By early 2009, BV LLC was able to enter into lease agreements for 35 of its 38 condominium units.

14.    In February 2009, BV LLC was able to sell condominium unit 3C for $456,000.00, which was $75,925.00 (or 20%) above WFF's release price of $380,075.00.

15.    Despite the Debtor's success in selling condominium unit 3C and renting 35 of the remaining 37 units, the Debtor has been unable to generate sufficient rental income to operate on a positive cash flow basis.    This is due to the high interest rate (minimum 12%) that the Debtor is obligated to pay WFF pursuant to the WFF Note.

**(v)    WFF Loan Maturity And Extension Extortion**

16.    The original maturity date of the WFF Loan was October 13, 2009, with options to extend for two (2) 6-month time periods.    Over the course of the last year, the Debtor has spent significant time and effort attempting to refinance the WFF Loan because of its short term and exorbitant interest rate.    Despite four (4) letters of intent from four (4) separate institutions, and significant due diligence completed towards such refinancing, the Debtor has been unable to refinance the WFF Loan due to the continued tightness of the credit markets.

17.    On or about October 13, 2009, the Debtor and WFF executed a loan extension agreement which extended the maturity date of the WFF Loan to January 13, 2010 (the **"<u>Extension Agreement</u>"**).    The Extension Agreement is annexed as **Exhibit D** to the Ehrenfeld Cash Collateral Affidavit.

18.    Pursuant to the Extension Agreement, in addition to remaining obligated to pay WFF its exorbitant $170,000.00 interest payment during the extension period, WFF charged the Debtor an "extension fee" of $84,875.36, plus the legal fees WFF incurred in connection with the extension.

Among other things, the Debtor, by this bankruptcy filing and its proposed Chapter 11 plan, wishes to avoid a number of short-term extensions and attendant extension fees and legal fees of its lender.

19.     As of the bankruptcy filing date (December 4, 2009), WFF's principal amount outstanding was $16,975,072.00 (the "**WFF Debt**").   Annexed as **Exhibit E** to the Ehrenfeld Cash Collateral Affidavit is a copy of the statement issued by WFF to the Debtor, dated December 1, 2009 (the "**WFF 12/1/09 Statement**").   At the time of the bankruptcy filing, WFF had not declared any defaults under the WFF Loan and WFF had taken no steps to control the Debtor's rental stream.

20.     The collateral securing the WFF Loan is the Debtor's 37 condominium units and 40 parking spaces located at the Bayard Condominium Complex (20 Bayard Avenue, Brooklyn, New York), along with the attendant rental stream and leases (collectively, the "**Collateral**").   Attached as **Exhibit F** to the Ehrenfeld Cash Collateral Affidavit is a chart listing the Debtor's 37 condominium units, along with the number of rooms and square footage in the respective units.   Attached as **Exhibit G** to the Ehrenfeld Cash Collateral Affidavit is a schedule of the 40 parking lot spaces.

21.     Attached as **Exhibit H** to the Ehrenfeld Cash Collateral Affidavit is the valuation report prepared by Leitner Group, Inc.("**LGI**") at the request of WFF (the "**WFF Appraisal**").   The WFF Appraisal was completed in early October 2008 and had valuations dated as of September 24, 2008, thus, it was after the general economic decline caused by the Lehman Brothers bankruptcy case which filed in mid-September 2008.   The WFF Appraisal appraised the Collateral prior to the sale of condominium unit 3C in February 2009 for $456,000.00.[2]  The WFF Appraisal provided valuations based upon four (4) different valuation methods and the chart below describes the valuation method and LGI's valuation amounts:

---

[2] At the time of the WFF Loan, More Marketing Inc. ("MMI") held title to condominium unit 3C, which is why MMI was included in the WFF Loan documents.  As noted, unit 3C was sold and WFF released its lien on unit 3C in order for the sale to close.

| METHOD | VALUATION |
|---|---|
| As is Value as a Rental Building (dated 9/24/08) | $24,400,000.00 |
| Value Upon Stabilization of Rental Building (dated 4/1/09) | $23,800,000.00 |
| Net Sellout Value As Is Market Value (dated 9/24/08) | $31,600,000.00 |
| Bulk Sellout (dated 9/24/08) | $28,400,000.00 |

22.    The average of these valuations is $27,050,000.00.

23.    Additionally, the total of the release prices that WFF listed in the WFF Mortgage was $27,642,756.00, which supports that WFF is oversecured.  *See* **Exhibit I** to the Ehrenfeld Cash Collateral Affidavit, Release Prices Schedule.  The sale price obtained for unit 3C further supports this conclusion because unit 3C had a release price of $380,075.00 and sold in February 2009 for $456,000.00.

24.    As explained in the Affidavit of Irving Schwarzbaum, CPA, CIRA, CFA, CFF, as submitted in support of the Motion (the "**Schwarzbaum Affidavit**"), WFF is oversecured when the assumptions of the WFF Appraisal are utilized and then adjusted to incorporate the Debtor's current financial data.  As noted above, the WFF Appraisal provided valuations based upon several valuation methods; specifically, (i) an income approach based upon its value as a rental building as of September 24, 2008 (the "**Income Method**"); (ii) an income approach based upon its value as a stabilized rental building as of April 1, 2009 (the "**Stabilized Rent Method**"); and (iii) a net sellout value of the building as of September 24, 2008 (the "**Sellout Method**").

25.    As for the Income Method, LGI assumed net operating income of $1,463,000.00 per year at a 6% capitalization rate yielding a value of $24,400,000.00.  *See* Schwarzbaum Affidavit, at ¶ 4 and Ehrenfeld Cash Collateral Affidavit, **Exhibit H** (copy of WFF Appraisal), at p. Debtor 121.  Current net operating income is $1,277,000.00 per year, 12.7% lower than LGI's assumption.  The valuation under

the Income Method using current income at a 6% capitalization rate is $21,300,000.00.  *See* Schwarzbaum Affidavit, at ¶ 4.

26.    Under the Stabilized Rent Method, the WFF Appraisal reflects a $23,800,000.00 valuation.  *See* Schwarzbaum Affidavit, at ¶ 5, and Ehrenfeld Cash Collateral Affidavit, **Exhibit H** at p. Debtor 122-123.  Using current net operating income and LGI's underlying assumptions, the valuation under the Stabilized Rent Method is $20,700,000.00.  *See* Schwarzbaum Affidavit, at ¶ 5.

27.    In assessing the Sellout Method, the WFF Appraisal assumes 38 condominium units, average square footage/unit of 1,180 square feet and selling price of $750 sq./ft. which results in a net valuation after selling costs of $31,600,000.00.  *See* Schwarzbaum Affidavit, at ¶ 6 and Ehrenfeld Cash Collateral Affidavit, **Exhibit H** at p. Debtor 148.  There are only 37 units currently available and assuming a sales price of $600/sq. ft., which is a 20% discount to the sales price/square footage assumption in the WFF Appraisal, the valuation under the Sellout Method would be $24,600,000.00.  *See* Schwarzbaum Affidavit, at ¶ 6.

28.    There are approximately $146,000.00 worth of mechanic's liens that were filed outside the preference period (the **"Mechanic Lien Claims"**).  Annexed hereto as Exhibit _ is a chart listing the creditors which hold the Mechanic Lien Claims.  While these Mechanic Lien Claims may decrease the Collateral's equity cushion, there remains a substantial equity cushion even when WFF's Debt is combined with the Mechanic Lien Claims.

**Use of Cash Collateral**

29.    As reflected by the schedule annexed to the Ehrenfeld Cash Collateral Affidavit as **Exhibit J,** rental income from the Collateral averages $130,000.00 a month.  The amount of income the Debtor generates postpetition will remain consistent with its prepetition income.

30.    The prepetition Debtor paid a monthly management fee to the building manager, JBM Estates LLC, of $2,650.00.  The Debtor was also required to pay monthly common charges to Bayard Views Condominium Association (the "**Condo Association**") of approximately $32,000.00.   These ordinary course expenses will remain the same postpetition.  These expenses benefit WFF because they preserve the value of the Collateral, including ensuring  the continuation of the rent payments from the tenants.

31.    In addition to the maintenance costs for the Collateral, the Debtor will use the cash collateral to pay the costs of administering this case, including professional fees.  The Debtor expects to minimize the administration costs by proposing a Chapter 11 plan in the near term and obtaining confirmation of its reorganization plan within 120 days of the bankruptcy filing.

### Requested Relief

32.    The Debtor respectfully requests authorization to use cash collateral pursuant to Bankruptcy Code §§ 105, 361, 363 and pursuant to the terms set forth herein and in the proposed interim order attached as **Exhibit 1** (the **"Interim Order"**).  The Debtor also requests that the Court schedule a final hearing to consider entering a Final Order permitting use of cash collateral.

33.    The Debtor has a critical need to use the cash collateral in order to maintain the value of its condominium units within the Bayard Condominium Complex, which units serve as WFF's primary collateral.   Absent the satisfaction of its maintenance obligations, the Debtor will default on its leases with tenants and endanger the collection of the rents that comprise the cash collateral.   The interests of WFF and other known secured creditors are adequately protected because of the substantial equity cushion.   Accordingly, the Debtor should be authorized to utilize the cash collateral consistent with its proposed budget to satisfy maintenance costs of the Collateral and the administrative costs of maintaining this Chapter 11 case.

## Basis for Relief for Use of Cash Collateral

**I.      Property of the Estate**

34.      Property of a bankruptcy estate consists of all property in which a debtor holds an interest upon the filing for bankruptcy relief.  11 U.S.C. § 541(a)(1).  Specifically, rents, profits, and proceeds derived from property of a debtor's estate are correspondingly property of the estate.  11 U.S.C. § 541(a)(6).  Accordingly, the Collateral, *i.e.*, the Debtor's 37 condominium units, 40 parking spaces and related rental stream and leases, is property of the estate.[3]

**II.      The Requirement to Show Adequate Protection**

35.      Pursuant to Bankruptcy Code § 363(c)(2), a debtor in possession may not use cash collateral without the secured creditor's consent or the court's authorization.  Section 363(c)(3) of the Bankruptcy Code further provides that if the debtor seeks Court authorization for the use of cash collateral, then a hearing must be conducted as to the satisfaction by the debtor of the requirements of § 363(e) of the Bankruptcy Code.  Section 363(e) of the Bankruptcy Code provides that on the request of an entity that has an interest in property proposed to be used by the debtor in possession, the court shall prohibit or condition such use  "as is necessary to provide adequate protection of such interest."

---

[3] The Lease Rent Agreement does not alter that conclusion.  As noted earlier, the Lease Rent Agreement was expressly "made for the purpose of securing" the WFF Loan.  *See* Ehrenfeld Cash Collateral Affidavit, **Exhibit C**, at ¶ 3; *see also Sullivan v. Rossen*, 223 N.Y. 217, 224 (1918) (assignment of rent language supported conclusion that it was a pledge to secure indebtedness, not absolute conveyance); *In re Carmania Corp*. N.V., 154 B.R. 160, 164 (S.D.N.Y. 1993) (same).  Consistent with this, the WFF Mortgage lists the leases and rents as part of the property securing its debt.  *See* Ehrenfeld Cash Collateral Affidavit, **Exhibit A** (WFF Mortgage) at 2-4; *In re 641 Avenue of Americas LP,*  189 B.R. 583, 590-591 (S.D.N.Y. 1995).   Even if there is "absolute assignment" language contained within a mortgage document, courts have noted that the terms of an assignment of rents document (the Lease Rent Agreement) controls.  *In re Kingsport Ventures, L.P.*, 251 B.R. 841, 847 (Bankr. E.D. Tenn 2000) ("To determine whether an assignment of rents is an absolute assignment or a pledge of security, a court must analyze the language and provisions of the assignment . . .  Statements within the assignment that the assignment was intended to secure a debt is strong evidence that the assignments are in fact a pledge of security, even if the assignment is referred to as 'absolute'.").  Additionally, under New York law, a lender is not entitled to collect rents pursuant to an assignment of rents unless there has been a default and the lender obtains possession through entry of possession or by the appointment of a receiver.  *Carmania*, 154 B.R. at 164*; In re Northport Marina Associates*, 136 B.R. 911, 916-917 (Bankr. E.D.N.Y. 1992).  Here as of the Petition Date, a  default was not declared under the WFF Loan, and WFF did not take any steps to obtain possession of the rents.

36.    Bankruptcy Code § 361 provides:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by –

(1) Requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) Providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) Granting such other relief, other than entitling such entity to compensation allowable under 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

37.    Section 361 of the Bankruptcy Code "provides a *non*-exhaustive list of methods for providing adequate protection."  *In re Riverfront Properties, Inc.*, 405 B.R. 570, 574 (Bankr. D.S.C. 2009)[emphasis added]. "Section 361 of the Bankruptcy Code provides examples of what may constitute adequate protection [however] there is no precise definition of the term 'adequate protection' as used in the Bankruptcy Code."  *In re Oligbo*, 328 B.R. 619, 651 (Bankr. E.D.N.Y. 2005).  Accordingly, the existence of adequate protection is always fact-specific and is determined anew on a case-by-case basis. *In re Island Helicopter Corp*., 63 B.R. 515, 521 (Bankr. E.D.N.Y. 1986).

38.    Crucially, where "the creditor is oversecured, the interest in property protected by § 361 is the amount of the debt, not the value of the collateral."  *In re Fortune Smooth (US) Ltd.*, 1993 WL 261478 (Bankr. S.D.N.Y. 1993) at *6; *see In re Megan-Racine Associates*, Inc., 202 B.R. 660, 663 (Bankr. N.D.N.Y. 1996) ("If, as the Debtor alleges, the FDIC is oversecured, it may not be entitled to either cash payments or postpetition liens [i.e. as adequate protection under § 361].  Indeed, where there is a substantial value cushion there may be no need for additional protection."); *In re Lane*, 108 B.R. at 8 ("§ 361 does not contain a definition of adequate protection.  But § 361 certainly does tell us what constitutes lack of adequate protection: a decline in value of the secured creditor's interest in the

property.  We know from § 506(a) that this property interest cannot exceed the allowed amount of the claim."); *see also*, *In re James Wilson Associates*, 965 F.2d 160, 171 (7th Cir. 1992) (Posner, C.J.)  (holding that the Bankruptcy Code does not permit an oversecured lender "to fence off the entire collateral in which it  has an interest so that no other creditor can get at it.  Its only entitlement is to the adequate protection of that interest…he may not paralyze the debtor and gratuitously thwart the other creditors by demanding superfluous security.").

39.    Regardless of its form, the entitlement to and measure of, the adequate protection required in any case is always determined by the extent of diminution in value, if any, in the secured creditor's interest *vis a` vis* the collateral subject to its liens during the course of the bankruptcy case.   *In re 495 Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

40.    Bankruptcy courts have frequently recognized the importance of permitting a debtor in possession to use cash collateral, particularly where, as here, denial of such authority may preclude the possibility of successful reorganization.

> In reviewing application under 11 U.S.C.  § 363 which provides the use of cash collateral, the Court must balance two irreconcilable and conflicting interests.  The holder of a lien on cash collateral must not be left unprotected by unrestricted use of the collateral by the debtor.  However, the purpose of Chapter 11 is to rehabilitate Debtors and generally, access to cash collateral is necessary in order to operate a business.  The equities in each case must be weighted in striking a balance.

*In re Stein*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).  *See also In re Dynaco Corp.*, 162 B.R. 389, 395-396 (Bankr. D.N.H. 1983)(finding that alternative to debtor's use of cash collateral, termination of its business, would doom reorganization and any value to maximize value for all creditors.)

41.    The application of rents to pay necessary maintenance costs of a rent-generating property has consistently been held to constitute adequate protection that satisfies § 363(e).  *See, e.g., In re W. Warren Street Associates, Ltd. Partnership*, 142 B.R. 53, 57 (Bankr. N.D.N.Y. 1992)("[T]he creditor's interest in the rental income generated by the property is adequately protected when a

portion is reinvested in the property for operational expenses and maintenance."); *In re Pine Lake Village Apartment Co.*, 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) ("The protection and maintenance of the plaintiff-mortgagee's collateral…clearly ensures that the plaintiff-mortgagee's investment is adequately protected.").

42.     Additionally, the existence of an "equity cushion", where the value of the collateral exceeds the amount of the claims secured by that collateral, "is the classic form of protection for a secured debt," and "the existence of an equity cushion, standing alone, can provide adequate protection." *In re Mellor,* 734 F.2d 1396, 1400 (7th Cir. 1984); *see, e.g., In re Lafayette Hotel Partnership*, 227 B.R. 445, 453 (S.D.N.Y. 1998)(finding debtor's use of cash collateral to pay attorneys fees and administrative costs acceptable where secured creditor retained its primary lien on the office building and thereby retained a sufficient equity cushion). "Courts have held that a secured creditor is adequately protected where the value of the property is significantly more than the amount of the secured creditor's claim—that is, that an equity cushion adequately protects the secured creditor's interest." *In re Oligbo*, 328 B.R. 619, 651 (Bankr. E.D.N.Y. 2005); *In re Fortune Smooth (US) Ltd.*, 1993 WL 261478 (Bankr. S.D.N.Y. 1993) at *6.  As the bankruptcy court in *In re Fortune Smooth (US) Ltd.*, 1993 WL 261478 (Bankr. S.D.N.Y. 1993) at *6, summarized the law on point: "In cases like this in which the creditor is oversecured, the interest in property protected by §361 is the amount of the debt, not the value of the collateral.  An oversecured creditor is not entitled to adequate protection unless the value of the collateral declines to the point of extinguishing the equity cushion."

43.     Here, the WFF Appraisal establishes that the fair market value of the Collateral is in excess of $21,000,000.00.  *See* Ehrenfeld Cash Collateral Affidavit and Schwarzbaum Affidavit, at ¶¶ 2-6. Thus, the Debtor should be permitted to use the cash collateral in accordance with the proposed budget.

44.     As previously discussed, the interests of WFF and the other known secured creditors are adequately protected because the Collateral is valued well in excess of WFF's Debt and the Mechanic Lien Claims.   Additionally, as set forth in the proposed budget, the cash collateral will be applied to maintain the value of the Collateral, including payment of Court approved bankruptcy administrative fees of the Debtor.   The Debtor expects to minimize the administration costs by proposing a Chapter 11 plan in the near term and obtaining confirmation of a reorganization plan within 120 days of the bankruptcy filing.   During that time period, WFF and the other known secured creditors will be adequately protected due to the equity cushion and the Debtor's proposed use of cash collateral.[4]

### Use of Cash Collateral Pending Final Hearing

45.     As set forth above, it is necessary for the Debtor to use proceeds of the rents in order to pay its maintenance and operating expenses.   The Debtor respectfully requests that the Court enter the Interim Order, substantially in the form attached hereto as Exhibit 1, authorizing the Debtor to use cash collateral in an amount necessary to continue operating, pending a final hearing on this Motion.

46.     Debtor seeks authority to use the cash collateral during the period from the date of the interim hearing until the conclusion of the final hearing, in accordance with the proposed budget attached to the Ehrenfeld Cash Collateral Affidavit.   Accordingly, the Debtor further requests that the Court schedule a final hearing on the Debtor's ability to use the cash collateral in the Chapter 11 case.

### Notice

47.     Notice of this Motion has been given to the Office of the United States Trustee, WFF, Debtor's other known secured creditors, and Debtor's 20 largest unsecured creditors.   In light of the nature of the relief requested, the Debtor submits that the notice provided is sufficient and complies

---

[4] Section 362 (d)(3)(B) of the Bankruptcy Code requires a single asset real estate debtor to commence monthly payments equal to the non-default interest rate on the mortgage, however, that obligation is not enforceable until 90 days after the order for relief has been entered.   *See*, §362 (d)(3)(B); *In re Hope Plantation Group, LLC*, 393 B.R. 98, 102 (Bankr.D.S.C. 2007) ("The debtor is entitled to his 'breathing period' of 90 days, . . . . ").

with the requirements of §363(e) and Bankruptcy Rule 4001 and that no additional notice need be given

for entry of the proposed Interim Order.

48.    No prior application for the relief requested herein has been made by Debtor to this or

any other Court.

**WHEREFORE**, the Debtor respectfully requests that this Court: (i) enter an Interim Order

substantially in the form of the proposed order attached hereto as **Exhibit 1**, authorizing the immediate

use of the cash collateral in the manner and estimated amounts set forth herein and in the proposed

budget and (ii) schedule a final hearing to consider entering the Final Order authorizing Debtor to use

the cash collateral in the manner and estimated amounts set.

Dated: December 9, 2009                    **PORZIO, BROMBERG & NEWMAN, P.C.**


By:    /s/John S. Mairo
       John S. Mairo, Esq.


       (Mail to) P.O. Box 1997, Morristown, NJ  07962-1997
       (Delivery to) 100 Southgate Pkwy, Morristown, NJ 07960
       Telephone (973) 538-4006
       -and-
       **MORITT HOCK HAMROFF & HOROWITZ LLP**
       400 Garden City Plaza
       Garden City, NY  11530
       Telephone (516) 873-2000
       Leslie A. Berkoff, Esq.
       Lia M. Pistilli, Esq.