HERRICK, FEINSTEIN LLP
*Attorneys for W Financial Fund, LP*
Andrew C. Gold
Hanh V. Huynh
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
agold@herrick.com
hhuynh@herrick.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re                                                                    Chapter 11

20 BAYARD VIEWS, LLC,                                    Case No. 09-50723 (ESS)

        Debtor.
-------------------------------------------------------x

## RESPONSE OF W FINANCIAL FUND, LP TO MOTION BY 20 BAYARD VIEWS, LLC: (1) OBJECTING TO AND REQUESTING REDUCTION OF W FINANCIAL FUND, LP'S PROOF OF CLAIM; AND (2) SEEKING TO REQUIRE W FINANCIAL FUND, LP TO DETAIL ITS FEES/COSTS/CHARGES AND ESCROW FUND

W Financial Fund, LP ("WFF"), by its counsel Herrick, Feinstein LLP, submits this response (the "Response") to the motion (the "Motion") [Docket No. 74] of 20 Bayard Views, LLC (the "Debtor") (i) objecting to and requesting reduction of the proof of claim filed by WFF, and (ii) seeking to require WFF to detail its fees/costs/charges and escrow fund, and respectfully represents as follows:

### PRELIMINARY STATEMENT[1]

1. The Debtor's objection to WFF's claim for Pendency Interest at the Default Rate is entirely premised on the fallacy that a pre-petition default under the Loan Documents has not occurred. On the contrary, the Loan Documents make clear that the Debtor's

---

[1] Capitalized terms not defined in the Preliminary Statement shall have the meaning ascribed to them below.

failure to timely pay its interest payment due November 1, 2009, constitutes an Event of Default thereunder. This Event of Default occurred prior to the Petition Date, and thus the Debtor's presumption that WFF relies solely on the filing of the Debtor's bankruptcy case as WFF's basis for asserting the accrual of post-petition interest at the Default Rate is incorrect.

2. In any event, even if WFF relied solely on the Debtor's bankruptcy filing as an Event of Default triggering the Default Rate, the application of the Default Rate would be permissible because WFF is not relying on an unenforceable *ipso facto* clause. The Debtor's argument regarding the unenforceability of *ipso facto* clauses ignores a fundamental legal principle: the Bankruptcy Code prohibition against enforcing rights based upon *ipso facto* clauses pertains only to *executory* contracts and unexpired leases; the Loan Documents at issue are not executory contracts.

3. Lastly, WFF has provided Debtor's counsel the requested information regarding legal fees, expenses, charges and other costs included in the WFF Claim, as well as information regarding any funds of the Debtor held by WFF in escrow. Accordingly, there is no basis for the Debtor's continued objection to the WFF Claim with respect to the disclosure of fee/costs/charges and escrow funds.

## BACKGROUND

### The WFF Loan

4. The Debtor owns 37 unsold condominiums located at 20 Bayard Street, Brooklyn, New York (the "Units") and associated storage units and parking spaces in a 62-unit residential building known as the Bayard Condominium Complex. The development of the Bayard Condominium Complex was financed by a loan from iStar Loans, LLC ("iStar"). When

the initial sales of units dried up, forcing the Debtor to rent the unsold units, iStar required the Debtor to refinance its loan (or otherwise be in default) because iStar would not agree to lend where its collateral consisted of rented condominium units.

5. Because of the tight credit markets and the fact that the collateral would consist of unmarketable rental units, the Debtor was unable to obtain institutional permanent financing in an amount sufficient to repay iStar in full. As a result, the Debtor sought short-term financing arrangements that would allow the Debtor time to find a conventional lender. Following negotiations with several lenders, the Debtor eventually agreed on a loan with WFF because WFF offered the Debtor comparatively favorable terms. The loan to the Debtor was intended as a bridge loan,[2] and the terms of WFF's loan to the Debtor were below market for bridge loans at the time of origination.

6. In October 2008, WFF and the Debtor entered into that certain Agreement of Consolidation, Extension and Modification of Mortgage (the "Mortgage"), whereby WFF replaced iStar as the Debtor's lender. A copy of the Mortgage is annexed as Exhibit A to the Affidavit of David Heiden In Support of the Response (the "Heiden Affidavit"), filed contemporaneously herewith. In connection with the Mortgage, the Debtor, as maker, entered into that certain Consolidated, Amended and Restated Note in the principal amount of $17,400,000 (the "Note," and together with the Mortgage and other related documents, the "Loan Documents"). A copy of the Note is annexed as Exhibit B to the Heiden Affidavit. The maturity date on the Note was October 13, 2009. The Note is secured by, among other things,

---

[2] While banks tend to make longer term loans (typically 5 years or more) on cash-flowing, stabilized properties, bridge lenders make short-term loans on transitional (and in this case vacant and non-cash flowing) properties designed to help the borrower get from point A to point B (*i.e.*, once cash flow has been established, the borrower typically refinances with a bank at a lower interest rate). As a bridge lender, WFF makes only short term, one-year (or less) loans at 11% or 12% interest, with six or twelve month extension options for a fee.

3

the Units and the storage units and 40 parking spaces located at the Bayard Condominium Complex, together with the related rents and leases (collectively, the "Collateral"). *See* Heiden Aff. ¶ 2.

**The Defaults Under The Mortgage And Note**

7. Among other things, the following constitute events of default (each an "Event of Default") under the terms of the Mortgage, without the need for WFF to declare an Event of Default or provide notice to the Debtor of the occurrence of an Event of Default: (i) if any portion of the debt is not paid within five (5) days after due and payable; and (ii) if the Debtor files a petition for bankruptcy. *See* Heiden Aff. ¶ 3; Mortgage § 21. Upon the occurrence of an Event of Default, the Debtor must pay interest on the debt at the default rate of 24% (the "Default Rate"). *See* Heiden Aff. ¶ 3; Mortgage § 22.

8. Under the terms of the Note, interest on the principal amount is due and payable in arrears on the first day of each month, with interest calculated at twelve (12%) percent per annum. *See* Heiden Aff. ¶ 4; Note pg. 1. The Note further provides that, if the Debtor fails to make interest payments by the fifth day of the month, *or* upon the occurrence of an Event of Default under the Loan Documents, interest on the principal amount is calculated at the Default Rate. *See* Heiden Aff. ¶ 4; Note pg. 3.

9. Just prior to the maturity of the Note, the Debtor requested a three-month extension of the maturity date of the Note.[3] WFF agreed to an extension and the parties entered

---

[3] Through an omission, the Loan Documents did not provide for any extension of the term of the loan. The loan application letter between WFF and the Debtor, however, did provide two options to renew for six months each, at the same interest rate for a 1% extension fee. Although the Loan Documents did not reflect any right to extend the maturity of the loan, WFF accommodated the Debtor's request for an extension, and in fact, further agreed to a shorter three month extension on the same economic terms (1/2% for three months, rather than 1% for six months). *See* Heiden Aff. ¶ 5.

into that certain Loan Extension Agreement in October 2009, pursuant to which the maturity date of the Note was extended to January 13, 2010, in exchange for the Debtor's payment to WFF of an extension fee of .5%, or $84,875.36. The terms of the Loan Documents were not otherwise modified and remain in full force and effect. *See* Heiden Aff. ¶ 5.

10. Following the parties' entry into the Loan Extension Agreement, the Debtor failed to timely pay the interest payment due on November 1, 2009.[4] Accordingly, pursuant to the terms of the Note and Mortgage, the Debtor's failure to timely pay the November 1, 2009 interest payment constitutes an Event of Default. *See id.*

**The Debtor's Bankruptcy Case and the WFF Claim**

11. On December 4, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate and manage its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed.

12. On January 22, 2010, the Debtor filed an application to establish a bar date for the filing of proofs of claim against the Debtor. By order dated February 26, 2010, the Court established April 1, 2010 (the "Bar Date") as the last date by which creditors were to file their proofs of claim against the Debtor.

13. Prior to the Bar Date, WFF timely filed a proof of claim (the "WFF Claim"), designated on the Debtor's claims register as claim number 11, in which WFF asserts a

---

[4] WFF did not receive the interest payment due on November 1, 2009 until November 9, 2009. *See* Heiden Aff. ¶ 6.

secured claim against the Debtor in an amount of no less than $18,163,756.85, plus interest, fees and costs thereon.[5]

**The Debtor's Objection to the WFF Claim**

14. On April 19, 2010, the Debtor filed the Motion objecting to and requesting a reduction of the WFF Claim insofar as WFF asserts interest owed from the Petition Date through March 23, 2010, and thereafter, up to the effective date of the Debtor's plan of reorganization ("Pendency Interest") at the 24% Default Rate. The Debtor requests that the Pendency Interest for the WFF Claim be calculated at the 12% non-default contract rate.

15. Relying on its belief that "[a]s of the Petition Date, no event of default existed under the WFF Loan," *see* Motion ¶ 9, the Debtor assumes that the Debtor's bankruptcy filing is the sole basis asserted by WFF as an Event of Default triggering the application of the Default Rate. The Debtor alleges that section 365(e)(1) of the Bankruptcy Code prohibits WFF from charging Pendency Interest at the Default Rate based on the Debtor's bankruptcy filing as an Event of Default. The Debtor further contends that the Default Rate is "exorbitant." *See* Motion ¶ 23.

**RESPONSE**

16. WFF requests that the court deny the Debtor's request to reduce the WFF Claim. The basis for the Debtor's request is both factually and legally incorrect. As a factual matter, a pre-petition Event of Default **did** occur under the Loan Documents, which permits WFF to charge interest at the Default Rate. As a legal matter, even if WFF were to rely on the Debtor's bankruptcy filing as an Event of Default requiring the Debtor to pay interest at the

---

[5] This is the amount owed as of the date of WFF's Proof of Claim. Since that date, interest continues to accrue on the principal amount owed.

Default Rate (what is known as an *ipso facto* clause), the Bankruptcy Code and the case law do not prohibit WFF from enforcing the *ipso facto* clause. Moreover, application of the Default Rate is appropriate in this case because (i) the parties contracted for the Default Rate; (ii) the Default Rate is reasonable and not a penalty; and (iii) the Debtor is solvent.

I. **The Default Rate Applies Because
There Was A Pre-Petition Event of Default**

17. The Debtor's objection to the calculation of Pendency Interest in the WFF Claim at the Default Rate is premised entirely on the mistaken belief that no pre-petition Event of Default has occurred. In fact, as described above, the Debtor's failure to pay the November 1, 2009, interest payment by November 5, 2009, constitutes an Event of Default. Accordingly, WFF's calculation of interest at the Default Rate is pursuant to the terms of the Loan Documents and appropriate under the circumstances.

18. The Debtor's Motion should be denied on this basis alone, because the Debtor only argues that WFF's use of the Default Rate is improper based on the lack of a pre-petition Event of Default.

II. **The Default Rate Applies Even If WFF Asserts
The Debtor's Bankruptcy Filing As The Event Of Default**

19. Notwithstanding the fallacy of the basis for the Debtor's argument, even if the Court were to ignore that a pre-petition Event of Default has occurred, the plain language of the applicable Bankruptcy Code statute and the relevant case law prove the Debtor wrong as well. The Debtor quite confidently states that WFF's reliance on the Debtor's bankruptcy filing as an Event of Default "is fatally flawed, for a default by the Debtor, if at all, is based on an unenforceable *ipso facto* clause." *See* Motion ¶ 16. The Debtor, however, has put the cart before

7

the horse: the Loan Documents must first be found to be an executory contract before the *ipso facto* clause contained therein is found to be unenforceable. In this case, as with almost every note and mortgage, the Loan Documents are not executory contracts, and thus not subject to the Bankruptcy Code prohibition against *ipso facto* clauses.

A. <u>Section 365(e)(1) Applies Only To Executory Contracts</u>

20. The plain language of section 365(e)(1) of the Bankruptcy Code makes clear that the prohibition against enforcing *ipso facto* clauses applies only to executory contracts and unexpired leases:

> Notwithstanding a provision in an ***executory contract or unexpired lease***, or in applicable law, an ***executory contract or unexpired lease*** of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on -- . . . the commencement of a cause of action under this title.

11 U.S.C. § 365(e)(1) (emphasis added). Section 365(e)(1) unambiguously and expressly refers to the unenforceability of *ipso facto* provisions in *executory* contracts, and absent a reading of the statute that would lead to absurd results, that express reference is not to be ignored. *See, e.g., Lamie v. United States Trustee*, 540 U.S. 526 (2004).

21. Further, the case law in this and other circuits makes clear that the threshold issue for determining the applicability of section 365(e)(1) is whether the instrument in question is an executory contract or unexpired lease. *See In re Lehman Brothers Holdings, Inc.*, 422 B.R. 407, 415 (Bankr. S.D.N.Y. 2010) (stating that before the court could determine whether section 365(e)(1) applied, the court had to first determine whether the documents in question were executory contracts); *see also In re Garrison-Ashburn, L.C.*, 253 B.R. 700, 708 (Bankr.

8

E.D. Va. 2000) ("The threshold issue [to determine the applicability of Section 365] is whether there is an executory contract in this case.").

22. Where there is no executory contract, courts have held that the prohibition against enforcing rights pursuant to *ipso facto* clauses under section 365(e)(1) does not apply. *See In re Garrison-Ashburn, L.C.*, 253 B.R. at 708 ("[T]here is no executory contract, [therefore] the provisions § 365(c) and (e) are not applicable . . . ."); *In re F.B.F. Indust., Inc.*, 165 B.R. 544, 549 (E.D. Pa. 1994) ("§ 365(e)(1) which nullifies the effect of *ipso facto* clauses is simply not applicable here because the [promissory note] is not an executory contract."); *In re Zenith Laboratories, Inc.*, 104 B.R. 667, 672 (Bankr. D.N.J. 1989) ("The court has determined that actions springing from the letter of credit are not executory contracts, and thus the *ipso facto* language of Code Section 365 also does not apply . . . .").

23. Therefore, in order for section 365(e)(1) to apply in this case, the Loan Documents first must be found to be an executory contract.

### B. The Mortgage is Not an Executory Contract

24. The Bankruptcy Code does not define the term "executory contract," but courts in this and other Circuits have adopted the Countryman definition of an executory contract as one on which performance remains due to some extent on both sides. *See e.g., In re Lehman Brothers Holdings, Inc.*, 422 B.R. at 415.

25. Under the Countryman definition, notes and mortgages typically are not considered executory contracts, because the only performance remaining is repayment. *See In re N. Am. Dealer Group, Inc.*, 16 B.R. 996, 1000 (Bankr. E.D.N.Y. 1982) ("It is apparent . . . that a

9

mortgage on real property is not an executory contract . . . .") (quoting Countryman); *see also First Nationwide Bank v. Brookhaven Realty Assocs.*, 223 A.D.2d 618 (holding that mortgages are not executory contracts and therefore section 365(e) does not apply).

26. It cannot fairly be disputed in this case that the Mortgage is a non-executory contract. The Mortgage is a typical mortgage, and there are no obligations remaining on either side except for the Debtor's repayment of the debt. Accordingly, the Bankruptcy Code does not prohibit the *ipso facto* provision contained in the Mortgage, and if WFF were to rely on the *ipso facto* clause as an Event of Default triggering the Default Rate, such a reliance would be permissible.

C. **This Case Is Distinguishable From *In re Bownetree***

27. The Debtor relies substantially on the case of *In re Bownetree, LLC*, 2009 Bankr. LEXIS 2295 (Bankr. E.D.N.Y. July 24, 2009), in support of its Motion. The facts of *Bownetree*, however, are easily distinguishable from this case. In *Bownetree*, the lender, Kennedy Funding, Inc. ("Kennedy") extended a loan in the principal amount of about $7 million to the debtor under a note secured by a mortgage. *In re Bownetree, LLC*, 2009 Bankr. LEXIS 2295 at *1. The loan documents stated that a bankruptcy filing by the debtor would trigger a default rate of interest on the loan. *Id.* Importantly, the lender only disbursed part of the loan at closing, with the remainder retained by the lender as "holdbacks" to be funded in the future. *Id.* Therefore, performance by the lender was remaining under the loan. Accordingly, the *Bownetree* court noted that "[t]he modification of rights under an *executory contract* may not be effected" solely due to a bankruptcy filing. *Id.* at *2 (emphasis added). Therefore, the *Bownetree* court implicitly held that the loan documents at issue in that case were executory contracts.

28. Here, WFF and the Debtor entered a traditional note and mortgage whereby WFF disbursed the entirety of funds to the Debtor at closing, leaving WFF with no further obligations under the Loan Documents. This is exactly the type of mortgage loan Countryman and the courts have held to be non-executory. So, in the first instance, the *Bownetree* case involved an executory contract, and this case does not.

29. The *Bownetree* court also refused to impose the default interest rate on the debtor because accrual of interest at the non-default contract rate would return the lender in a position of status quo under the circumstances of that case, which are vastly different than the circumstances here. The court recognized the inequity of awarding Kennedy the default rate in *Bownetree* based on these egregious facts:

　　i. Although the principal amount of the loan was about $7 million, Kennedy held back $2.9 million for future funding, which were never disbursed.

　　ii. At closing, the debtor only received $2.5 million in loan proceeds, because Kennedy received the remaining $1.6 million for prepaid interest and professional fees.

　　iii. Under the loan agreement, because Kennedy received prepaid interest and fees, the debtor's obligation to make regular payments did not start until *well after* the debtor filed bankruptcy.

　　iv. Kennedy had established a reserve for pre-paid interest of $498,000 which Kennedy was depleting at twice the rate after it applied the default interest rate.

　　v. And most importantly, under the debtor's chapter 11 plan and sale plan, Kennedy's claim would either be paid in full or a debtor-related party would assume the Kennedy mortgage lien without modification of the loan. In addition, Kennedy would get closing costs and legal fees.

30. Even a cursory review of the *Bownetree* case should dispel any notion that it is "on all fours" with this case, as the Debtor suggests. The WFF loan to the Debtor bears no

resemblance to the Kennedy loan, and the treatment of the WFF Claim in the Debtor's proposed plan of reorganization is a far cry from the treatment of the Kennedy claim in the *Bowntree* case. The Debtor is attempting to cram down WFF at 3.5% over 7 years; in *Bownetree*, the debtor paid Kennedy in full and left its loan unmodified.

### III. WFF Is Entitled To Pendency Interest At The Default Rate Provided In The Note

31. The Debtor has failed to articulate any credible reason why WFF would not be entitled to Pendency Interest at the Default Rate. The Default Rate is not punitive and is enforceable under New York law. Moreover, section 506(b) of the Bankruptcy Code specifically allows for the accrual of interest on oversecured claims after the filing of a bankruptcy petition. The plain language of section 506(b) requires the Court to apply the enforceable Default Rate. Even if the Court were to review the proper interest rate to apply to Pendency Interest, the Default Rate would be appropriate. Indeed, "[t]he developing consensus is a presumption in favor of the contract default rate." *In re Vest Assocs.*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998). If the debtor is solvent, "there is much more leeway to grant the default rate because other creditors will not be injured." *Id.* at 703.

#### A. The Default Rate Provided In The Note Is Enforceable Under New York Law

32. The express terms of the Note provide that a higher rate of interest is imposed on the Debtor in the event of default. It is undisputed that "contractual provisions providing for an increased interest rate on default are enforceable under New York law." *In re Chateaugay*, 150 B.R. 529, 542 (Bankr. S.D.N.Y. 1993); *see also, Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959).

33. New York courts have upheld default rates similar to the default rate provided in the Note. *See Bruce v. Martin*, 845 F.Supp. 146 (S.D.N.Y. 1994) (default rate of 24.9% is allowable); *Emery v. Fishmarket Inn of Granite Springs, Inc.*, 173 A.D.2d 765, 570 N.Y.S.2d 821, 823 (2 Dept. 1991) (upholding default interest of 25%). Thus, the Default Rate provided in the Note (24%) is not a penalty in that it compensates WFF for costs incurred as a result of the Debtor's default and is permitted under New York law.

B. Section 506(b) Of The Bankruptcy Code Does Not Restrict The Application Of The Contractual Default Rate

34. A number of courts have recognized that the literal language of section 506(b) prohibits a bankruptcy court from reviewing an otherwise enforceable default rate of interest, since the term "reasonable" does not modify "interest" in section 506(b). *See, e.g., In re Schaumburg Hotel Owner Ltd. P'ship*, 97 B.R. 943, 950 (Bankr. N.D. Ill. 1989) (holding that court should allow contractually bargained for default interest rate under section 506(b) without examining the reasonableness of the rates provided they fall within the range of acceptable rates); *In re Skyler Ridge*, 80 B.R. 500, 511 (Bankr. C.D. Cal. 1987) (noting that section 506(b) provides no federal inhibition on contractual default interest rates); *see also In re Martindale*, 125 B.R. 32 (Bankr. Idaho 1991); *In re Wathy*, 134 B.R. 561 (Bankr. S.D. Miss. 1991); *In re Consolidated Operating Partners*, 91 B.R. 113 (Bankr. D. Colo. 1988).

35. In fact, the United States Supreme Court in *United States v. Ron Pair*, supports this position where it states that "recovery of post-petition interest [under §506(b)] is unqualified." *United States v. Ron Pair Enters. Inc.*, 489 U.S. 235 (1989).

36. As demonstrated above, the Default Rate provided in the Note is enforceable under New York law. As such, WFF's entitlement to the Default Rate contracted for

by the parties is not subject to review under section 506(b), which does not permit a bankruptcy court's review of an enforceable default rate.

C. The Default Rate Is Reasonable Under Section 506(b) Of The Bankruptcy Code

37. Should the Court decide that the default interest rate is subject to review under section 506(b) of the Bankruptcy Code, WFF is able to demonstrate that the Default Rate is reasonable. Courts analyzing the enforceability and reasonableness of default interest provisions generally look at (i) whether the default rate provided in the contract is so usurious and unconscionable that it constitutes an unenforceable 'penalty', and (ii) whether the equities of the case warrant the allowance of default interest. *See e.g. In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546 (Bankr. S.D.N.Y. 1998).

i. The Default Rate Is Reasonable
And Compensatory And Is Not A "Penalty"

38. Only a default interest rate that is inordinately high relative to the non-default rate will be found to be a penalty. *See id.* at 551-552. In *Liberty Warehouse*, the United States Bankruptcy Court for the Southern District of New York ruled that a chapter 11 debtor was required to pay a secured creditor interest at the default rate in paying off such creditor's claim in full through a plan of reorganization. *See Id.* In so ruling, the Court held that a default rate of 22.8% was not as high as those that are construed to be a penalty and, further, the spread between the non-default interest rate and the default interest rate (8.8%) was smaller than the differential present in most cases where courts have found the default rate to constitute a penalty. *See id.* (citing *In re Hollstrom, D.C.*, 133 B.r. 535, 539-540 (Bankr. D. Colo. 1991), which involved a 36% default rate of interest that was deemed a penalty where non-default rate was

12%); *In re White*, 88 B.R. 498, 511 (Bankr. D. Mass. 1988) (48% default rate of interest was deemed penalty where non-default rate of interest was 16.5%).

39. The Default Rate provided in the Note is similar to the default interest rates approved by courts in the above cases, and substantially less than the default interest rates the courts have deemed a penalty. As such, the default rate is reasonable under section 506(b) of the Bankruptcy Code.

### ii. WFF Is Entitled To The Default Rate

40. In allowing a secured creditor's claim for default interest *and* a yield maintenance premium, Chief Judge Craig in *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122 (Bankr. E.D.N.Y. 2002) (J. Craig), cited approvingly to the reasoning in *In re Vest* of a presumption in favor of the contract default rate, and noted that the default interest rate in that case was within the range of default rates that have been allowed under section 506(b). Likewise, as noted above, the court in *Liberty Warehouse* granted pendency interest at the default rate of almost 23% (from a pre-default rate of 14%) because the debtor was solvent and unsecured creditors would receive a distribution. *In re Liberty Warehouse Ltd. P'ship*, 220 B.R. 546 (Bankr. S.D.N.Y. 1998).

41. In fact, as one court has held, a "solvent Debtor's...filing of a bankruptcy petition to avoid a contractual default rate of interest" can not be allowed because "it would be inequitable and inappropriate to deny a creditor's right to interest at the default rate, particularly where the debtor was solvent and knowingly bargained for the terms of his contract." *In re 139-141 Owners Corp.*, 313 B.R. 364, 369 (Bankr. S.D.N.Y. 2004) (citing *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959)).

42. In this case, the Debtor is solvent and the award of Pendency Interest at the Default Rate will still result in a distribution to creditors. The Debtor will point to the fact that, under its chapter 11 plan, general unsecured claims will be paid at 7% if Pendency Interest on the WFF Claim is calculated at the Default Rate, and at 50% if calculated at the non-default contract rate of 12%. The Debtor's position, however, fails to take into account that, while the distribution to general unsecured creditors would decrease to 7%, the Debtor's equity interest holders would retain the same interest in the Debtor whether the WFF Claim includes Pendency Interest at the Default Rate or the contract rate. In other words, awarding WFF the Default Rate on its interest will affect the distribution to unsecured creditors only if the Debtor seeks to protect the equity interest holders at the expense of general unsecured creditors. That should not be a reason to prevent WFF from realizing the benefit of its bargain.

For all the foregoing reasons, WFF respectfully requests that the Court deny the Motion and grant WFF such other and further relief as the Court deems just and proper.

Dated: New York, New York
May 21, 2010

HERRICK, FEINSTEIN LLP
*Attorneys for W Financial Fund, LP*

By: ___/s/ Andrew C. Gold___
    Andrew C. Gold
    Hanh V. Huynh
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
agold@herrick.com
hhuynh@herrick.com