**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
Morristown, NJ 07960
Attorneys Appearing
John S. Mairo, Esq.
jsmairo@pbnlaw.com
Robert M. Schechter, Esq.
rmschechter@pbnlaw.com

Attorneys for the Debtor and Debtor-in-Possession

**UNITED STATE BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>20 BAYARD VIEWS, LLC,<br><br>        Debtor. | Case No. 09-50723 (ESS)<br><br>Hon. Elizabeth S. Stong<br><br>Chapter 11 |

**REPLY TO W FINANCIAL FUND, LP'S RESPONSE TO MOTION BY 20 BAYARD VIEWS, LLC: (1) OBJECTING TO AND REQUESTING REDUCTION OF W FINANCIAL FUND, LP'S PROOF OF CLAIM; AND (2) SEEKING TO REQUIRE W FINANCIAL FUND, LP TO DETAIL ITS FEES/COSTS/CHARGES AND ESCROW FUND**

      20 Bayard Views, LLC (the "Debtor"), by its counsel Porzio, Bromberg & Newman, P.C., submits this reply (the "Reply") to the W Financial Fund, LP ("WFF") response (the "Response") to the Debtor's motion: (1) objecting to and requesting reduction of WFF's proof of claim; and (2) seeking to require WFF to detail its fees/costs/charges and escrow fund (the "Motion"), and respectfully represents as follows:

**PRELIMINARY STATEMENT**

      1.      This Reply is submitted to clarify two central points of contention raised by WFF in its Response and to reaffirm the Debtor's position that WFF's Pendency Interest[1] should <u>not</u> be calculated at the 24% Default Rate. In its Response, WFF has asserted for the first time that

---
[1] Capitalized terms not otherwise defined shall have the meaning ascribed to such term in the Motion.

1372593

there was a default in November 2009 (this assertion was likely made because WFF has realized it cannot rely upon the Debtor's bankruptcy filing as a default); however, as demonstrated by WFF's past conduct and inconsistent certified filings in State Court and this Court, the 24% Default Rate was not in effect at the time of the Debtor's bankruptcy filing.  Additionally, despite WFF's assertion that the threshold issue for assessing the enforceability of *ipso facto* clauses (or bankruptcy-default clauses) is determining whether the underlying agreement is an executory contract, various bankruptcy courts have and continue to invalidate such bankruptcy-default clauses contained in non-executory contracts because these clauses hamper a debtor's ability to obtain a "fresh start" and directly contradict the spirit and purposes of the Bankruptcy Code.  Accordingly, even if the WFF Loan is considered non-executory (which the Debtor is not conceding), WFF cannot rely upon the Debtor's bankruptcy filing as the event entitling it to charge its 24% Default Rate.

2.  Finally, aside from there being no enforceable default for attempting to impose the 24% Default Rate and WFF's own documents evidencing that the 24% Default Rate was not in effect on the Petition Date, the caselaw and equities support the conclusion that WFF's Pendency Interest should be calculated at no more than the already generous 12% Contract Rate -- which rate more than adequately compensates WFF for the time period between the bankruptcy filing date and the effective date of the Debtor's proposed Chapter 11 Plan.  WFF's legal costs through April 2010 are over $175,000.00, which amount will be added to WFF's claim and effectively cover the "cost" to WFF of this bankruptcy case.[2]  Moreover, in weighing

---

[2] WFF provided the Debtor with a figure of approximately $175,000.00 for its legal fees and expenses through April 30, 2010, as well as information on the Debtor's funds being held in escrow.  The Debtor notes, however, that WFF's legal fees and expenses were not detailed and no supporting documents were provided.  Accordingly, before this Court can find that such fees, costs and charges are reasonable under Section 506(b), WFF must provide the Court and parties in interest with detail and supporting documents.

2

1372593

the equities, the Court should be mindful that the interest payments at the 12% Contract Rate amount to approximately $170,000.00 per month and the Debtor's monthly cash flows, both pre-petition and post-petition, have never been sufficient to pay that amount, which is a primary reason the Debtor sought bankruptcy protection. Consequently, in proposing a feasible reorganization plan, the Debtor's proposed Chapter 11 Plan provides for a better distribution to its general unsecured creditors if WFF's Pendency Interest is calculated at the 12% Contract Rate as opposed to the stifling 24% Default Rate (which amounts to a monthly interest charge of approximately $340,000.00).

## RELEVANT ADDITIONAL FACTUAL BACKGROUND[3]

A. *Relevant WFF Loan Provisions*

3. The WFF Loan provides that an event of default ("Event of Default") shall occur if (i) any portion of the debt is not paid within 5 days after same is due and payable; and (ii) the Debtor files a petition for bankruptcy (the "Bankruptcy-Default Clause"). *See* Motion, **Attachment 1,** Exhibit A (WFF Mortgage), § 21(a) and (g). Under the terms of the WFF Note, interest on the principal amount is due and payable in arrears on the first day of each month. *See* Motion, **Attachment 1**, Exhibit B (WFF Note), p.1.

4. The WFF Mortgage permits WFF to charge a late fee for any payments not made within five days of when due (the "Late Fee"). *See* Motion, **Attachment 1**, Exhibit A (WFF Mortgage), § 25. The WFF Mortgage provides that the Late Fee is "to defray the expense incurred by [WFF] in handling and processing such delinquent payment and to compensate [WFF] for the loss of the use of such delinquent payment, …" *Id.*

---

[3] The Debtor incorporates by reference the background of facts presented in the Debtor's Motion [Document No. 74].

B. *WFF's Attorneys Fees and Escrow Fund Management*

5. In an email from WFF's H. Huynh to Debtor's J. Mairo, dated May 20, 2010, WFF provided a chart detailing the activity in the tax escrow since October 21, 2008 (the "WFF Tax Escrow Chart"). True copies of the email and WFF Tax Escrow Chart are annexed as **Exhibit A** to the Affidavit of John J. Mairo ("Mairo Affidavit") in support of this Reply.

6. As of the Petition Date, there was approximately $3700 in the tax escrow. After the Petition Date, the tax escrow was reduced by a property tax payment to New York City for $2,347.30. *See* Mairo Affidavit, **Exhibit A** (copy of WFF Tax Escrow Chart).

7. In an email from WFF's H. Huynh to Debtor's J. Mairo, dated May 21, 2010, WFF advised that its legal fees were $173,840.00 and expenses were $3,065.57 through April 30, 2010 (the "WFF Legal Fees/Expenses Email"). A copy of the WFF Legal Fees/Expenses Email is annexed to the Mairo Affidavit as **Exhibit B**.

C. *WFF's Inconsistent Positions*

(i) *The December 1, 2009 Invoice*

8. On November 1, 2009, the Debtor needed to submit its monthly interest payment of approximately $170,000.00. The Debtor was late with this monthly payment, and the funds were not received by WFF until November 9, 2009. *See* Affidavit of WFF's D. Heiden dated May 21, 2010, submitted in support of Response (the "Heiden May 21, 2010 Bankruptcy Court Affidavit"), ¶ 6.

9. In WFF's invoice to the Debtor dated December 1, 2009 (the "December 1, 2009 Invoice"), which is annexed as **Exhibit C** to the Mairo Affidavit, WFF added the Late Fee to be paid with the Debtor's December 2009 monthly payment and continued to accrue and charge interest at the 12% (non-default) Contract Rate.

4

(ii) *WFF's Proof of Claim dated March 24, 2010 (Certified By D. Heiden)*

10. On March 24, 2010, WFF submitted its proof of claim ("Proof of Claim" or "Claim") against the Debtor—which was certified by David Heiden, the Managing Member of WFF [Claim No. 11]. *See* Mairo Affidavit, attaching the Rider to the Proof of Claim as **Exhibit D**. As methodically outlined in paragraph 3 to the Rider attached to the Proof of Claim, WFF had calculated interest at the 12% Contract Rate up to and including one day before the Petition Date. *Id.*, ¶ 3. The 24% Default Rate was imposed only on the principal amount due from the Petition Date going forward. *Id.* There is <u>no</u> <u>mention</u> of a November 2009 Event of Default.

(iii) *Heiden Affidavit in Support of State Court Order and Judgment, dated May 13, 2010*

11. In January 2010, WFF (along with a co-plaintiff) moved before the Supreme Court of the State of New York—Nassau County for an order directing judgment against the guarantors (the "Guarantors") of the WFF Loan (the "State Court Action").[4] The State Court Action was assigned to the Honorable Timothy S. Driscoll.

12. On April 28, 2010, Judge Driscoll issued a decision concluding that WFF (and the co-plaintiff) would be to judgment against the Guarantors for a sum consistent with the governing guaranty. Judge Driscoll, however, could not "definitively establish" WFF's entitlement to interest thereon, and directed that an evidentiary hearing be held to determine such interest, along with other fees and charges.

13. On May 13, 2010 (about three weeks ago), WFF's David Heiden submitted an Affidavit in Support of WFF's proposed order and judgment (the "Heiden May 13, 2010 State Court Affidavit"), asserting that no evidentiary hearing was required or necessary because the

---

[4] The Debtor notes that the State Court Action is the underlying basis of its Adversary Complaint commenced on May 24, 2010 (Adv. Pro. No. 10-01112 (ESS)) and the Debtor's Motion to Impose the Automatic Stay filed on May 25, 2010 (Document No. 101).

5

interest amount was "clearly quantifiable and certain." *See* Mairo Affidavit, attaching the Heiden May 13, 2010 State Court Affidavit as **Exhibit E**, ¶ 7. Referring to the WFF Note, Mr. Heiden affirmed that the 12% Contract Rate was in effect <u>up until *January 13, 2010*</u>, the extended maturity date of the WFF Note, and more than four (4) weeks post-petition. *Id.*, ¶ 11, and Exhibit E (WFF spreadsheet - - showing amount due and owing WFF). Thus, consistent with the December 1, 2009 Invoice and the Proof of Claim, the Heiden May 2010 State Court Affidavit makes <u>no</u> mention of a November 2009 Event of Default.

## REPLY ARGUMENT

### I. 24% Default Rate Was Not In Effect On The Petition Date And WFF Is Estopped From Arguing Otherwise

14. Although WFF would like this Court to believe that an Event of Default occurred pre-petition and that the 24% Default Rate was in effect on the Petition Date, the conduct and documents of WFF plainly show otherwise. The December 1, 2009 Invoice and the Proof of Claim (certified by M. Heiden) evidence that WFF did not believe an Event of Default occurred in November 2009. Indeed, the December 1, 2009 Invoice and Proof of Claim evidence the following: (1) WFF accepted the November 2009 payment and effectively waived any default; (2) WFF charged the Late Fee for the delinquent November payment; and (3) did not declare an Event of Default or impose the 24% Default Rate due to the delinquent November 2009 payment.

15. Incredibly, on May 21, 2010 (8 days after the Heiden May 13, 2010 State Court Affidavit), WFF submitted its Response, along with the Heiden May 21, 2010 Bankruptcy Court Affidavit, in which WFF contends that there was an Event of Default in November 2009 entitling

6

WFF to charge the 24% Default Rate[5] even though: (i) the December 1, 2009 Invoice made no mention of a November 2009 Event of Default; and (ii) the Proof of Claim (certified to by M. Heiden) made no mention of a November 2009 Event of Default.

16. Even more incredible, in the State Court Action just days earlier, WFF submitted the Heiden May 13, 2010 State Court Affidavit, which makes no mention of a November 2009 Event of Default and states that the 12% Contract Rate applied for November 2009, December 2009 and for the first 13 days of January 2010, up through the extended maturity date of the WFF Loan.

17. "Judicial estoppel is an equitable doctrine that can be evoked at a court's discretion." *Pereira v. Dow Chem. Co.* (*In re Trace Int'l Holdings, Inc.*), 2009 U.S. Dist. LEXIS 55168 (S.D.N.Y. June 25, 2009). The doctrine of judicial estoppel precludes a party from adopting a factual position that is inconsistent with a position that was taken in the same or separate litigation. *Bates v. Long Island R.R.*, 997 F.2d 1028, 1037 (2d Cir.), *cert. denied*, 510 U.S. 992 (1993).[6] While some courts refuse to recognize the doctrine, judicial estoppel is recognized in the Second Circuit. *See, e.g., Axa Marine & Aviation Ins., Ltd. v. Seajet Industries, Inc.*, 84 F.3d 622, 628 (2d Cir. 1996); *Popadyn v. Clark Const. and Property Maintenance Services, Inc.*, 49 A.D.3d 1335, 854 N.Y.S.2d 626 (4th Dep't 2008) (a prior bankruptcy judgment establishing that a party's assets were worth one amount, precluded, under doctrine of judicial estoppel, that party's allegation of a different amount of value in a separate action). Judicial estoppel aims at "(1) preserving the sanctity of the oath by requiring consistency in sworn positions; and (2) protecting judicial integrity by avoiding inconsistent

---

[5] In the Response, WFF doesn't clearly state that the alleged November 2009 Event of Default entitled WFF to accrue the 24% Default Rate from early November 2009, but this appears to be the result WFF wants this Court to reach.

[6] *Bates v. Long Island R.R.*, 997 F.2d 1028, 1037 (2d Cir.) was superseded by statute regarding unrelated law.

results in two proceedings." *Mohamed v. Marriott Int'l*, 944 F. Supp. 277, 280 (S.D.N.Y. 1996) (citing *Bates v. Long Island R.R.*, 997 F.2d at 1038).

18. Here, the equitable doctrine of judicial estoppel supports this Court concluding that WFF is not entitled to the 24% Default Rate. As evidenced by the Proof of Claim (certified by M. Heiden) and the Heiden affidavits submitted in State Court on May 13th and this Court on May 21st, WFF has taken "inconsistent [sworn] positions." Accordingly, WFF should be precluded from arguing that an Event of Default occurred pre-petition and that the 24% Default Rate was in effect on the Petition Date.

## II. <u>Bankruptcy-Default Clauses Can Be Invalidated in Non-Executory Contracts</u>

19. WFF is wrong to assert that the Debtor has ignored a "fundamental legal principal" of law in that the Bankruptcy Code invalidates bankruptcy-default clauses only in executory contracts. To the contrary, the real "fundamental legal principle" being ignored is by WFF, in that equity abhors forfeiture and bankruptcy laws disfavor *ipso facto* clauses. *In re Island Helicopter Corp.*, 63 B.R. 809, 818 (Bankr. E.D.N.Y. 1986) (stating Bankruptcy Code "evinces a strong predeliction [sic] against the enforcement of *ipso facto* contract clauses which place the debtor in default due to its bankruptcy filing. . . . Consequently, this court cannot render a decision which deems a debtor to be in default of its contract obligations because of its bankruptcy filing.").

    A. *In re Bownetree, LLC Is Applicable and Not Distinguishable*

20. As argued in the Debtor's Motion, the Court may justifiably rely on *In re Bownetree, LLC*, 2009 Bankr. LEXIS 2295 (Bankr. E.D.N.Y. July 24, 2009) as a primary basis to invalidate the Bankruptcy-Default Clause.

1372593

21.     First, the *Bownetree* case involved a mortgage and note. *Id.* at *2-3. WFF asserts that, under the Countryman definition, a mortgage and note are typically not considered executory contracts. *See* Response, ¶¶ 24, 25, and 28. If this was the absolute case, then Judge Milton conceivably would never have chartered into section 365(e) territory. But without extensive analysis, Judge Milton did apply section 365(e) (and presumably section 541(c)) to the loan documents at issue, and conclusively held that the lender "may not use the commencement of the debtor's Chapter 11 bankruptcy case to . . . trigger the default rate of interest. [S]uch an act would be in violation of the Bankruptcy Code." *In re Bownetree, LLC*, 2009 Bankr. LEXIS 2295, at *18. Accordingly, that the WFF Loan entails both a mortgage and note is no reason for this Court to refuse to invalidate the Bankruptcy-Default Clause.

22.     Second, Judge Milton found that the "holdbacks" at issue in *Bownetree* were never advanced and would not be dispersed in the future. *Id.* at *8-9. Accordingly, Judge Milton held that section 365(e)(2)'s exception to the *ipso facto* doctrine did not apply. *Id.* at *9. Based on this, WFF has attempted to distinguish the Bownetree case by asserting that Judge Milton "implicitly held" that the loan documents were executory contracts. See Response, ¶ 10. As an initial matter, it would be a misreading of *Bownetree* to interpret Judge Milton as "implicitly" holding that the loan documents at issue were executory contracts.[7] However, even if Judge Milton did reach that conclusion, this Court has grounds to find that WFF Loan, as of the Petition Date, was an executory contract with obligations on both parties; specifically, contrary to WFF's assertion that after the WFF Loan closing WFF had "no further obligations" under the WFF Loan (*see* Response, ¶ 28), WFF was obligated to maintain the tax escrow and apply the escrow fund to payments for taxes, which WFF did post-petition. *See* Motion,

---

[7] In fact, the quotation from *Bownetree* cited by WFF in its Response was Judge Milton's reiteration of the debtor's argument, not an "implicit" holding. *See In re Bownetree, LLC*, 2009 Bankr. LEXIS 2295, at *6-7. A review of the *Bownetree* shows no reference by Judge Milton as characterizing the loan documents as executory contracts.

9

**Attachment 1**, Exhibit A (WFF Mortgage), §6 Escrow Fund (stating "[WFF] will apply the Escrow Fund to payments of Taxes, Other Charges and Insurance Premiums required to be made by [Debtor] pursuant to Sections 4 and 5 hereof.") and Mairo Affidavit, **Exhibit A** (WFF Tax Escrow Chart), at 2 (reflecting post-petition activity in escrow fund maintained by WFF, including WFF's post-petition payment for New York City taxes).

23. Third, the treatment of the lender's claim in *Bownetree* and the treatment of WFF's Claim as proposed in the Debtor's Plan are indeed comparable; although WFF disagrees. Under the Debtor's proposed Plan, WFF intends to pay WFF the allowed amount of its claim in full. Moreover, WFF, unlike the lender in *Bownetree*, has received monthly adequate protection payments aggregating $548,221.00 through May 2010.[8] While WFF may want to point to differences regarding the respective plans' interest rates and time period for distributions, those matters are plan confirmation issues and the *Bownetree* analysis on pendency interest is persuasive and on point for this case.

24. For these reasons, the Debtor respectfully urges this Court to apply the analysis from *In re Bownetree* to the instant case and invalidate the Bankruptcy-Default Clause.

  B. *Bankruptcy Courts Invalidate Bankruptcy-Default Clauses In Situations Other Than Executory Contracts*

25. WFF cites several cases for the "fundamental legal principal" that this Court may only invalidate an *ipso facto* clause in the context of an executory contract. This is incorrect because there is authority for invalidating the Bankruptcy Default Clause even if this Court were to determine the WFF Loan was not an executory contract.

26. WFF's reliance on *In re F.B.F. Indust., Inc.*, 165 B.R. 544, 549 (E.D. Pa. 1994), is not as sound as presented in WFF's Response. For example, after determining that section

---

[8] December 2009 ($62,500.00); January 2010 ($82,743.00); February 2010 ($108,211.00); March 2010 ($101,951.00); April 2010 (102,312.00); May 2010 ($90,504.00).

365(e) did not apply because the contract at issue was not executory, the *F.B.F. Industries* court "recognized that there is authority . . . to refuse to recognize the operation of a bankruptcy default provision as intruding upon Congressional purpose to provide debtors a fresh start toward reorganizing their financial affairs." *Id.* at 549 (citing *In re Taylor*, 146 B.R. 41 (M.D. Ga. 1992)[9] (noting that enforcing the bankruptcy-default clause would penalize the debtors "for exercising their federal right to file bankruptcy")).

27. As suggested by the *F.B.F. Industries* court, several bankruptcy courts have been faced with a similar issue—whether a court may invalidate a bankruptcy-default clause in a non-executory contract—and have concluded affirmatively. For example, in *In re Price Oil, Inc.*, 2006 Bankr. LEXIS 3145 (Bankr. M.D. Ala. 2006), the court was presented with a claims dispute between two mortgagees on the same piece of real estate, which was poised for sale. The first mortgage holder ("Moore") had objected to the sale because, after receipt of payment, a slim amount of proceeds would remain available for the estate and the second mortgage holder ("Colonial"). *Id.* at *2. Colonial responded to Moore's objection and opposed the amount of Moore's claim. *Id.* Moore's claim was based on a promissory note and mortgage on the subject property, and Colonial objected on the ground that the claim improperly included a default rate of interest. *Id.* at *3-4.

28. After the bankruptcy court concluded that no pre-petition default occurred and that Moore could not accelerate the note post-petition (without violating the automatic stay), Moore argued that the bankruptcy-default clause included in the governing contract permitted its entitlement to a default rate of interest. *Id.* at *5-8. But although the contract at issue was non-executory, the bankruptcy court refused to enforce the bankruptcy-default clause. *Id.* In support of its conclusion, the *Price Oil* court reasoned that:

---

[9] *Rev'd and rem'd on other grounds*, 3 F.3d 1512, *reh'g denied*, 11 F.3d 169 (11th Cir. 1993).

> [M]ost of the authority considering the issue of *ipso facto* clauses in bankruptcy cases have done so in connection with cases involving executory contracts (§ 365(e)) and estate property (§ 541(c)). Yet, '[i]t is axiomatic that the bankruptcy laws disfavor *ipso facto* clauses which purport to entitle a creditor to call due an indebtedness solely on account of a bankruptcy filing.' . . . Therefore, the court finds that the due on bankruptcy provision did not [invoke] . . . the terms of the contract related to the default interest rate . . . .

*Id.* (citations omitted). Accordingly, Moore was not entitled to a default rate of interest.

29. Similar conclusions have been reached by several courts. *See In re Perry*, 25 B.R. 817, 820 (Bankr. M.D. Md. 1982), *aff'd* 729 F.2d 982 (4th Cir. 1984) ("Even though the instant contracts are not executory, and therefore not subject to the prohibition [of invalidating *ipso facto* clauses under] 11 U.S.C. § 365(e), it does not follow that such clauses in the instant non-executory contracts are *per se* valid. . . . To enforce theses clauses would deprive the debtors of their opportunity to obtain a fresh start and would result in forfeitures contrary to the spirit of the Code, a result which courts of equity strain to avoid.");[10] *In re Rose*, 21 B.R. 272, 279-80 (Bankr. D.N.J. 1982) (same); *see also In re Schwegmann Giant Super Mkts.*, 287 B.R. 649, 658 (E.D. La. 2002) (invalidating *ipso facto* clause contained in a promissory note).

    C.    *This Court Should Invalidate the Bankruptcy-Default Clause*

30. The Debtor submits that the foregoing analyses applies to the case at bar. As recognized by several courts, an *ipso facto* clause in a non-executory contract may be invalidated because it hampers a debtor's ability to "make a fresh start" and directly contradicts "the spirit and purposes of the Bankruptcy Code." *See In re Rose*, 21 B.R. at 276. Additionally, as will be discussed further below, the equities favor the Debtor because: (1) there was no Event of Default called or noticed before the Petition Date and the 12% Contract Rate was in effect on the Petition Date; (ii) the Debtor has made substantial adequate protection payments to WFF each month of

---

[10] *Superseded in part by statute*, 11 U.S.C. § 521(d).

this bankruptcy case; (iii) WFF's reasonable legal costs for monitoring this bankruptcy case are recoverable under Section 506(b); and (iv) under the Debtor's proposed Plan, general unsecured creditors will receive an enhanced distribution if WFF's Pendency Interest is calculated at the 12% Contract Rate.

III. **Assuming Arguendo That There Is An Enforceable Default To Support the Assertion of Default Interest, the 24% Default Rate Is an Unreasonable Penalty or Charge**

    A. *The Default Rate of Interest is Subject to Review and Equitable Considerations*

31. In contravention of Second Circuit law cited by the Debtor in the Motion, WFF asserts that "section 506(b) prohibits a bankruptcy court from reviewing an otherwise enforceable default rate of interest." WFF Response, ¶ 34 (citing *In re Schaumburg Hotel Owner Ltd. P'ship*, 97 B.R. 943, 950 (Bankr. N.D. Ill 1989)). WFF attempts to buttress this assertion by referencing the United States Supreme Court's holding in *United States v. Ron Pair Enters. Inc.*, 489 U.S. 235, 241 (1989), stating that the "recovery of post-petition interest [under § 506(b)] is unqualified." WFF Response, ¶ 35 (quoting *id*.).

32. In the Motion, the Debtor cited the Second Circuit decision, *In re Milham*, 141 F.3d 420, 423 (2d Cir. 1998), in which the Second Circuit held that the rate of interest under section 506(b) is a decision within the discretion of the court. WFF did not mention or discuss this controlling decision. Instead, WFF asserted multiple non-binding cases outside the Second Circuit to support the erroneous assertion that this Court may not review a lender's contractual default rate.

33. Additionally, it's worth noting that *Schaumburg Hotel* is both distinguishable and did, in fact, consider the particular equities associated with the default rate of interest. For instance, the case is distinguishable because, not only did the court determine that the debtor was

13

1372593

"clearly" in default pre-petition, the debtor had also "stipulated that the 19% default rate [of interest] was applicable pre-petition . . . ." *In re Schaumburg Hotel Owner Ltd. P'ship*, 97 B.R. at 945, 950-51. Accordingly, the default rate of interest was applied, because the default rate of interest was the applicable contract rate of interest at the time of the bankruptcy filing. *Id.* at 951.[11]

34. Contrary to WFF's Response, *Ron Pair* does not stand for the proposition that a court may not review a default rate of interest. Instead, *Ron Pair* determined that awarding interest under section 506(b) is not governed by the loan agreement alone. *United States v. Ron Pair Enters. Inc.*, 489 U.S. at 241. The Supreme Court reasoned that the language in section 506(b) referring to the recovery of interest is "unqualified," in the linguistic sense, such that interest on an oversecured claim is permitted only if allowed by the underlying contract or applicable law; in contrast, the recovery of fees, costs and charges, which is "qualified" by language in section 506(b), is not allowed without a governing contractual provision. *Id.* In other words, "while fees, costs and charges cannot be allowed in the absence of a contractual agreement providing that the debtor may be liable for them, interest will be allowed if it is provided under the contract *or* under applicable law." 4 COLLIER ON BANKRUPTCY, ¶ 506.04[2][a] (16th ed.).

35. *Ron Pair* also did not determine what precise rate of interest should be used, and "section 506(b) is silent . . . as to what rate of interest is to be applied." *In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998). Indeed, as seen most recently in *Bownetree*, bankruptcy courts <u>do</u> undertake a "factual and equitable analysis prior to the application of a contractual default rate of interest." *In re Bownetree*, 2009 Bankr. LEXIS 2295, at *11. *See also In re*

---

[11] This holding also supports the argument made by the Debtor in its Motion, in that bankruptcy courts commonly apply the rate of interest in effect pursuant to the contract on the petition date. Debtor's Motion, ¶ 25. Here, the rate of interest in effect on the Petition Date was the 12% Contract Rate.
14

1372593

*Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 134 (Bankr. E.D.N.Y. 2002) (reviewing the default rate of interest and applying considerations of equity). Therefore, despite WFF's incorrect assertion that section 506(b) "does not permit a bankruptcy court's review of an enforceable default rate," there is binding Second Circuit precedent holding that this Court has discretion to review the equities surrounding the 24% Default Rate before applying same.[12] *See Milham*, 141 F.3d at 423.

    B.    *The Equities of This Case Disfavor Application of the 24% Default Rate*

36.    In *In re Bownetree*, Judge Milton found the proposed default rate "inequitable" because, in part, the "difference between the default rate and non-default rate is significant and unexplained." *Id.* at *11. Similarly, the difference between WFF's 12% Contract Rate and 24% Default Rate is significant, *i.e.*, 12%. Indeed, the 12% differential is nearly four (4) times the United States Prime Rate of 3.25%.[13]

37.    WFF's reliance on *In re Vanderveer* and *In re Liberty Warehouse* to show that the 24% Default Rate is reasonable is misplaced. In *Vanderveer*—as with seemingly all cases awarding a default rate of interest—the debtor was in monetary default well in advance of the bankruptcy filing and the default rate of interest was in effect on the petition date. *See In re Vanderveer Estate Holdings, Inc.*, 283 B.R. at 126 (two months before the bankruptcy filing (i) debtor had defaulted on the loan, (ii) lender had accelerated the loan, and (iii) lender had imposed the default rate of interest); *Liberty Warehouse*, 220 B.R. at 547 (debtor in default pre-petition and default rate in effect on petition date). Accordingly, these cases are distinguishable.

---

[12] Certainly WFF cannot strongly believe that, under section 506(b), this Court is "prohibited" to review the 24% Default Rate, for WFF's next argument in its Response pertains to the equitable considerations and purported reasonableness of the 24% Default Rate.

[13] Source: Wall Street Journal website on April 15, 2010 [www.wsjprimerate.us].

15
1372593

38. Other than legal fees (which are being added to WFF's claim and reimbursed by the Debtor), WFF has not set forth any extra expenses for collecting on the WFF Loan to constitute application of the 24% Default Rate. Additionally, WFF imposed the Late Fee in November 2009 to compensate WFF for the Debtor's untimely payment, and the Debtor has not objected to same; however, WFF may not be permitted to collect the Late Fee in addition to the 24% Default Rate.

39. In sum, WFF's Pendency Interest should be calculated at nothing more than the 12% Contract Rate -- which rate more than adequately compensates WFF for the time period between the Petition Date and effective date of the Debtor's Plan. WFF has not and cannot provide a sound justification for why it should receive the 24% Default Rate for its Pendency Interest when: (a) no pre-petition default was called and the 12% Contract Rate was in effect on the Petition Date; (b) the Debtor has made substantial adequate protection payments each month of this bankruptcy case; (c) WFF's reasonable legal costs for monitoring this bankruptcy case are already recoverable under Section 506(b); and (d) under the Debtor's proposed Plan, general unsecured creditors will receive an enhanced distribution if WFF's Pendency Interest is calculated at the 12% Contract Rate.

1372593

## **CONCLUSION**

For all the foregoing reasons, the Debtor respectfully requests the Court to enter an Order granting the Debtor's Motion to disallow WFF's Proof of Claim insofar as it asserts a right to recovery of pendency interest calculated at the 24% Default Rate, and award the Debtor such other relief as is just and equitable.

Dated: May 28, 2010  **PORZIO, BROMBERG & NEWMAN, P.C.**

By: /s/ John S. Mairo
John S. Mairo (JM–0670)
Attorneys for the Debtor and Debtor-in-Possession