HERRICK, FEINSTEIN LLP
*Attorneys for W Financial Fund, LP*
Andrew C. Gold
Hanh V. Huynh
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
agold@herrick.com
hhuynh@herrick.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re

20 BAYARD VIEWS, LLC,

        Debtor.

-------------------------------------------------------x

Chapter 11

Case No. 09-50723 (ESS)

## OBJECTION OF W FINANCIAL FUND, LP TO
## THIRD AMENDED PLAN OF REORGANIZATION OF 20
## BAYARD VIEWS, LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

       W Financial Fund, LP ("WFF"), by its counsel Herrick, Feinstein LLP, hereby

files its objection (the "Objection") to the Third Amended Plan of Reorganization of 20 Bayard

Views, LLC Under Chapter 11 of the Bankruptcy Code (the "Plan") filed by 20 Bayard Views,

LLC (the "Debtor"). In support of the Objection, WFF respectfully represents as follows:

## PRELIMINARY STATEMENT[1]

       1.     The Debtor's Plan as proposed cannot be confirmed because the Plan

violates seven different provisions of Bankruptcy Code section 1129. Most glaring, however, is

the simple economic fact that the Debtor has insufficient cash flow to make debt service

payments to WFF and payments to its other creditors if the Court applies a market rate of interest

to WFF's secured claim. The success of the Debtor's Plan is wholly based upon its fanciful

---

[1] Capitalized terms not defined in the Preliminary Statement shall have the meanings ascribed to them in below.

assumption that WFF's approximately $20,500,000 secured claim will be treated fairly and equitably if WFF receives interest on its claim at the prime rate (currently 3.25%) plus 25 basis points. The Plan further requires WFF to make virtually a 100% LTV (loan to value ratio) loan and receive no principal paydowns at least until year two of the Plan, and then only if the Debtor meets its sales projections.[2] The Debtor's Equity Holders are not contributing any funds to reduce the loan to value ratio and therefore the entire risk of failure is borne by WFF. Without substantial capital infusions by the Equity Holders to reduce WFF's claim, the Debtor will be unable to provide for the fair and equitable treatment of WFF's claim and still ensure that the Plan will be feasible. Under these circumstances, the proper course is to deny confirmation of the Debtor's Plan.

2.      Furthermore, the Plan simply is fundamentally unfair. It requires WFF to lend at a ridiculous rate, for seven years, provides for a 7% distribution for unsecured creditors while, according to the Debtor's projections, leaves the Debtor and its Equity Holders with 14 Units worth (again according to the Debtor's projections) over $11 million at the termination of the Plan. This is simply an absurd result.

3.      Moreover, the Plan fails to comply with a number of the requirements of plan confirmation set forth in section 1129 of the Bankruptcy Code:

- The Plan does not satisfy section 1129(a)(11) of the Bankruptcy Code because confirmation of the Plan is likely to be followed by liquidation or further financial reorganization. The Debtor's own Plan projections demonstrate that the Debtor's cash flow will not be sufficient to make Plan distributions. The Plan provides for the restructuring of WFF's debt as a 93-100% LTV loan with scheduled paydowns of principal through sales of condo units that are speculative. The risk of failure of the Plan is borne entirely by WFF, and that

---

[2] The Plan provides for payment to WFF of "Excess Cash Flow" which will only be achieved if the Court agrees that prime plus 25 basis points is an appropriate post-confirmation interest rate.

risk is significant. At the same time, the Debtor stands to benefit by $11 million if the Plan is successful.

- The Plan does not satisfy section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code because WFF will not receive on account of its claim deferred cash payments totaling the present value of its claim. The Plan proposes to pay WFF's claim at 3.5%[3] over seven years. This is not a market rate. This is not *any* kind of rate that would result in the fair and equitable treatment of WFF's secured claim.

- The Plan does not satisfy section 1129(b)(2)(A)(i)(I) of the Bankruptcy Code because WFF will not retain all of its liens securing its claim. The Plan does not provide for the continuation of WFF's security interest in the membership interests of the Debtor pursuant to the Pledge Agreement, or that WFF will receive 100% of the net proceeds from the sale of Units.

- The Plan does not satisfy section 1129(b)(2)(A)(ii) of the Bankruptcy Code because it does not provide WFF the right to credit bid on the sale of the Debtor's membership interests that is contemplated under the Plan.

- The Plan does not satisfy section 1129(a)(1) because it does not comply with the applicable provisions of the Bankruptcy Code. The Plan contains an impermissible injunction for the benefit of third parties, in contravention of section 524(e) of the Bankruptcy Code.

- The Plan does not satisfy section 1129(a)(3) of the Bankruptcy Code because it has not been proposed in good faith and is proposed by means forbidden by law. The Debtor has not dealt with WFF in a manner that even approaches fundamental fairness. Instead, the Plan is intended solely to benefit insiders of the Debtor and to ensure value is retained by equity interests at the expense of the Debtor's creditors. Moreover, the Plan provides for changes to the membership interests in the Debtor and to the Debtor's operating agreement without the consent of WFF, in violation of the terms of the Pledge Agreement between WFF and the Guarantors of the Debtor.

- The Plan does not satisfy section 1129(a)(9) of the Bankruptcy Code because it does not provide for the full payment of administrative expense claims on the effective date of the Plan.

4. As discussed more fully below, each of these objections forms an independent basis to deny confirmation of the Debtor's Plan.

---

[3] The Debtor's Plan proposes to pay WFF's claim with a cramdown interest rate of 3.5%. The Debtor's interest rate expert, however, submitted a revised report in which he concluded that the proper cramdown interest rate is 55 basis points over the national prime rate, currently at 3.25%.

# BACKGROUND

## The WFF Loan

5.     The Debtor owns 37 unsold condominiums (the "Units") and associated parking spaces in a 62-unit residential building located at 20 Bayard Street, Brooklyn, New York known as the Bayard Condominium Complex.  The development of the Bayard Condominium Complex was financed by a loan from iStar Loans, LLC ("iStar").  When the sales of Units dried up, iStar required the Debtor to refinance its loan because iStar would not agree to remain a lender when the lack of sales forced the Debtor to begin to rent the unsold Units.

6.     When the Debtor was unable to obtain conventional permanent financing in order to take out iStar and prevent foreclosure, the Debtor sought alternative financing.  At the time, the credit markets were virtually frozen due to the Lehman Brothers bankruptcy filing and the bailout of AIG.  Because of this tight credit market and the fact that the collateral would consist of unmarketable rental units, the Debtor was unable to obtain institutional permanent financing in an amount sufficient to repay iStar in full.  As a result, the Debtor sought short-term financing arrangements that would allow the Debtor time to find a conventional lender.  Following negotiations with several lenders, the Debtor eventually agreed on a loan with WFF because WFF offered the Debtor comparatively favorable terms.  The loan to the Debtor was intended as a "bridge" loan, and the terms of WFF's loan to the Debtor were below market for bridge loans at the time of origination.  While banks tend to make longer term loans (typically 5 years or more) on cash-flowing, stabilized properties, bridge lenders make short-term loans on transitional (and in this case vacant and non-cash flowing) properties designed to help the borrower get from point A to point B (*i.e.*, once cash flow has been established, the borrower typically refinances with a bank at a lower interest rate).  As a bridge lender, WFF typically

makes only short term, one-year (or less) loans at 11% or 12% interest, with six or twelve month extension options for a fee.

7.      Following negotiations between the parties regarding the loan, in October 2008, WFF and the Debtor entered into that certain Agreement of Consolidation, Extension and Modification of Mortgage (the "Mortgage"), whereby WFF extended bridge financing to the Debtor and replaced iStar as the mortgageholder. In connection with the Mortgage, the Debtor, as maker, entered into that certain Consolidated, Amended and Restated Note in the principal amount of $17,400,000 (the "Note"). The Note is secured by, among other things, the Units and 40 parking spaces located at the Bayard Condominium Complex, together with the related rents and leases (collectively, the "Collateral"). As of the Petition Date, the Debtor owed WFF principal in the amount of $16,975,072, plus accrued interest, legal fees, and post-petition interest, costs and fees allowable under section 506(b) of the Bankruptcy Code.

8.      In further consideration for the WFF loan, WFF required Chaim Lax, Moshe Lax and Isaac Hager (collectively, the "Guarantors") to guaranty payment and performance of a portion of the Debtor's obligations under the Loan Documents pursuant to that certain Guaranty dated as of October 14, 2008 (the "Guaranty"). The Guaranty is limited to payment of $8,700,000 of the principal amount of the loan, plus all accrued interest, fees and costs on the entire loan. The Guaranty is governed by the laws of the State of New York.

9.      As part of its underwriting requirements, WFF requested and the Guarantors provided financial statements compiled by an accountant evidencing the Guarantors' creditworthiness. Chaim Lax delivered to WFF a statement of net worth that shows his net worth at $205,530,524, as of March 31, 2008. The statement of net worth of Moshe Lax shows

his net worth at $22,600,695, as of August 31, 2008. Isaac Hager had a net worth of $15,273,196, as of May 15, 2008. At the time that the parties entered into the Guaranty, the Guarantors had a combined total net worth of over $240 million. Accordingly, the Guaranty was a major component of WFF's collateral security for the loan.

10.    In addition to the Guaranty and Mortgage, WFF is further secured by a pledge of the Equity Holders' membership interests in the Debtor.[4] Pursuant to that certain Pledge of LLC Interests (the "Pledge Agreement") dated as of October 14, 2008, among WFF and Isaac Hager, Chaim Lax, and Jack Weingarten (collectively, the "Pledgors"), the Pledgors granted WFF a continuing first priority security interest in the Pledgors' membership interests in the Debtor. Further pursuant to the Pledge Agreement, the Pledgors are prohibited from modifying or amending the Debtor's operating agreement (the "Operating Agreement") without WFF's consent. Pledge Agreement § 4(e).[5]

11.    Just prior to the maturity of the Note, the Debtor requested a three-month extension of the maturity date of the Note. WFF agreed to an extension and the parties entered into that certain Loan Extension Agreement in October 2009, pursuant to which the maturity date of the Note was extended to January 13, 2010, in exchange for the Debtor's payment to WFF of an extension fee of .5% or $84,875.36. The terms of the Loan Documents were not otherwise modified and remain in full force and effect.

---

[4] At the time of the loan, the Debtor represented to WFF that it had no debt. The pre-closing claims now being asserted by various unsecured and mechanics lien creditors indicate that the Debtor misled WFF, with the consequence that the value of the Equity Interests pledged to WFF were diluted.

[5] "Until such time as all of the Obligations are paid to the Lender in full, the Pledgor agrees that it will not, without the prior written consent of Lender: . . . permit the Borrower to issue any additional membership interests in the Borrower or consent to any transfer, hypothecation or pledge of any membership interests in the Borrower or modify or amend the Operating Agreement . . . ." Pledge Agreement § 4(e).

12.     As discussed above, the parties entered into the loan transaction with the understanding that the Debtor would obtain conventional financing to take out WFF once the Units could be rented and cash flow could be established.  In furtherance of this understanding, as late as October 5, 2009, just before the original maturity date of the loan, the Debtor procured an executed application letter from M&T Bank to provide the Debtor a loan up to the lesser of $15 million or 75% LTV, for a five-year term at 7.00%.  At the time, WFF was owed approximately $17 million.  M&T Bank required the Debtor to establish a $5 million account at M&T Bank for at least six months with $ 2 million remaining as additional cash collateral.  In other words, the loan was so risky that M&T Bank required a minimum $7 million cash infusion by the Debtor's principals in order to reduce the loan to $15 million at closing, and initially provide $5 million of additional cash security.  However, rather than come out of pocket for the $7 million necessary to refinance through M&T Bank, the Equity Holders determined to file bankruptcy in order to attempt to restructure the WFF loan on a non-consensual basis.  The Plan requires WFF to take a larger loan ($20.5 million vs. $15 million), for a longer term (7 years vs. 5 years), with an interest rate of *half* of what M&T Bank proposed (7% vs. 3.5%), and with no additional collateral.

**The State Court Actions**

13.     On January 22, 2010, after the Note matured (without payment), WFF commenced an action (the "Summary Judgment Action") in New York Supreme Court, Nassau County (the "State Court") against the Guarantors by filing a motion for summary judgment in lieu of complaint pursuant to New York CPLR § 3213.  On May 28, 2010, the State Court granted WFF a judgment awarding it the principal amount of $8.7 million against the Guarantors, jointly and severally.  On July 27, 2010, following an inquest to determine the

amount of interest, legal fees and expenses, the State Court awarded WFF judgment for interest at the default rate of 24%, fees and expenses in the total amount of $1,762,041.50 (collectively with the judgment for the principle amount, in the total amount of $10,462,041.50, the "State Court Judgment").

14.     Following entry of the State Court Judgment, WFF learned about the potential stripping of assets from Dynamic Diamond Corporation ("Dynamic"), a primary business asset of Guarantor Chaim Lax. Dynamic was a premier dealer of both diamond jewelry and loose stones. Moshe Lax, Chaim's son, is the co-executor of Chaim Lax's estate and has engaged in a stripping of Dynamic from Chaim's estate while the Summary Judgment Action was proceeding.

15.     Upon learning this information, on June 16, 2010, WFF commenced a second action (the "Fraudulent Transfer Action," and together with the Summary Judgment Action, the "State Court Actions") in the State Court to seek to recover Dynamic for the estate. A copy of the Complaint detailing Moshe Lax's and Martin Ehrenfeld's (the Debtor's chief restructuring officer) actions in furtherance of the asset stripping scheme is annexed hereto as Exhibit A. Furthermore, other creditors of the Chaim Lax Estate have similarly accused Moshe Lax of stripping the estate of assets.

**The Bankruptcy Case**

16.     On December 4, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate and manage its business as a debtor in possession pursuant to

sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed.

17.     The Debtor's equity holders are Jack Weingarten, LX Holdings, LLC[6] (as holder of the Chaim Lax Interest), and Yitzchok Hager (collectively, the "Equity Holders"). Moshe Lax is a Guarantor but not an Equity Holder, though upon information and belief he is the major beneficiary of LX Holdings, LLC's interest, and Jack Weingarten is an Equity Holder but not a Guarantor.

18.     During the course of the Debtor's chapter 11 case, the Debtor and WFF have entered into and extended several cash collateral stipulations, pursuant to which the Debtor is permitted to use WFF's cash collateral in the form of rental income to pay certain necessary expenses of the Debtor, including monthly condo fees and management fees, with the remainder of the rents paid to WFF in partial payment of its debt service.

19.     Another significant event in the Debtor's bankruptcy case was the Debtor's objection to WFF's proof of claim, in which WFF asserted as part of its claim, post-petition interest at the 24% contract default rate. By order dated August 16, 2010, the Court overruled the Debtor's objection and allowed WFF's secured claim with pendency interest calculated at 24%. As of September 30, 2010, WFF's claim including principal, accrued interest, legal fees and expenses will exceed $20,500,000.

20.     The Debtor commenced two adversary proceedings seeking injunctions for the benefit of the Guarantors enjoining WFF from continuing to prosecute the State Court

---

[6] The transfer of Chaim Lax's interest to LX Holdings, LLC was accomplished without WFF's knowledge or consent in violation of the Pledge Agreement.

Actions. In the first adversary proceeding, the Debtor sought an injunction to enjoin the Summary Judgment Action so that the Guarantors could fund the Plan, which the Debtor alleges they could not do if WFF was able to execute on the State Court Judgment. The Debtor eventually withdrew its motion for an injunction and dismissed the adversary proceeding because the Guarantors had determined to commit the Plan funds into escrow. Less than two months later, the Debtor commenced yet another adversary proceeding, this time seeking an injunction by order to show cause. The Debtor's second request for an injunction was to enjoin WFF from executing or levying upon assets of Moshe Lax in connection with the State Court Judgment. The Debtor submitted that Mr. Moshe Lax could not obtain a loan for $500,000 unless the purported lender was assured that a court order issued enjoining WFF from levying on his assets. The Debtor further argued that the injunction was necessary because no other Equity Holder or Guarantor had the financial wherewithal to make the $500,000 plan contribution. On the eve of the evidentiary hearing on the order to show cause, and without proceeding with the scheduled deposition of Moshe Lax, the Debtor withdrew its motion and dismissed the adversary proceeding.

**The Plan**

21. On March 26, 2010, the Debtor filed a Disclosure Statement in connection with a plan of reorganization. The Disclosure Statement and plan were amended several times, and by consent order entered on May 19, 2010, the Court approved the Disclosure Statement. On May 25, 2010, the Debtor filed its Third Amended Plan of Reorganization of 20 Bayard Views, LLC Under Chapter 11 of the Bankruptcy Code [Docket No. 95], which is the Plan before the Court for confirmation.

22.     The Plan provides that Class 1 Priority Claims are to be paid in cash in full within 30 days of the effective date of the Plan from the Administrative Claims/Priority Claims Account, which is to be funded by capital contributions from Equity Security Holders and/or the Guarantors.  The Debtor has not provided evidence that these funds exist.  To the extent that the Equity Security Holders fail to fund their proportionate share of the Administrative Claims/Priority Claims Account, their interests in the Debtor will be extinguished.  Thus, the Plan effectuates a transfer of the ownership of the Debtor and WFF's collateral without WFF's consent in violation of the Pledge Agreement, the Loan Documents and without WFF's right to credit bid.

23.     Pursuant to the Plan, WFF will retain its lien on the Collateral on account of the Class 2 WFF Secured Claim, which will be paid over seven years at 3.5% interest per annum (the contract rate of interest is 12%), with yearly principal paydowns commencing in the second year from 85% of the proceeds from the sale of Units.  If sales do not materialize as projected, there will be no principal paydowns and the Equity Holders have not proposed to backstop the possibility that sales will not materialize as projected.  Therefore, the entire success of the Debtor's Plan is contingent upon selling Units as projected.  If the Debtor does not make the projected Unit sales, it will have no other source of funds to make payment to WFF.

24.     The Debtor also proposes to make annual excess net cash flow payments, which will be credited against the required annual principal paydowns.  The Debtor projects that it will sell two Units in years 2 and 3, three Units in years 4, 5, and 6 and 10 Units in year 7 to pay off the final balance of approximately $7 million.[7]  The Debtor does not project any sales of

---

[7] The Debtor's projections are inconsistent with the Debtor's appraisal, which shows all 37 units being sold in 5 years.

Units in the first year, but the Debtor will pay WFF $250,000 from the net cash flows. However, the Plan provides for a "WFF Allowed Claim Contingency" that permits the Debtor to elect to reduce the first year principal payment of $250,000 and pay the balance of that first year payment in years two and three, if WFF's claim is calculated with a Pendency Interest rate of 24%. Furthermore, the excess cash flow payment is wholly contingent on this Court confirming a plan providing for post-confirmation interest on WFF's claim at 3.5%.

25. The holders of Class 3 through Class 5 Secured Mechanic Lien Claims also will retain their liens, and interest on their claims will be calculated at 3.5%. However, to the extent that the amount of the Secured Mechanic Lien Claims together with the amount of the WFF claim exceeds the value of the Collateral, those claims will be treated as general unsecured claims. The Plan does not provide for this contingency. To the extent that Secured Mechanic Lien Claims remain secured claims, the holders of Secured Mechanics Lien Claims shall be paid 33.3% of their allowed claim plus accrued interest on the first, second and third anniversaries of the effective date of the Plan. Under the WFF Allowed Claim Contingency, the Debtor also may defer payments to Allowed Secured Mechanic Lien Holders, so that those claimants will receive their scheduled plan distributions in years two, three and four of the Plan.

26. The holders of Class 10 General Unsecured Claims will receive a 7% distribution on their allowed claims in three equal installments on the second, third and fourth year anniversaries of the effective date of the Plan. The General Unsecured Claims will receive this paltry dividend even though the Debtor's projections show that after WFF is paid it will still own 14 Units allegedly worth over $800,000 a piece. Thus, at the end of the Plan, WFF will receive interest at 3.5%, the unsecured creditors will receive pennies on the dollar, and the

Equity Holders will retain Units having a value of over $11 million. For this reason alone, the Court should deny confirmation.

27. The Debtor's projections filed with the Plan show a beginning balance of WFF's claim at $17,553,500. The amount of WFF's claim, now that the Court has determined that WFF is entitled to the 24% contract default interest rate to calculate its pendency interest, is over $20.5 million, including actual and projected legal fees, through September 30, 2010.

28. The Plan also contains the following provisions that are relevant to the Guarantors and/or the funding of the account to pay the Debtor's professional fees (the "Professional Fees Account"):[8]

- "A Holder of Allowed Equity Securities of the Debtor shall retain his Equity Securities and receive an equal Equity Security Share in the Reorganized Debtor so long as such Holder complies with the capital call to fund the Administrative Claims/Priority Account and Professional Fees Account. Any Holder not complying shall have its Equity Securities' share discharged and cancelled." Plan, Art. III(a)(7)(b).

- "Consistent with the Plan, the Debtor may elect to effectuate the following restructuring transactions: 1. Make a capital call of the Owners to fund the Administrative Claims/Priority Claims Account and Professional Fees Account; 2. Seek contribution from the Guarantors to fund the Administrative Claims/Priority Claims Account and Professional Fees Account; and 3. Amend its formation documents and operating agreement." Plan, Art. VI(E).

- "*Except as otherwise provided in this Plan or the Confirmation Order, all Entities that have held, currently hold or may hold Claims or other debts or liabilities against the Debtor or other right of an Equity Security Holder in any or all of the Debtor that are discharged pursuant to the terms of this Plan are permanently enjoined, on and after the Effective Date, from taking any of the following actions on account of any such Claims, debts, liabilities or*

---

[8] While the Plan provides that Equity Holders will retain their equity interests only if the capital contribution is made, it was disclosed at the hearing on the second injunction motion, that Jack Weingarten (the only Equity Holder that appears to be funding the Plan) and Moshe Lax (who is not an Equity Holder and therefore not entitled to "retain" any equity interest) had a secret side agreement to transfer some percentage of the interest in the Debtor to Moshe Lax in return for Moshe's $500,0000 capital contribution.

*rights: (i) commencing or continuing in any manner any action (including the Guarantor Action) or other proceeding of any kind with respect to any such Claim, debt, liability, or right other than to enforce any right to a Distribution pursuant to this Plan . . . .*" Plan, Art. X(C) (the "Plan Injunction").

## OBJECTION

29.     Section 1129 of the Bankruptcy Code provides that a court shall confirm a plan *only if* all of the requirements set forth in section 1129(a) are satisfied.  Section 1129 also requires a plan to satisfy the requirements of section 1129(b) with respect to a class of claims that does not vote to accept the plan.  WFF, as the holder of the Class 2 Secured Claim, voted to reject the Plan.

**I.      The Plan Should Not Be Confirmed Because It Is Not Fair And Equitable With Respect To WFF's Claim**

30.     In addition to satisfying all of the requirements set forth in section 1129(a) of the Bankruptcy Code, by virtue of WFF's dissent, the Debtor also must satisfy the fair and equitable standard for secured claims under section 1129(b)(2).  The Debtor cannot demonstrate that its treatment of WFF's claim is fair and equitable.

A.      The Plan Does Not Satisfy The Requirement Under
         Section 1129(b)(2)(A)(i)(II) That WFF Receive The Present Value Of Its Claim

31.     The Bankruptcy Code requires a plan to provide for the fair and equitable treatment of a dissenting secured class by payment of a deferred cash stream that equals the present value of secured claim.  11 U.S.C. § 1129(b)(2)(A)(i)(II).  In order to ensure that the deferred payments proposed under a plan affords the dissenting secured creditor the present value of its claim, an appropriate discount rate or interest rate must be applied.  The Plan in this case proposes to pay WFF's secured claim at the risk free prime rate of 3.25% plus a .25% risk premium.  The proposed interest rate does not accurately reflect the market rate or the substantial

risk the Debtor proposes to impose on WFF. An interest rate of 3.5% does not compensate WFF the present value of its claim. Accordingly, the Plan can not be confirmed because it does not treat WFF fairly and equitably.

32.    The interest rate proposed under the Plan is based upon the Debtor's reading of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), which determined that the cram-down rate in a *chapter 13* case should be determined using the "formula" approach. Under the formula approach, the base rate is the national prime rate. That rate is then increased by an appropriate risk percentage. The Supreme Court's own language in the *Till* decision, however, gives rise to doubts about the vitality of the formula approach outside of the chapter 13 context. In dicta, the Supreme Court noted that, while there was no readily apparent chapter 13 cramdown market rate of interest, the same was not true in chapter 11: "Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." 541 U.S. at n. 14.

33.    Although there is disagreement over whether *Till* and its formula approach apply in the context of a chapter 11 cramdown, most courts agree that the market interest rate should be used where an efficient market exists for loans to chapter 11 debtors. *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 210 (Bankr. S.D.N.Y. 2009) (internal footnotes omitted) ("In determining the appropriateness of a proposed cramdown interest rate, courts in this district have looked to the market interest rate for loans with similar terms. Still other courts have considered the prepetition contract rate in determining whether the cramdown interest rate is sufficient. There is arguably relevant law, under chapter 13 of the Bankruptcy Code [referring to *Till*], but I consider reliance on these two bases to be preferable."); s*ee also In re Am. HomePatient, Inc.*, 420 F.3d 559, 568 (6th Cir. 2005) ("We decline to blindly adopt *Till*'s endorsement of the

formula approach for Chapter 13 cases in the Chapter 11 context."); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 255 (Bankr. M.D. Fla. 2006) ("In an efficient market rate in a Chapter 11 case, the market rate should be applied."); *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 11-12 (D. Conn. 2006) ("Courts have held, however, that 'a Bankruptcy Court deciding upon a [sic] interest rate in a Chapter 11 case should apply the market rate of interest where there exists an efficient market.'"); *In re Prussia Assocs.*, 322 B.R. 572, 585, 589 (Bankr. E.D. Pa. 2005) ("The Supreme Court's dicta implies that the Bankruptcy Court in such circumstances (*i.e.* efficient markets) should exercise discretion in evaluating an appropriate cramdown interest rate by considering the availability of market financing.").

34.     WFF's expert, Stuart Bruck, a Director of Funding and Mortgage Brokerage at Time Equities, Inc., will establish that there is an efficient market for similar mortgage loans. According to Mr. Bruck's expert report, there is market for lenders that would provide first mortgage financing to an entity similarly situated to the Debtor up to 65% LTV (or $13,650,000 assuming a collateral value of $21 million) at an interest rate of 7.5%. There is another class of lenders, known as hard money lenders, that would finance the mezzanine debt up to 80% LTV (or $3,150,000 assuming a collateral value of $21 million) at an interest rate of 13.5%. Lastly, any financing of the remainder of the debt up to 97.3% LTV (or $3,628,682 assuming a collateral value of $21 million) would be considered an equity investment requiring a 22% interest rate.

35.     Mr. Bruck concludes that in order to compensate for the significant risk imposed by a 100% LTV loan on this Collateral would represent, lenders or investors would invest in the tranches explained above. Taking these market rates at the different tranches or bands of investment and deriving a blended rate, Mr. Bruck concludes that a blended rate of

11.68% is the proper market rate to fairly and equitably compensate WFF for the risks inherent in providing this loan to the Debtor. Mr. Bruck's blended rate approach is supported by case law. *See, e.g., In re Cellular Info. Sys., Inc.*, 171 B.R. 926, (Bankr. S.D.N.Y. 1994) (using band of investment technique and denying plan confirmation because proposed cramdown rate was lower than market blended rate); *see also In re N. Valley Mall, LLC*, -- B.R. --, 2010 WL 2632017 at *7 (Bankr. C.D. Cal. June 21, 2010) (applying a blended rate to determine proper cramdown rate by referring to (i) a senior tranche loan at market rate of 6.25% on 65% LTV loan, (ii) a mezzanine tranche for additional 20% of loan at 11.18%, and (iii) an equity tranche for the remainder of the loan at 25.18%, and deriving a blended rate of 8.5%.); *In re Boulders on the River, Inc.*, 164 B.R. 99, 103 (B.A.P. 9th Cir. 1994) (applying blended rate of 9% based on (i) market interest rate of 8.25% on first 70% of value of collateral, and (ii) 12% interest rate on riskier remaining amounts); *In re SM 104 Ltd.*, 160 B.R. 202, 233 (Bankr. S.D. Fla. 1993) ("In the absence of an efficient . . . market for 100% loans, the most appropriate methodology for determining the risk premium on 100 % loans is the band of investment technique employed by the court in *Bloomingdale Partners*. The band of investment technique attempts to simulate the financing scheme ordinarily employed by owners of commercial real estate.").

36. While the 11.68% interest rate advocated by Mr. Bruck represents a significant departure from the 3.8% rate proffered by the Debtor's expert Mr. Fried and the Debtor's 3.5% rate contained in the Plan, the 11.68% rate also accurately represents a market rate that would allow WFF to receive the present value of its claim on account of the deferred payments the Plan proposes to pay WFF over seven years and to provide an appropriate return to WFF given the risk the Debtor is asking it to assume. If that interest rate happens to make the Plan unfeasible, the remedy is not to arbitrarily lower the interest rate, but to deny confirmation

of the Plan. *See, e.g., In re N. Valley Mall, LLC*, -- B.R. --, 2010 WL 2632017 at *3 (Bankr. C.D. Cal. June 21, 2010) ("The *Till* court did acknowledge that adopting too high a rate might render a plan infeasible, but noted that the remedy in such a case was to simply deny confirmation on the grounds of feasibility."); *In re Dindiyal*, 1993 WL 540373 (E.D.N.Y. Sept. 30, 1993) (finding that proper cramdown rate was base market rate of 9% plus 1% for risk premium, which was 1.5% higher than debtor's proposed 8.5% rate, and then denying confirmation because cash flow could not support interest payments with imposition of higher rate).

37.      Moreover, in the recent case of *In re TCI 2 Holdings, LLC*, 428 B.R. 117,166 (Bankr. D.N.J. 2010), the court determined there was a market for loans in the hotel casino industry, and used a 12% interest rate as the confirmation interest rate for a dissenting secured lender under section 1129(b).  In addition to the 12% interest rate, the court found that the terms of the restructured loan were fair and equitable to the secured lender:

> [The new loan] must not unduly shift the risk relating to the operations and financial performance of the reorganized debtor, and must be fair and equitable to the secured creditor.  Here, approximately two and a half years after the inception of the original creditor agreement, the proponents present a New Term Loan that has terms nearly identical to the original agreement, with some enhancements.  The maturity date is extended by three years, but the amount outstanding is paid down by 25%, and the interest rate on the obligation is nearly doubled.  The total debt carried by the debtors' enterprise is reduced by nearly $1.4 billion.  There are sufficient protections included in the covenants to safeguard the First Lien Lenders against the risk of plan failure.

*In re TCI 2 Holdings, LLC*, 428 B.R at 167-68 (emphasis added).  Here, the Debtor, is attempting to force upon WFF loan to a non-creditworthy borrower, at an extended term, with a 93%-100% loan to value ratio (depending upon how the Court values the Collateral) and offers an interest

rate reduced from 12% to merely prime plus a quarter of a percentage point. There is no paydown on the effective date. There is no additional collateral (*i.e.*, cash) being offered to protect WFF. Rather than receiving credit enhancements, WFF is being forced to take all of the risk. Clearly, the terms and interest rate proposed by the Debtor are not consistent with the market or section 1129(b)(1) of the Bankruptcy Code.

38. Even assuming, *arguendo*, that an efficient market does not exist, the interest rate of prime plus 25 basis points would not pass muster under the formula approach under the facts and circumstances of this case. Instructive on this point is *In re Northwest Timberline Enterprises, Inc.*, 348 B.R. 412 (Bankr. N.D. Tex. 2006). In that case, the debtor proposed to cram down a secured creditor with a 100% loan amortized over twenty-five years with a seventh year balloon payment. 348 B.R. at 421, 433. The court heard credible evidence that "no lender would do a 100% loan without credible guarantees in place and maybe not even without some historical financial performance about which it could feel good." *Id.*

39. The *Northwest Timberline* Court determined that there was "no 'efficient market' of lenders willing to provide an exit loan identical to what is being offered to [the secured creditor] here." *Id.* at 434. Accordingly, the court imposed the "closest thing to market ... (*i.e.* prime plus 4% to 5% if a lender got a first lien, and had credible guarantees, and received a 10%+ down payment [and amortization based upon a 25 year schedule]) as the best guidance for what an appropriate risk factor would be" utilizing the evidence presented in that case. *Id.* Thus, the court found, under the formula approach, that prime plus a 5.75% risk adjustment was appropriate.

40.     The Debtor's interest rate expert, Paul Fried of Traxi LLC, opines that there is no market for these types of loans and that the appropriate risk premium is 55 basis points, given as he opines the nearly non-existent risk of default under the Plan. Mr. Fried points to the following as evidence of the minimal risk of default: (i) the collateral has existing and stable cash flow, (ii) there is significant equity in the collateral, so ownership will be motivated to perform under the Plan, (iii) the collateral is high quality, and (iv) the projected sales are conservative. Mr. Fried's position is not supported by the Debtor's own appraiser, who assigned a discount rate of 15% on an internal rate of return based on his assessment of the risk related to the property.

41.     As WFF discusses below regarding the feasibility of the Plan, Mr. Fried's rosy-tinted outlook on projected cash flow is not consistent with the reality that WFF's claim is approximately $20.5 million and the Debtor's own appraised value of the collateral is approximately $21.8 million, while WFF values the collateral at $19.8 million. Given how narrow the margins are, if the Debtor rents or sells even one fewer Unit than projected, the Debtor will not be able to make the required payments under the Plan. And that is the situation at a 3.8% interest rate, which is clearly not a sufficient rate. When a more reasonable interest rate is employed, the Debtor's cash flow cannot cover required payments as a mathematical certainty.

42.     The interest rate proposed by the Plan is woefully insufficient to provide a value on the proposed deferred cash flows equal to the current value of WFF's secured claim. Because of this disparity, the Debtor cannot cram down on WFF and its Plan, therefore, may not be confirmed.

43.     Additionally, the proposal to stretch payment of WFF's secured claim over seven years does not treat WFF's claim fairly and equitably.  While the Bankruptcy Code does permit the Debtor to extend the maturity date of the pre-petition WFF Loan, that right is not without limits.  The Plan goes beyond what is fair and equitable by converting WFF's short term bridge loan into a seven year conventional loan.  *See, e.g., In re Peterson*, 95 B.R. 663, 664 (Bankr. W.D. Mo. 1988) ("[A]n indebtedness which . . . results from a contract entered into shortly before the date of bankruptcy and was intended by the parties to be a short-term indebtedness cannot, under the governing standard, be converted into long-term indebtedness."); *In re Miami Ctr. Assocs.*, 144 B.R. 937, 941 (Bankr. S.D. Fla. 1992) (denying confirmation of plan that proposed to stretch loan in last year of 10 year term for additional 10 years, and market for similar loans was 3 to 4 years); *In re Manion*, 127 B.R. 887, 890-91 (Bankr. N.D. Fla. 1991) (denying confirmation because plan that proposed to convert 5-year note into 20-year note was not fair and equitable to secured lender).  For example, the court in *In re Peterson* denied confirmation of the debtor's plan that proposed to stretch a short-term note (which became due shortly after the bankruptcy filing) into a five-year note.  In that case, the court found that the proposed treatment of the secured lender with respect to one of its notes was insufficient, as a matter of law, and the "illegality is discernable in advance of any hearing." *In re Peterson*, 95 B.R. at 664.  The court in that case summarily denied confirmation of the debtor's plan because it proposed to re-amortize the loan over a five year period, even at the contract rate.  The court's concern was with the extension of the original term of the loan:  "The delay cannot be 'prejudicial to creditors.'  That is the case at bar, in which the debtor appears to convert a past-due, short term debt into a long term debt." *Id.*  (internal citation omitted).

44.     The proposed loan tenure in this case is even more egregious.  The WFF

loan has already matured for over eight months, and was intended only as a one-year bridge loan.

The Plan seeks to convert this matured, short term debt into a seven year long term loan.

B.     The Plan Does Not Satisfy The Requirement Under
       Section 1129(b)(2)(A)(i)(I) That WFF Retain Its Liens Securing Its Claim

45.     Section 1129(b)(2)(A)(i)(I) provides that, in order to satisfy the condition

that a plan be fair and equitable with respect to a secured claim, the plan must provide that the

secured claimant retain the liens securing such claim.  11 U.S.C. § 1129(b)(2)(A)(i)(I).  The Plan

does not provide for the continuation of WFF's security interest in the membership interests of

the Debtor pursuant to the Pledge Agreement.

46.     The Plan allows Equity Holders, who are also Pledgors under the Pledge

Agreement, to have their equity interests extinguished, resulting in the corresponding

extinguishment of WFF's security interest pledged by such Pledgor.  The Plan, therefore, does

not comply with this confirmation requirement and confirmation of the Plan must be denied.

47.     In addition, the Plan provides that WFF will be paid from 85% of the net

proceeds of sales of Units.  Unless WFF is paid 100% of all net proceeds of sales of Units, or

WFF is permitted to credit bid on Units, the Plan does not comply with section

1129(b)(2)(A)(i)(I) and confirmation of the Plan must be denied.  *See In re N. Valley Mall, LLC*,

-- B.R. --, 2010 WL 2632017 (Bankr. C.D. Cal. June 21, 2010) (requiring all sale proceeds of

future sales of undeveloped pads in shopping center to be paid to secured lender who had lien on

shopping center property, otherwise would be inconsistent with 1129(b)(2)(A)(i)(I), unless

lender given right to credit bid).

C.   The Plan Does Not Satisfy The Requirement
     Under Section 1129(b)(2)(A)(ii) That WFF Be Permitted
     To Credit Bid On The Sale Of The Debtor's Membership Interests

48.   Section 1129(b)(2)(A)(ii) allows a plan to satisfy the fair and equitable requirement with respect to the cramdown of a secured claim if the plan calls for the sale of property free and clear of liens securing such claims if the liens attach to the proceeds of the sale and the sale is subject to section 363(k), which permits a secured creditor to credit bid its claim in a sale of the secured creditor's collateral. 11 U.S.C. § 1129(b)(2)(A)(ii). In this case, the Plan contemplates a sale of the Debtor's equity interests, in which WFF has a security interest by virtue of the Pledge Agreement, without allowing WFF its right to credit bid for those assets. *See Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 679 (D. Mass. 2000) (noting that transfer of equity interest of debtor to insider in exchange for equity investment to fund plan was sale of equity subject to a secured creditor's right to credit bid, but only if secured creditor has lien on the equity interests being sold).

49.   "It is well established that a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a bankrupt's estate." *In re PCH Assocs.*, 949 F.2d 585, 597 (2d Cir. 1991). Here, the transfer of 100% ownership interest in the Debtor from three of the Equity Holders to one Equity Holder (and perhaps some side dealings to further transfer interests in the Debtor to Moshe Lax), where the transaction is not subject to market competition or valuation, is tantamount to a sale.

50.   The plain language of section 1129(b)(2)(A)(ii) states that sales of property subject to a secured creditor's liens is subject to section 363(k). By circumscribing

WFF's right to credit bid pursuant to section 363(k), the Plan does not treat WFF fairly and equitably with respect to the sale of the Debtor's equity interests. Accordingly, the Plan can not be confirmed.

## II.    The Plan Should Not Be Confirmed Because It Is Not Feasible

51.    Section 1129(a)(11) of the Bankruptcy Code provides that a plan may only be confirmed if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11). The purpose of section 1129(a)(11) is to "prevent confirmation of visionary schemes which promise creditors more under a proposed plan than that which the debtor can possibly attain after confirmation." *In re Sea Garden Motel & Apts.*, 195 B.R. 294, 304 (B.N.J. 1996). "To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations." *In re The Leslie Fay Cos.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997).

52.    This Court previously has noted, in denying a plan as not feasible, that where a debtor "believes a sale of the property or its refinancing will enable it to carry out the Plan, the Debtor is relying on a veritable pot of gold at the end of the rainbow . . . . Plans which extensively rely on the sale or refinance of real property that constitutes a debtor's primary or sole significant asset, and where the asset has been a marginal performer to date, are inherently speculative and invite close judicial scrutiny of the assumptions of the underlying plan." *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, 735 (Bankr. E.D.N.Y. 1994) (quoting *In re Investors Fla. Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994)).

53.     As noted above, the proper interest rate to apply to WFF's secured claim is the blended market rate of 11.68% advocated by WFF's interest rate expert, Mr. Stuart Bruck. Using an 11.68% cramdown rate, the aggregate interest payment due WFF in the first year is approximately $2.4 million.[9] The net cash flow in the first year is approximately $1.1 million, and no Units are projected to be sold. Going forward through year 7 of the Plan projections, there will be a shortfall of approximately $5.3 million in plan payments (predominately in interest payments to WFF), and the principal amount of WFF's secured claim will remain unpaid in the amount of over $4.6 million at the end of the 7 years, if the 11.68% rate is used. The Plan is patently unfeasible if the proper market interest rate is used. *See In re Dindiyal*, 1993 WL 540373 (E.D.N.Y. Sept. 30, 1993) (finding that proper cramdown rate was base market rate of 9% plus 1% for risk premium, which was 1.5% higher than debtor's proposed 8.5% rate, and then denying confirmation because cash flow could not support interest payments with imposition of higher rate).

54.     Moreover, the Debtor's Plan in this case is not feasible because it relies on the sales of Units that are speculative. By the Debtor's own admission, the last unit sold was in February 2009, over a year and a half ago, and prior to that, units were sold in the third quarter 2008. Over the course of approximately the last 20 months, the Debtor has managed to sell one, single unit. Further, the Debtor has no details regarding sales projections to support the ability of the Debtor to sell the Units, and the Debtor has not modeled for financing restrictions[10] that could impede the sale of Units. By providing for the substantial balloon paydown of WFF's

---

[9] Attached hereto as Exhibit B is a chart indicating the Debtor's cash flow shortfall in payments to WFF with post-confirmation interest rates from 6.50% to 11.68%.

[10] A buyer cannot receive an FHA loan on a unit in a condominium buildings that is less than 50% sold or in contract. Because 37 Units (60% of the building) are unsold, the financing restrictions make the timing of the Debtor's sales projections less reliable.

claim in the amount of approximately $7 million in the seventh year of the Plan through sales of Units (the pot of gold at the end of the rainbow), the Debtor has shifted all the risk of the failure of the Plan on WFF.

55.     Accordingly, the Debtor's Plan is not feasible and may not be confirmed pursuant to section 1129(a)(11).

**III.     The Plan Should Not Be Confirmed Because It Provides For An Impermissible Injunction In Violation Of Sections 1129(a)(1) And 524(e) Of The Bankruptcy Code**

56.     Section 1129(a)(1) of the Bankruptcy Code requires a plan to comply with the applicable provisions of the Bankruptcy Code.  One such applicable provision is section 524(e) of the Bankruptcy Code, which states that, with few exceptions, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).  Most courts that reject injunctions, exculpations and releases protecting non-debtor third parties do so on the basis that section 524(e) precludes such relief.  *See Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir. 1985) ("The bankruptcy court has no power to discharge the liabilities of a non-debtor pursuant to the consent of creditors as part of a reorganization plan.  The broad language of section 524(e), limiting the scope of discharge so that it does not 'affect the liability of any other entity,' encompasses this result.").

57.     Some courts do allow injunctions that protect non-debtor third parties under extremely limited circumstances.  These courts argue that although section 524(e) prevents the discharge from releasing non-debtor third parties, the court may, on rare occasions, and for exceptional circumstanecs, use its broad equitable powers under section 105 to grant injunctions against non-debtor third parties.  These courts have granted such injunctions under a variety of theories, but always, either implicitly or explicitly, invoke the bankruptcy court's section 105

injunctive powers only when they have found authorization for such an injunction elsewhere in the Bankruptcy Code or under other state or federal law. *See In re Chauteaugay Corp.*, 167 B.R. 776 (S.D.N.Y. 1994) (holding that section 105(a) does not give a bankruptcy court unfettered discretion to discharge a non-debtor from liability). The language of section 105(a) limits the bankruptcy court's discretion to acts necessary or appropriate to carry out the purposes of the Bankruptcy Code, which was intended to provide protection to debtors, not non-debtors.

58.     Notwithstanding that courts have on rare occasions granted non-debtor releases, the Second Circuit views "third party plan releases more skeptically." *In re Dreier LLP*, 2010 WL 1707737 (Bankr. S.D.N.Y. Apr. 28, 2010) (referring to *Metromedia* and discussing with approval). The Second Circuit Court of Appeals made clear in *In re Metromedia Fiber Network, Inc.*, that the limited exceptions in which a non-consensual third party injunction could be granted were reserved for "rare cases." 416 F.3d 136, 141 (2d Cir. 2005) ("While none of our cases explains when a nondebtor release is 'important' to a debtor's plan, it is clear that such a release is proper only in rare cases."). The *Metromedia* court provided the following guidance on issuing third party releases and injunctions:

> Courts have approved nondebtor releases when: the estate received substantial consideration; the enjoined claims were "channeled" to a settlement fund rather than extinguished; the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution; and the plan otherwise provided for the full payment of the enjoined claims. Nondebtor releases also may be tolerated if the affected creditors consent. . . . But this is not a matter of factors and prongs. *No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique.* . . . A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan.

416 F.3d at 142-43 (quotations and citations omitted) (emphasis added). *See also In re DBSD N. Am., Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009) (noting exculpations and third party releases only to be used in *some* case, and listing *Metromedia* factors); *In re TCI 2 Holdings, Inc.*, 428 B.R. 117, 139 (Bankr. D.N.J. 2010) (requiring deletion of plan provision releasing third-party guarantor in order to confirm plan); *In re Prussia Assocs.*, 322 B.R. 572, 603 (Bankr. E.D. Pa. 2005) ("[E]ven where an injunction is only temporary, a clear showing of necessity is obviously required on the part of the Debtor to justify approval of such a significant departure from customary principles of bankruptcy law.")..

59.     As *Metromedia* teaches, the circumstances here must be "rare," "unique," or "unusual" in order to justify the Plan Injunction for the benefit of the non-debtor Guarantors. But such is not the case here. This is a simple single asset real estate case, in which some of the principals of the Debtor and Moshe Lax (a non-principal) gave personal guaranties for the payment of the Debtor's obligations under the Loan Documents. It is a scenario played out in nearly every single asset real estate bankruptcy case. To provide the Guarantors a permanent injunction against prosecution, especially when one of the Guarantors is an estate, on a liability that has already been reduced to judgment would require the Court in this case to ignore the Second Circuit's binding mandate that third party releases and injunctions be reserved for unusual circumstances.

60.     In addition, this case does not present any of the instances in which the *Metromedia* court deemed susceptible to the granting of a third party release. For example, the Debtor's estate here will not be receiving a "substantial" contribution; there is no separate fund to which WFF's enjoined claim against the Guarantors may be satisfied; and the Debtor has no indemnity or contribution obligations with respect to the Guarantors as a result of the Summary

Judgment Action. It does not appear that any of the Guarantors[11] is making a contribution to the Professional Fees Account or the Plan. In any event, the up to $1 million payment to the Professional Fees Account represents approximately 4% of the over $21.3 million in total plan disbursements that the Debtor proposes to make through the Debtor's operations and the sale of Units (based on the Debtor's assumptions and a 3.5% interest rate on WFF's claim), and those funds are not available for distribution to *any* creditor, nevermind the enjoined claims of WFF. Nor is the Plan Injunction itself important to the Plan. The Plan Injunction has no effect on the Debtor, the property of the Debtor's estate or the Debtor's reorganization. The Guarantors are not induced to make contributions to the Plan on account of the Plan Injunction. Nor are any of the Guarantors making a contribution.

61. Lastly, the Debtor's anticipated argument that the Plan Injunction is permissible because the payment of WFF's claim in full[12] under the Plan relieves the Guarantors from their liability on the Guaranty and the State Court Judgment is without support. On the contrary, the law is well-settled that the treatment of the underlying claim by the principal obligor of the debt in a bankruptcy proceeding does not relieve the guarantor from liability on account of the guarantee of that debt. *See* 11 U.S.C. § 524(e) (providing that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt"); *see also NCNB Texas Nat'l Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir. 1994) (permitting bank to pursue suit against guarantor where debtor on underlying debt confirmed bankruptcy plan which treated the underlying debt, and reasoning that "discharge of a debtor in reorganization proceedings does not affect a guarantor's liability"); *United States v.*

---

[11] WFF was advised that only Jack Weingarten (a non-guarantor) will be making a contribution.

[12] The Court made clear at the hearing on August 16, 2010 that WFF's claim is not being "paid in full."

*Stribling Flying Serv., Inc.*, 734 F.2d 221, 222-23 (5th Cir. 1984) (holding that unconditional guarantors of corporate debtor's debt not affected by confirmation of plan that restructured and reduced the debt, and rejecting argument that confirmation of plan cured default on the accelerated debt); *Union Trust Co. of Rochester v. Willsea*, 275 N.Y. 164, 166 (1937) (holding that creditor's acceptance of stock in payment of debt pursuant to bankruptcy plan did not bar creditor from pursuing guarantor of the debt); *Chem. Bank New York Trust Co. v. Liebman*, 379 N.Y.S.2d 69 (N.Y. App. Div. 1976) (holding that creditor's receipt of portion of debt in bankruptcy proceeding of principal obligor did not discharge liability of guarantor of obligor's indebtedness); *Comi v. DSC Fin. Corp.*, 994 F. Supp. 121, 124 (N.D.N.Y. 1998) ("[W]here a guaranty specifically authorizes the release of an obligor without impairing the ability to seek payment from the guarantor, the guarantor's liability exists independently of the underlying obligation."); *Hampton v. Bank of Lafayette*, 578 S.E.2d 486, (Ga. Ct. App. 2003) (disagreeing with guarantor's argument that "because the primary debtor's confirmed bankruptcy plan would have enabled the bank to obtain full payment of cosigned debts . . ., the bank is barred from bringing suit to collect the indebtedness from the debtor's cosignor," on the basis that the debtor's bankruptcy plan did not discharge the guarantor's liability on the guaranty); *Mercantile Club, Inc. v. Scherr*, 651 A.2d 456, 462 (Md. Ct. Spec. App. 1995) ("Because bankruptcy only avoids the debts of the debtor, we must next consider what obligations a guarantor or surety has after the debtor's plan of reorganization in bankruptcy is confirmed. We conclude that the guaranty or surety cannot be eliminated, because extinguishing or modifying the collateral obligation upon the reorganization of the principal debtor would defeat the very purpose of the guaranty--i.e., protection against the principal's inability to pay.") (quotations and citation omitted); *Pemstein v. Stimpson*, 630 N.E.2d 608, 615 (Mass. App. Ct. 1994) ("Guarantors are

still liable on the entire original primary debt, notwithstanding the debtor's chapter 11 petition and notwithstanding confirmation of a plan that reduced the corporate debtors' debt to the creditor."). Here, because repayment of WFF's claim is wholly contingent upon Unit sales, there is no assurance that WFF will indeed be paid. Accordingly, WFF should be able to proceed against the Guarantors.

## IV. The Plan Should Not Be Confirmed Because It Has Not Been Proposed In Good Faith And Has Been Proposed By Means Forbidden By Law

62. Section 1129(a)(3) of the Bankruptcy Code provides that a plan may only be confirmed if it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The good faith requirement is viewed in light of the totality of circumstances surrounding the plan, with the most important feature being an inquiry into the "fundamental fairness in dealing with creditors." *In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting *In re Jorgensen*, 66 B.R. 104, 109 (Bankr. 9 Cir. 1986); *see also In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001); *In re Am. Family Enterprises*, 256 B.R. 377 (D.N.J. 2000); *Epic Metals Corp. v. Condex, Inc.*, 232 B.R. 806, 808 (M.D. Fla. 1999) (citing *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984) ("Determination as to whether Chapter 11 plan has been proposed in good faith is a complex one, which is based upon consideration of all of the facts in assessing the debtor's intent, the realistic possibility of effective reorganization, and the exercise of judicial discretion.").

63. In this analysis, a plan's apparent compliance with the technical requirements for confirmation is not dispositive, as the Court has considerable discretion, as a court of equity, to assess the true impact of the proposed plan. As one court has stated: "[P]lacing the amorphous concept of good faith outside the confines of all of the other elements

for confirmation of the plan, even outside § 1129(b)'s cramdown requirements, is intended to allow courts to utilize their gut feeling about a plan's effects." *In re Dow Corning Corp.*, 244 B.R. 673, 676 (Bankr. E.D. Mich. 1999). That court quoted extensively from one of its prior decisions to explain that, in making the requisite 1129(a)(3) evaluation, the bankruptcy judge considers what is just and equitable under the circumstances:

> [A] court of equity must use all of its senses to determine whether a proposed course is fair and equitable. A bankruptcy judge is more than a pair of ears to hear the argument and a pair of eyes to read the law. Furthermore, the mind, which may tell us intellectually that there is nothing technically "illegal" in a particular course of action, is not always the final arbiter. Sometimes, a bankruptcy judge's nose tells him/her that something doesn't smell right and further inquiry is warranted. (Others call this "common sense."). . . . In the context of a plan confirmation in the bankruptcy cases, when this is the way the judge feels, it may be because the plan has not "been proposed in good faith." In short, the reading of the law should be tempered by the judge's sense of equity--what is *just* in the circumstances of the case. If there are objective facts to support this feeling, perhaps the plan should not be confirmed.

*In re Dow Corning Corp.*, 244 B.R. at 676. Thus, one court that refused to confirm a Chapter 11 plan on the grounds that it was not proposed in good faith declared:

> No amount of refined (or strained) analysis can still the moral outrage that the Debtors' plan triggers. At some point, a court of equity has to say, no, this cannot be . . . . If "good faith" is to have any moral significance, the Debtors' plan cannot be found to be deserving of that appellation.

*In re Barr*, 38 B.R. 323, 325 (E.D. Mich. 1984).

64.     This Plan has not been proposed in good faith. It is clear that, from the very beginning, the Debtor has no intention to deal with WFF with fundamental fairness. WFF extended the short term loan to the Debtor with both parties' understanding that the Debtor

would seek conventional financing once it established its cash flow. Indeed, just prior to the maturity of the WFF loan, the Debtor had an executed application letter in hand from M&T Bank to refinance and replace WFF as the mortgageholder. Instead, the Debtor decided to file bankruptcy and convert WFF from a short-term bridge lender into a long-term conventional lender and to cram WFF down at a lower interest rate than even what conventional lenders were offering. This Plan is the attempted culmination of that scheme.

65. Furthermore, the Plan does not satisfy section 1129(a)(3) because implementing the Plan requires the Debtor to take actions that it is prohibited from taking. "Although the statute requires denial of confirmation if the plan is 'proposed' by 'forbidden' means, most courts have focused not on the means of proposal but on the means of implementation." 7 Collier on Bankruptcy ¶ 1129.02[3][b] (16th Ed. Rev. 2010). In this case, the Plan requires the Debtor to amend its Operating Agreement to modify, among other things, the composition of the members of the Debtor without the consent of WFF. Such action would be in direct contravention of the Pledge Agreement, which requires WFF's consent to all modifications to the Operating Agreement. Part of WFF's collateral package to support the pre-petition loan to the Debtor was the security interest granted to WFF in the Pledgors' interests in the Debtor. By permitting parties to amend and modify the Operating Agreement, which may have the consequence of removing Pledgors as interest owners of the Debtor and thus degrade WFF's collateral, the Plan runs afoul of section 1129(a)(3) and must be denied confirmation.

66. The insider dealings in this case also add to the sense that this Plan doesn't smell right. At the August 16, 2010 hearing on the second motion for an injunction, for the first time, the Debtor disclosed that Mr. Moshe Lax stood to gain membership interests in the Debtor through non-disclosed side agreements with Mr. Weingarten in exchange for his contribution to

the Professional Fees Account even though he is not an Equity Holder and therefore not entitled to receive equity interests under the Plan. The Debtor's efforts to protect Mr. Moshe Lax, a non-debtor guarantor, also is evident. The Debtor tried twice to obtain an injunction for his benefit, even though the State Court Actions do not in any way affect the Debtor. The Debtor has included the gratuitous Plan Injunction, even though none of the Guarantors will be contributing in any fashion to the Plan.

**V.    The Plan Should Not Be Confirmed Because It Does Not Provide For
The Full Payment Of Administrative Expenses On The Effective Date Of The Plan**

67.    Section 1129(a)(9) requires that, "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that . . . with respect to a claim of a kind specified in section 507(a)(2) [administrative expense claims] . . ., on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim." 11 U.S.C. §1129(a)(9)(A).

68.    Although the Debtor submits in its Plan that Administrative Expenses and Professional Fees will be paid in full on the effective date of the Plan, the Debtor has provided no evidence that it has the funds to make these payments or that any holders of Administrative Expense Claims or Professional Fees has agreed to a different treatment. On the contrary, the Debtor's own representations in proceedings before this Court indicate that it will not have the necessary funds to make administrative payments in full on the effective date. For example, in pleadings filed with this Court in connection with the Debtor's second request for an injunction to enjoin WFF from executing upon the assets of Moshe Lax so that he would be able to fund the remainder of the Professional Fees Account, the Debtor has stated that no principal or guarantor, other than Jack Weingarten and Moshe Lax has the financial wherewithal to fund the required $1

million Professional Fees Account. Since the Debtor has advised that Moshe Lax will not make a contribution and argued at the hearing on the injunction motion that Jack Weingarten did not have the means to contribute any more than the $500,000 he purportedly has already committed to the Debtor,[13] there does not appear to be any evidence that the Debtor will be able to fund the Professional Fees Account in full. Accordingly, the Plan must be denied for failing to comply with section 1129(a)(9) of the Bankruptcy Code.

For all the foregoing reasons, WFF respectfully requests that this Court deny confirmation of the Plan, and grant WFF such other and further relief as the Court deems just and equitable.

Dated: New York, New York
       September 8, 2010

HERRICK, FEINSTEIN LLP
*Attorneys for W Financial Fund, LP*

By:    */s/ Andrew C. Gold*
       Andrew C. Gold
       Hanh V. Huynh
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
agold@herrick.com
hhuynh@herrick.com

---

[13] The Debtor has stated that Jack Weingarten has committed to contribute $500,000, but the Debtor has provided no evidence of this commitment, even though WFF has sought such information and documents through discovery.

HF 5860503v.4 #06920/0006

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------------------------X
BRT REALTY TRUST and
W FINANCIAL FUND, LP,

                         Plaintiffs,

              - against -

THE ESTATE OF CHAIM LAX, deceased, MOSHE LAX,
individually and as the Executor of the Estate of Chaim Lax,
ZLATY SCHWARTZ, as Executor of the Estate of Chaim
Lax, WHITE COAT, INC. f/k/a DYNAMIC DIAMOND
CORP., DIAMOND DYNAMICS, LLC,  SHAINDY LAX,
MORDECHAI EHRENFELD a/k/a MARTIN EHRENFELD,
and JUDA ROSENFELD,

                      Defendants.
-----------------------------------------------------------------------------X

**SUPPLEMENTAL
SUMMONS** _____

Index No.: 11632/10
Date Purchased: ~~July~~ 6-16, 2010

Plaintiffs designate Nassau
County as the Place of Trial.

The Basis of Venue is
Plaintiffs' Place of Business

**TO THE ABOVE NAMED DEFENDANTS:**

     **YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE** upon the
undersigned, Jaspan Schlesinger LLP, 300 Garden City Plaza, Garden City, New York 11530, as
attorneys for Plaintiffs, an Answer to the annexed Amended Verified Complaint, which is herewith
served upon you, within twenty (20) days after service hereof, exclusive of the day of service or
within thirty (30) days after the service is complete, if service is made by any method other than
personal delivery to you within the State of New York.

     In case of your failure to answer the Amended Verified Complaint, judgment will be taken
against you by default for the relief demanded therein.

Dated: Garden City, New York
       July 7, 2010

**RECEIVED**

JUL 08 2010

NASSAU COUNTY
COUNTY CLERK'S OFFICE

JASPAN SCHLESINGER LLP
Attorneys for Plaintiffs
*BRT REALTY TRUST and
W FINANCIAL FUND, LP*

By:                                  
     STEVEN R. SCHLESINGER
     300 Garden City Plaza
     Garden City, New York 11530
     (516) 746-8000

To:   Porzio, Bromberg & Newman, P.C.
Attorneys Defendants
   *White Coat, Inc. f/k/a Dynamic Diamond Corp.*
   *and Martin Ehrenfeld*
156 West 56th Street, Suite 803
New York, New York 10019

Wachtel & Masyr, LLP
Attorneys for Defendants
   *Moshe Lax, Individually and as*
   *the Executor of the Estate of Chaim Lax, deceased*
   *Zlaty Schwartz, as Executor of the Estate of Chaim Lax, deceased*
One Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017

Neiger LLP
Attorneys for Defendants
   *Shaindy Lax and Diamond Dynamics, LLC*
111 John Street; 8th Floor
New York, New York 10038

Juda Rosenfeld
Defendant
580 5th Avenue
New York, New York 10036

Juda Rosenfeld
Defendant
1 Ashel Lane
Monsey, New York 10952

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------------------X

BRT REALTY TRUST and
W FINANCIAL FUND, LP,

                           Plaintiffs,

          - against -

THE ESTATE OF CHAIM LAX, deceased, MOSHE LAX,
individually and as the Executor of the Estate of Chaim Lax,
ZLATY SCHWARTZ, as Executor of the Estate of Chaim
Lax, WHITE COAT, INC. f/k/a DYNAMIC DIAMOND
CORP., DIAMOND DYNAMICS, LLC, SHAINDY LAX,
MORDECHAI EHRENFELD a/k/a MARTIN EHRENFELD,
and JUDA ROSENFELD,

                           Defendants.

------------------------------------------------------------------------X

**AMENDED**
**VERIFIED**
**COMPLAINT**

Index No.: 11632/10

Plaintiffs, BRT Realty Trust ("BRT") and W Financial Fund, LP ("W Financial") (BRT

with W Financial collectively, "Plaintiffs"), by their attorneys, Jaspan Schlesinger LLP, as and

for their Amended Verified Complaint against Defendants, state as follows:

## NATURE OF ACTION

1.     This action arises out of defendants' fraudulent scheme to transfer the assets of

defendant guarantors in a concerted effort to defraud plaintiffs and frustrate, hinder and delay

their efforts with respect to the satisfaction of a prospective judgment. This action is brought

pursuant to the provisions of, *inter alia*, N.Y. Debt. & Cred. Law §§ 273-a, 276, 276-a, and 278.

## THE PARTIES

2.     At all relevant times hereinafter mentioned, plaintiff BRT was and is a

Massachusetts business investment trust, with offices located at 60 Cutter Mill Road, Great

Neck, New York.

3.     At all relevant times hereinafter mentioned, plaintiff W Financial was and is a Delaware limited partnership, with its principal place of business located at 149 Madison Avenue, New York, New York.

4.     Upon information and belief, defendant the Estate of Chaim Lax, deceased (the "Estate"), was the principal shareholder/owner of Dynamic Diamonds Corp. ("Dynamic"), which, at one time operated one of the largest full-service diamond manufacturing businesses in the United States producing high-end ideal cut loose diamonds and jewelry for sale at whole sale and whose customers included Tiffany & Co.

5.     Upon information and belief and at all relevant times hereinafter mentioned, defendant Moshe Lax ("M. Lax") was and is an individual and executor of the Estate, residing at 1653 58th Street, Brooklyn, New York. Furthermore, upon information and belief, M. Lax was a shareholder, owner, principal and/or officer of Dynamic and manager of Diamond Dynamics, LLC.

6.     Upon information and belief and at all relevant times hereinafter mentioned, defendant Zlaty Schwartz ("Z. Schwartz") was and is an individual and executor to the Estate, residing at 725 Bedford Avenue, Brooklyn, New York.

7.     Upon information and belief and at all relevant times hereinafter mentioned, defendant White Coat, Inc. ("White Coat"), formerly known as Dynamic Diamonds Corp., was and is a New York corporation with its principal place of business located at 580 5th Avenue, New York, New York.

8.     Upon information and belief and at all relevant times hereinafter mentioned, defendant Diamond Dynamics, LLC ("DD") was and is a New York limited liability company with its principal place of business located at 580 5th Avenue, New York, New York.

2

9.     Upon information and belief and at all relevant times hereinafter mentioned, Shaindy Lax ("S. Lax") was and is an individual and wife of defendant M. Lax as well as sole member of DD with a principal place of business located at 580 5th Avenue, New York, New York.

10.     Upon information and belief and at all relevant times hereinafter mentioned, defendant Mordechai Ehrenfeld, also known as Martin Ehrenfeld ("M. Ehrenfeld"), was and is an individual and chief restructuring officer of White Coat f/k/a Dynamic with a principal place of business located at 580 5th Avenue, New York, New York. Upon information and belief, M. Ehrenfeld is the brother-in-law of S. Lax.

11.     Upon information and belief and at all relevant times hereinafter mentioned, defendant Juda Rosenfeld ("Rosenfeld"), was and is an individual who purports to hold a secured interest in all of the assets of DD and who has offices at 580 5th Avenue, New York, New York and resides in Rockland County, New York.

12.     Defendants the Estate; M. Lax, individually and in his capacity as executor of the Estate; and, Z. Schwartz, as executor of the Estate, are collectively referred to herein as the "Guarantor Defendants".

## FACTS RELEVANT TO ALL CAUSES OF ACTION

13.     On or about October 14, 2008, W Financial agreed to lend 20 Bayard Views, LLC (the "Borrower") the principal amount of $17,400,000, pursuant to a Consolidated, Amended and Restated Note dated October 14, 2008 (the "Note").

14.     In conjunction with the Note, Plaintiffs entered into a Participation Agreement dated October 14, 2008 (the "Participation Agreement") whereby BRT agreed to purchase from W Financial a fifty percent (50%) interest in the Note for the sum of $8,700,000.

3

15.     Also on October 14, 2008, the Guarantor Defendants made, executed and delivered to Plaintiffs, an instrument wherein they guarantied, as primary obligors, prompt and complete payment pursuant to the terms of the Note (the "Guaranty").

16.     Prior to the Guaranty, in or around April 2008, Chaim Lax tendered a Statement of Net Worth reflecting his total net worth as $205,530,944.00.

17.     Upon information and belief, Chaim Lax died on November 3, 2008.

18.     In or around March 2009, Plaintiffs sent Guarantor Defendants a Notice of Default informing them of their failure to make the March 1, 2009 payment under the Note. Guarantor Defendants eventually made payment and the Note was reinstated.

19.     Thereafter, on or about October 13, 2009, defendants M. Lax and Z. Schwartz, as executors of the Estate, executed an Application for Extension of Preliminary Letters Testamentary ("Application"), which valued the Estate's equity interest in Dynamic at $20,000,000.00 and the total Estate at $23,816,666.00 – a staggering $181,714,278.00 less than the $205,530,944.00 represented in the financial statements provided to Plaintiffs a mere 18 months earlier.

20.     Also on October 13, 2009, at Guarantor Defendants' request, Plaintiffs entered into a Loan Extension Agreement, which extended the maturity date of the Note to January 13, 2010.

21.     Despite the above extension, Borrower defaulted on the Note by failing to make payment in December 2009. In addition, the Borrower filed a Chapter 11 Bankruptcy Petition in the United States Bankruptcy Court for the Eastern District of New York on December 4, 2009.

4

22.     By January 13, 2010, the extended loan maturity date, an outstanding principal balance in the amount of $16,975,072, plus accrued interest, advances and costs incurred in connection therewith, remained unpaid on the Note.

23.     As such, on or about January 22, 2010, Plaintiffs, by their attorneys Jaspan Schlesinger LLP, moved this Court (Index No. 10/001473) for an Order, pursuant to CPLR § 3213, directing judgment in favor of the Plaintiffs and against defendants M. Lax and the Estate, among others, on the grounds that the action is based upon an instrument for the payment of money only, which is now due and payable (the "Motion"). The Motion return date was, initially, set for February 19, 2010.

24.     On or about February 17, 2010, Plaintiffs consented to an adjournment, albeit pursuant to Guarantor Defendants' request, until March 12, 2010.

25.     Upon information and belief, what was seemingly a benign request for an adjournment, in hindsight, was actually a stall tactic employed by Guarantor Defendants in order for them to accomplish their scheme to transfer their assets in a concerted effort to defraud Plaintiffs and frustrate, hinder and delay their efforts with respect to the satisfaction of a prospective judgment.

26.     Unbeknownst to Plaintiffs at the time the request was made, Guarantor Defendants had already set about their scheme, with the assistance of M. Ehrenfeld and S. Lax, to transfer their interest in Dynamic in order to frustrate any collection efforts of the prospective judgment on the Guaranty.

27.     This scheme to defraud Plaintiffs was furthered on February 26, 2010, just eight days after Plaintiffs agreed to adjourn the Motion, whereby the Guarantor Defendants and M. Ehrenfeld completed the first of a series of steps to shield, transfer and convey their interest in

5

Dynamic from the certain impending judgment by changing Dynamic's corporate name to White Coat.

28.     Just days later, on or about March 4, 2010, White Coat executed a Deed of Assignment for the Benefit of Creditors ("Deed of Assignment"), which provided that White Coat would transfer its assets to Tracey L. Klestadt, Esq., of Klestadt & Winters, LLP, to hold in trust, for the purpose of selling or disposing of White Coat's assets to the satisfaction of its known creditors. According to the Deed, any residual monies would inure to the benefit of White Coat or its successors.

29.     Conveniently, prior to the execution of the Deed of Assignment, M. Ehrenfeld negotiated a sale of all of White Coat's assets to a single entity with a name strikingly similar to that of White Coat's original name (Dynamic Diamonds Corp.)—Diamond Dynamics LLC ("DD").

30.     Upon information and belief, the purchase price secured by DD for White Coat was intentionally undervalued and based on inaccurate and outdated valuations and appraisals that were requisitioned by M. Lax and M. Ehrenfeld with the intent to defraud the Plaintiffs as creditor of the equity interest owner(s).

31.     The sole member of DD is defendant S. Lax, the wife of defendant M. Lax, who is a stay-at-home-mother with significant family responsibilities.

32.     Upon information and belief, S. Lax has little to no experience operating a full-service diamond manufacturing business, which produces high-end and ideal cut loose diamonds and jewelry for sale at wholesale.

33.     Upon information and belief, M. Lax instructed, directed and/or requested that S. Lax purchase White Coat with the expectation that M. Lax would retain control over White Coat

6

and DD in an effort to defraud Plaintiffs as creditor of the equity interest owner(s) and frustrate, hinder and delay their efforts with respect to the satisfaction of a prospective judgment.

34.  On March 11, 2010, Guarantor Defendants made an eleventh hour attempt to again adjourn the return date of the Motion. Guarantor Defendants requested the adjournment under the guise that the obligations to Plaintiffs would be paid in full pursuant to the proposed reorganization plan in the Borrowers' related bankruptcy action.

35.  Upon information and belief, this request for an adjournment of the return date was yet another step in the scheme by Guarantor Defendants to transfer, convey and dissipate the assets in an attempt to defraud Plaintiffs and frustrate the prospective judgment on the Guaranty.

36.  On or about March 25, 2010, the Hon. Marylin G. Diamond of the Supreme Court of the State of New York, New York County, entered a Sale Order approving the sale of substantially all of the assets of White Coat to DD based on the intentionally undervalued financials prepared and requisitioned by M. Lax and apparently with no objection being filed by any creditors of White Coat who were to be paid in full.

37.  Plaintiffs were not provided with notice of the sale of substantially all of the assets of White Coat to DD or the opportunity to object to that sale.

38.  Upon information and belief, on or about March 26, 2010, Defendants took the final step in their nefarious scheme by conveying the assets of White Coat to DD which were grossly undervalued, whereby DD and S. Lax agreed to purchase White Coat in consideration for $3,826,258 for cash and by assuming $3,116,668 of White Coats' debts and liabilities -- the majority of which, $2,000,000.00, was purportedly owed to M. Lax, S. Lax' husband.

7

39.     Upon information and belief, the funds and/or assets used by DD and S. Lax to purchase White Coat originated from M. Lax, individually or as joint owner of M. Lax' and S. Lax' marital property, or from a loan based upon and secured by marital assets.

40.     Upon information and belief, M. Lax orchestrated the above transfer as a means of purchasing White Coat at a substantial discount and secreting Guarantor Defendants' ownership interest in DD to hinder, delay and defraud Plaintiffs from enforcing the Guaranty.

41.     On April 28, 2010, the Supreme Court of the State of New York, County of Nassau (Driscoll, J.), issued a Short Form Order, which granted Plaintiffs' motion as and against the Guarantor Defendants in the principal amount of $8,700,000 and, further, directed that a hearing be held on the issues of interest, late fees, costs and counsel fees.

42.     On May 28, 2010, the Court issued an Order authorizing the entry of a money judgment in the amount of $8,700,000 as and against the Guarantor Defendants.

43.     On June 15, 2010, Judgment was entered in the amount of $8,700,000 as against Guarantor Defendants, a copy of which is annexed hereto as Exhibit A.

44.     Simultaneous with the commencement of the instant action, on June 16, 2010, Plaintiffs sought by Order to Show Cause, *inter alia*, (a) the appointment of a temporary receiver to take, hold and preserve Guarantor Defendants, identifiable interest in the assets of Dynamic and White Coat, which appeared to have been fraudulently transferred and conveyed to DD and S. Lax to shield Guarantor Defendants from the Judgment and (b) an temporary and preliminary injunction preventing, prohibiting, restraining and enjoining Defendants, their agents and/or anyone acting on their behalf from removing any funds, whether held jointly in whole or in part, from any bank, brokerage firm, or other institution, wherever situated and without limitation, and

8

from encumbering, pledging, assigning, transferring, disposing, conveying and or secreting any and all assets owned by the Guarantor Defendants.

45. On June 17, 2010, pending further order from this Court, an Order was issued (a) temporarily prohibiting and restraining Defendants from removing any funds, whether held jointly in whole or in part, from any bank, brokerage firm, or other institution, and from encumbering, pledging, selling or otherwise transferring or hypothecating any and all assets owned by the Guarantor Defendants, whether held jointly in whole or in part, wherever situated and without limitation, except for immediate and necessary living expenses in the ordinary course; and (b) enjoining, forbidding and restraining the Defendants and/or their agents, servants, employees and all persons acting on their behalf, from disposing, transferring, encumbering, altering or alienating any and all assets of the Guarantor Defendants, except for immediate and necessary living expenses in the ordinary course.

46. Upon information and belief, on June 23, 2010, defendants DD, S. Lax, M. Lax and Rosenfeld further encumbered the Guarantor Defendants' equity interest in White Coat and Dynamic by filing a UCC-1 Financing Statement whereby Rosenfeld was granted a security interest in all of the assets of DD.

47. The Judgment against Guarantor Defendants remains unpaid and unsatisfied.

## AS AND FOR A FIRST CAUSE OF ACTION

48. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "47" with the same force and effect as if more fully set forth herein.

49. As described in detail above, shortly after receiving notice of Plaintiff's action to collect debts owed under the Guaranty, the Guarantor Defendants: (1) requested multiple adjournments to stall Plaintiffs action to enforce the Guaranty; (2) changed the corporate identity

9

of Dynamic to White Coat; (3) conveyed White Coat to DD, an entity (a) wholly owned by S. Lax, the wife of guarantor defendant M. Lax and (b) that was going to be operated/managed by guarantor defendant M. Lax; and (4) transferred White Coat for inadequate consideration.

50. Upon information and belief, Guarantor Defendants' above referenced actions were done with the actual intent to hinder, delay and defraud both present and future creditors, including Plaintiffs.

51. Upon information and belief, Defendants jointly and severally conspired to and did unlawfully, knowingly and intentionally negotiate and accept the fraudulent conveyance of White Coat for inadequate consideration and did so with the knowledge that said conveyance was being made in an effort to unload and shield Guarantor Defendants' assets from Plaintiffs or were otherwise complicit with Guarantor Defendants' above referenced scheme.

52. Upon information and belief, the Defendants have done other acts, including the transfer of other assets of the Guarantor Defendants in an attempt to defraud the Plaintiffs and prevent the collection of the guaranteed debt of $8,700,000.

53. Upon information and belief defendants DD, S. Lax and M. Lax, as manager of DD, will continue to waste, dissipate, encumber and secrete the assets of DD to further shield Guarantor Defendants' interest in those assets from Plaintiffs' prospective judgment.

54. Upon information and belief, Defendants have also unloaded and shielded more than one hundred million dollars of the Estate's total net worth, including $18,000,000 of the Estate's interest in Dynamic, White Coat and/or DD.

55. Upon information and belief, as a result of Defendants' above referenced actions Plaintiffs' ability to recover the sum of $8,700,000 from Guarantor Defendants has been frustrated, in whole or in part.

10

## AS AND FOR A SECOND CAUSE OF ACTION

56.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "55" with the same force and effect as if more fully set forth herein.

57.    Upon information and belief, M. Lax instructed, directed and/or requested that his wife, S. Lax, purchase White Coat f/k/a Dynamic Diamonds Corp. with the expectation that M. Lax would retain control over White Coat and DD.

58.    Upon information and belief, S. Lax purchased White Coat pursuant to M. Lax' instruction, direction and/or request with funds and/or assets provided by M. Lax, individually or as joint owner of their marital property, or with a loan based on and secured by marital assets.

59.    Upon information and belief, S. Lax purchased White Coat at an artificially reduced purchase price knowing that M. Lax conveyed the Guarantor Defendants' interest in White Coat f/k/a Dynamic Diamonds Corp. with the intent to hinder, defraud and delay Plaintiffs ability to enforce their judgment.

60.    Upon information and belief, a UCC-1 Financial Statement was filed granting a security interest in all of DD's assets to Rosenfeld with the intent to further hinder, defraud, delay and encumber Plaintiffs ability to enforce their Judgment.

61.    It would be unjust to allow DD, S. Lax and Rosenfeld to realize the value of M. Lax' and the Estate's interest in White Coat in view of the above fraudulent conveyance.

62.    By reason of the forgoing, Plaintiffs are entitled to a constructive trust in an amount to be determined at trial, but in no event less than the sum of $8,700,000.00, together with interest thereon and punitive damages.

11

## AS AND FOR A THIRD CAUSE OF ACTION

63. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "62" with the same force and effect as if more fully set forth herein.

64. On June 15, 2010, Judgment was entered in favor of Plaintiffs and against Guarantor Defendants in the amount of $8,700,000.00.

65. On June 23, 2010, a UCC-1 Financial Statement was filed which granted Rosenfeld a security interest in all assets of DD which, upon information and belief, was filed with the intention to further encumber Plaintiffs' interest in White Coat and Dynamic and hinder, delay, defraud and prevent the collection of the Judgment.

66. By virtue of the above, Plaintiffs have no adequate remedy at law.

## AS AND FOR A FOURTH CAUSE OF ACTION

67. Plaintiffs repeat, reiterate and reallege each and every allegation set forth in paragraphs "1" through "66" with the same force and effect as if more fully set forth herein.

68. That pursuant to N.Y. Debt. & Cred. Law § 276-a, Plaintiffs are entitled to an award of counsel fees.

69. Plaintiffs have no adequate remedy at law.

**WHEREFORE,** Plaintiffs demand judgment as follows:

a) That the conveyance of White Coat to DD and S. Lax be set aside and declared null and void.

b) That the conveyance of White Coat to DD and S. Lax be declared and adjudged fraudulent, void and of no effect.

12

c) That the Court impose a constructive trust against S. Lax and DD in favour of Plaintiffs in an amount to be determined at trial, but in no event less than the sum of $8,700,000.00, together with interest thereon and punitive damages.

d) That Rosenfeld's secured interest in DD be declared subordinate to Plaintiffs' interest as judgment creditors.

e) That Plaintiffs be awarded reasonable attorneys fees in accordance with N.Y. Debt. & Cred. Law § 276-a.

f) That Plaintiffs have such other and further relief as this Court deems just and equitable together with the costs and disbursements of this action.

Dated: Garden City, New York
July 7, 2010

JASPAN SCHLESINGER LLP
*Attorneys for the Plaintiffs*

By: _____
Steven R. Schlesinger
300 Garden City, Plaza
Garden City, New York 11530
(516)746-8000

13

# VERIFICATION

STATE OF NEW YORK  )
                   )ss.:
COUNTY OF _N̲A̲s̲s̲u̲v̲_  )

David Heiden, being duly sworn, deposes and says:

I am a Managing Member of W Financial GP, LLC, which is a Managing Partner of Plaintiff, W FINANCIAL FUND, LP, and have read the foregoing Amended Verified Complaint and know the contents thereof, and the same is true to my knowledge, except those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true. The basis of my knowledge and belief for all matters alleged are the books and records maintained by W Financial Fund, LP, in the ordinary course of business.

Dated: _G̲r̲e̲a̲r̲l̲e̲u̲k̲_, NY
       July _7̲_, 2010

State of New York  )
                   )ss.:
County of _N̲A̲s̲s̲e̲v̲_  )

On the _7̲t̲h̲_ day of July in the year 2010 before me, the undersigned, a notary public in and for said State, personally appeared ̲D̲a̲v̲i̲d̲ ̲H̲e̲i̲d̲e̲n̲ , personally known to be or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

NOTARY PUBLIC

**DONNA MONTRONY**
**Notary Public, State of New York**
**No. 01MO6109507**
**Qualified in Suffolk County**
**Term Expires May 10, 2012**

## VERIFICATION

STATE OF NEW YORK )
                              )ss.:
COUNTY OF *N Assau* )

MARK H. LUNDY, being duly sworn, deposes and says:

I am a Senior Vice President of BRT REALTY TRUST and have read the foregoing
Amended Verified Complaint and know the contents thereof, and the same is true to my
knowledge, except those matters therein stated to be alleged upon information and belief, and as
to those matters I believe them to be true. The basis of my knowledge and belief for all matters
alleged are the books and records maintained by BRT Realty Trust in the ordinary course of
business.

Dated: *Great Neck,* NY
            July __7__, 2010

State of New York )
                              )ss.:
County of *N Assau*

On the __7__ day of July in the year 2010 before me, the undersigned, a notary public in and for
said State, personally appeared Mark H. Lundy, personally known to be or proved to me on the
basis of satisfactory evidence to be the individual whose name is subscribed to the within
instrument and acknowledged to me that he executed the same in his capacity, and that by his
signature on the instrument, the individual, or person upon behalf of which the individual acted,
executed the instrument.

NOTARY PUBLIC

**DONNA MONTRONY**
**Notary Public, State of New York**
**No. 01MO6109507**
**Qualified in Suffolk County**
**Term Expires May 10, 2012**

Exhibit A



NASSAU COUNTY CLERK'S OFFICE
ENDORSEMENT COVER PAGE

Recorded Date: 06-15-2010          Record and Return To:
Recorded Time: 4:06:39 p

        Liber Book: J   3414
        Pages From:      21
             To:         23

        Control
        Number:  2602
          Ref #: 10--001473
        Doc Type: J01  JUDGMENT-SUPREME COURT-MONEY

Plnt: BRT REALTY TRUST
Plnt: W FINANCIAL FUND LP
Dfnd: LAX, MOSHE
Dfnd: LAX, CHAIM


Judgment Amount:       8,700,000.00




                              Taxes Total           .00
                         Recording Totals           .00
TMR001                       Total Payment          .00

      THIS PAGE IS NOW PART OF THE INSTRUMENT AND SHOULD NOT BE REMOVED
                          MAUREEN O'CONNELL
                            COUNTY CLERK


2010061502602

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------------- X
BRT REALTY TRUST and                                    Index No.: 001473/10
W FINANCIAL FUND, LP,

                Plaintiffs,

      -against-                                      **JUDGMENT**

MOSHE LAX, ESTATE OF CHAIM LAX,
and YITZCHOK HAGER a/k/a Isaac Hager,          Justice Assigned.
                              Timothy S. Driscoll, J.S.C.
                Defendants.
------------------------------------------------------------------- X

    **WHEREAS**, on or about January 22, 2010, Plaintiffs BRT REALTY TRUST and W

FINANCIAL, LP (hereinafter referred to as the "Plaintiffs"), by their attorneys Jaspan

Schlesinger LLP, moved this Court for an Order pursuant to CPLR § 3213 directing judgment in

favor of the Plaintiffs and against defendants MOSHE LAX, ESTATE OF CHAIM LAX, and

YITZCHOK HAGER a/k/a ISAAC HAGER (hereinafter referred to as the "Defendants"), on the

grounds that this action is based upon an instrument for the payment of money only, which is

now due and payable; and

    **WHEREAS**, on April 28, 2010, this Court (Driscoll, J.) issued a Short Form Order

granting Plaintiffs' motion as and against the Defendants in the principal amount of

$8,700,000.00 and, in addition directing that a hearing be held on the issues of interest, late fees,

costs and counsel fees; and

    **WHEREAS**, on May 28, 2010, this Court (Driscoll, J.) issued an Order authorizing the

entry of a money judgment in the amount of $8,700,000.00 as and against the defendants, a copy

of which is annexed hereto as Exhibit "A";

    **NOW**, upon motion of Jaspan Schlesinger LLP, attorneys for the Plaintiffs IT IS

**ORDERED, ADJUDGED and DECREED**, that Plaintiffs BRT Realty Trust with offices located at 60 Cutter Mill Road, Suite 303, Great Neck, NY 11021 and W Financial, LP. with offices located at 149 Madison Avenue, Suite 701, New York, New York 10016, shall have judgment as and against Defendants MOSHE LAX, individually and as Executor of the Estate of CHAIM LAX, whose last known address is 1653 58th Street, Brooklyn, New York 11204; ZLATY SCHWARTZ, as Executor of the Estate of CHAIM LAX, whose last known address is 725 Bedford Avenue, Apt. 3, Brooklyn, New York 11205-1525; and YITZCHOK HAGER a/k/a ISAAC HAGER, whose last known address is 36 Lorimer Street, 2nd Floor, Brooklyn New York 11206, in the total amount of EIGHT MILLION, SEVEN HUNDRED THOUSAND AND NO/100 ($8,700,000.00) DOLLARS, jointly and severally with statutory interest thereon beginning May 28, 2010; and it is further

**ORDERED, ADJUDGED and DECREED** that BRT REALTY TRUST and W FINANCIAL FUND, LP, shall have execution therefor; and it is further

**ORDERED, ADJUDGED and DECREED** that that the Clerk of the Court shall enter Judgment thereon.

**JUDGMENT** entered this ____ day of _____, 2010.

ENTER:

_____
**HON. TIMOTHY S. DRISCOLL, J.S.C.**

SLM/707366v1/55452

**ENTERED**

JUN 15 2010
NASSAU COUNTY
COUNTY CLERK'S OFFICE

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------------------X

BRT REALTY TRUST and
W FINANCIAL FUND, LP,

                          Plaintiffs,

          - against –

THE ESTATE OF CHAIM LAX, deceased, MOSHE LAX,
individually and as the Executor of the Estate of Chaim Lax,
ZLATY SCHWARTZ, as Executor of the Estate of Chaim
Lax, WHITE COAT, INC. f/k/a DYNAMIC DIAMOND
CORP., DIAMOND DYNAMICS, LLC, SHAINDY LAX,
MORDECHAI EHRENFELD a/k/a MARTIN EHRENFELD,
and JUDA ROSENFELD,

                          Defendants.
----------------------------------------------------------------------------X

**AFFIDAVIT
OF SERVICE**

Index No.: 11632/10

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss: |
| COUNTY OF NASSAU | ) |

      Judy Melnick, being duly sworn, deposes and says:

      Deponent is not a party to the action, is over 18 years of age and is employed by Jaspan
Schlesinger LLP, 300 Garden City Plaza, Garden City, New York 11530.

      On July 8, 2010, deponent served the within **Supplemental Summons** and **Amended
Verified Complaint** upon the following:

> Porzio, Bromberg & Newman, P.C.
> Attorneys Defendants
> *White Coat, Inc. f/k/a Dynamic Diamond Corp.*
> *and Martin Ehrenfeld*
> 156 West 56th Street, Suite 803
> New York, New York 10019

JLO/D712979v1/M055452/C0051820

Wachtel & Masyr, LLP
Attorneys for Defendants
*Moshe Lax, Individually and as
the Executor of the Estate of Chaim Lax, deceased
Zlaty Schwartz, as Executor of the Estate of
Chaim Lax, deceased*
One Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017

Neiger LLP
Attorneys for Defendants
*Shaindy Lax and Diamond Dynamics, LLC*
111 John Street; 8th Floor
New York, New York 10038

the addresses designated by said attorneys for that purpose by depositing a true copy of same enclosed in a properly addressed Federal Express wrapper, in an official Federal Express depository located at 300 Garden City Plaza, Garden City, New York.

Judy Melnick

Sworn to before me this
8th day of July, 2010

Notary Public

SHERONDA L. TOPPIN
Notary Public, State of New York
No. 01TO6195098
Qualified in Nassau County
Commission Expires 10/20/2012

JLO/D712979v1/M055452/C0051820

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---

BRT REALTY TRUST and W FINANCIAL FUND, LP,

Plaintiffs,

- against -

THE ESTATE OF CHAIM LAX, deceased, MOSHE LAX, individually and
as the Executor of the Estate of Chaim Lax, ZLATY SCHWARTZ, as Executor
of the Estate of Chaim Lax, WHITE COAT, INC. f/k/a DYNAMIC DIAMOND CORP.,
DIAMOND DYNAMICS, LLC, SHAINDY LAX, MORDECHAI EHRENFELD
a/k/a MARTIN EHRENFELD and JUDA ROSENFELD,

Defendants.

---

**SUPPLEMENTAL SUMMONS AND AMENDED VERIFIED COMPLAINT**

---

JASPAN SCHLESINGER LLP
*Attorneys for Plaintiffs, BRT REALTY TRUST and W FINANCIAL FUND, LP*
300 Garden City Plaza
Garden City, New York 11530-3324
(516) 746-8000

---

*To:*                                                    *Certified Pursuant to Rule 130-1.1-a*

*Attorney(s) for*

Steven R. Schlesinger, Attorney

---

*Service of a copy of the within*                              *is hereby admitted.*

*Dated:*                              ..................................................... .. ....

*Attorney(s) for*

*PLEASE TAKE NOTICE*

_____          *that the within is a (certified) true copy of a*
Notice of      *entered in the office of the clerk of the within named Court on*          *20_*
Entry

_____          *that an Order of which the within is a true copy will be presented for settlement to the Honorable*
Notice of               *, one of the judges of the within named Court,*
Settlement     *at*
               *on          20___, at          m.*

*Dated:*

# EXHIBIT B

# Cash Flow Shortfall Analysis
# For the Debtor

Est  Loan Balance incl Fees     $     20,546,151
Cash Flow of property     $     1,140,000

| Interest Rate | Cash shortfall |
|---|---|
| 5.0% | $112,692 |
| 5.56% | -$2,558 |
| 6.0% | -$92,769 |
| 6.5% | -$195,500 |
| 7.0% | -$298,231 |
| 7.5% | -$400,961 |
| 8.0% | -$503,692 |
| 8.5% | -$606,423 |
| 9.0% | -$709,154 |
| 9.5% | -$811,884 |
| 10.0% | -$914,615 |
| 10.5% | -$1,017,346 |
| 11.0% | -$1,120,077 |
| 11.68% | -$1,259,790 |
| 12.0% | -$1,325,538 |