**PORZIO, BROMBERG & NEWMAN, P.C.**
(Mail to) P.O. Box 1997, Morristown, NJ 07962-1997
(Delivery to) 100 Southgate Parkway, Morristown, NJ 07960
Telephone (973) 538-4006
John S. Mairo
jsmairo@pbnlaw.com
Robert M. Schechter
rmschechter@pbnlaw.com

**Attorneys for the Debtor and Debtor-In-Possession**

- and-

**MORITT HOCK HAMROFF & HOROWITZ LLP**
Leslie A. Berkoff, Esq.
400 Garden City Plaza
Garden City, NY 11530
Email: lberkoff@moritthock.com
Telephone: (516) 873-2000

**Conflicts Counsel for Debtor and Debtor-In-Possession**

**UNITED STATE BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X
In re:                                                         :    Case No. 09-50723 (ESS)
                                                               :
    20 Bayard Views, LLC                      :    Hon. Elizabeth S. Stong
                                                               :
        Debtor.                :    Chapter 11
------------------------------------------------------------ X


# MEMORANDUM OF LAW IN RESPONSE TO THE OBJECTION OF W FINANCIAL FUND, L.P. AND IN SUPPORT OF CONFIRMATION OF THE DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION UNDER <u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT................................................................1

PROCEDURAL HISTORY .................................................................4

STATEMENT OF FACTS................................................................6

    A. Appraisals................................................8

    B. Interest Rate Expert Analysis................................................11

DESCRIPTION OF LEGAL AND FACTUAL ISSUES TO BE DECIDED BY
COURT................................................................14

ARGUMENT................................................................15

THE SOLE OBJECTION TO THE PLAN FILED BY WFF SHOULD BE
OVERRULED................................................................16

    A. The Plan Satisfies The "Cram Down" Requirements With Respect to Class 2.............16

        1. The Plan Does Not Discriminate Unfairly Against the Holders of Class 2...............17

        2. The Plan is Fair and Equitable With Respect to the Holder of Class 2..................18

            (a) *Till v. SCS Credit Corp.*—Controlling Law................................20

            (b) *Pre-Till* and *Post-Till* Law Requires Utilization of Formula Approach............26
                (i) *Pre-Till*: The Second Circuit and Bankruptcy Court for the
                    Eastern District of New York Utilized the Formula Approach...............26
                (ii) *Post-Till*: Formula Approach Applies in Chapter 11...........................27

            (c) Applying *Till*: No Efficient Market Exists For The "Cram Down Loan"
                And WFF Has Failed To Meet Its Burden Of Demonstrating That A
                Rate Higher Than 4.5% Is Required................................30
                (i) No Efficient Market for WFF's "Cram Down Loan"........................30
                (ii) Debtor's Proposed 4.5% Interest Rate is Appropriate and WFF Has
                    Failed to Meet Its Burden of Demonstrating That A Higher Rate is
                    Required................................31

        3. The Plan Provides for the Continuation of WFF's Security Interest....................36

        4. WFF is Not Entitled to Credit Bid................................37

B. The Plan is Not Likely to be Followed by Liquidation or the Need for Further Reorganization...................................................................................39

    1. The Plan is Feasible..............................................................40

    2. The Objection to Feasibility is Without Merit...............................41

    3. The Projections are Reasonable..............................................43

C. The Plan's Injunctive and Exculpatory Provisions Are Valid...........................45

    1. Injunction Related to the Discharge.........................................46

    2. The Injunction Is Valid Under Section 1123(b)(6)........................47

D. The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden By Law......................................................................................48

CONCLUSION..................................................................................51

1399024

TO THE HONORABLE ELIZABETH S. STONG,
UNITED STATES BANKRUPTCY JUDGE:

20 Bayard Views, LLC (the **"Debtor"**) submits this Memorandum of Law (the **"Memorandum"**) in support of confirmation of the Debtor's proposed Plan[1] (as defined below), pursuant to section 1129 of title 11 of the United States Code (the **"Bankruptcy Code"**), and in response to the Objection of W Financial Fund, L.P. (**"WFF"**) to Confirmation (the **"Objection"**), and respectfully represents as follows:

## PRELIMINARY STATEMENT

As discussed below, and as will be further demonstrated at the Confirmation Hearing, the Plan, as modified, satisfies all of the confirmation requirements contained in sections 1122, 1123, 1125, 1126 and 1129 of the Bankruptcy Code.[2] To the extent that the Objection is not consensually resolved prior to the Confirmation Hearing, the Objection should be overruled and the Plan should be confirmed.

The below chart summarizes each objection asserted by WFF and the Debtor's Response:

| Objection | Response |
|---|---|
| 1. The Plan only pays 3.5% interest. | The Modified Plan increases the interest rate to 4.5% equating to nearly $1 million in additional interest over the course of the Plan. |
| 2. The Plan is not feasible if the Court selects a rate of interest that is greater than 5.5% because in such case, rental income will not be sufficient to make current payment of interest. | The Plan is "rental cash flow feasible" at 4.5%, 5.0% and 5.5%. Each and every appraiser and evaluator (including WFF) that has assessed this property has concluded that the cash flow over the Plan period will be between $27 million and $32 million. If the Plan is confirmed at a slightly higher interest rate, |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Debtor's Third Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code, as modified (the **"Plan"**) or the Third Amended Disclosure Statement with respect to the Third Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the **"Disclosure Statement"**), as may be applicable.

[2] Unless otherwise specified herein, all references to "sections" in this Memorandum shall be construed to refer to sections of the Bankruptcy Code.

| Objection | Response |
|---|---|
| | additional debt service can be paid out of cash flow resulting from Unit sales. |
| 3. The Plan is not feasible because it proposes sales of Units over seven (7) years – too long a timeframe. | The Modified Plan reduces the Plan period to five (5) years which coincides with the schedule for obtaining the highest and best value proposed by the Debtor's appraiser. |
| 4. The risk of failure is born exclusively by WFF. | No risk of failure is ever articulated in WFF's objection with the singular exception of the risk that Units will not be sold. However, WFF's own appraiser, Anthony Iaccio, predicts $27,171,291.00 of income between rent and Unit sales within 2 ½ years after confirmation of the Plan. The Debtor's appraiser predicts $32.8 million of such proceeds over a 5 year period following confirmation of the Plan. The Units are fully improved, have certificates of occupancy, and are tenanted. WFF contends in its objection that the Debtor will have up to $11 million left over after paying WFF in full. Risk of failure? |
| 5. The Plan forces WFF to "lend" to the Debtor. | The "coerced loan" standard has been discredited under *Till* and is not relevant to the confirmation analysis. |
| 6. The Plan does not pay WFF the "present value" of its claim. | §1129 speaks in terms of "value, as of the effective date of the Plan." Identical language was construed by the Supreme Court in *Till*. See, 11 U.S.C. §1325(a)(5)(B)(ii). The *Till* "formula approach" articulates the appropriate standard for interest to be paid on a secured claim. |
| 7. The Plan does not permit WFF to retain its security interest in equity's membership interests in the Debtor. | <u>Resolved</u>: Debtor's equity will consent to a continuation of WFF's security interest in the surviving membership interest. |
| 8. The Plan does not permit WFF to retain "all" of its liens since it only delivers 85% of Unit sale proceeds to WFF. | The Plan has now been modified to deliver 95% of Unit sale proceeds to WFF. WFF's original loan agreement envisioned WFF retaining only 92% of the proceeds of the Unit sales in appropriate circumstances. Further, WFF's lien will continue in the remaining 5% of proceeds. |
| 9. The Plan as proposed contains an impermissible injunction protecting guarantors. | The injunction as proposed meets the standards for approval under the case law. If the Court, after considering the issue, determines |

1399024

| Objection | Response |
|---|---|
| | otherwise, the Debtor will provide modified language abrogating the injunction. |
| 10. The Plan takes away WFF's right to bid on the equity. | This is not an absolute priority rule or new value Plan insofar as the unsecured creditors voted unanimously in favor of Confirmation. Thus, there is no sale of equity. Rather, in an effort to incentivize/coerce equity holders to financially support Confirmation, the Plan provides that those equity holders not participating and contributing the funds necessary for Confirmation will have their equity interests canceled. No equity holder has objected to this provision. |
| 11. There is no evidence that the $1 million required to confirm the Plan has been posted. | Resolved: The funds have been posted and evidence of same has been provided to WFF. |
| 12. The funds posted will be insufficient to pay administrative claims in full. | To the extent that the $1 million posted is insufficient to pay administrative claims in full, Porzio, Bromberg & Newman, P.C., the largest administrative claimant, has agreed to defer payment of a necessary portion of its administrative claim. |
| 13. The Plan is not fair and equitable because the guarantors are acting in bad faith and are engaged in "asset stripping." | Two Courts have previously been presented with allegations by WFF and by the client of one of its named witnesses, Charlotte Moses Fishman, of "asset stripping." The first court initially entered a TRO upon WFF's attorney's affidavit without notice. Upon presentation of the facts, however, it rescinded the TRO and refused to enter a preliminary injunction. Judge McCarthy's Order has been presented to this Court as one of the Debtor's Confirmation exhibits. A joint motion by the defendants to dismiss WFF's "asset stripping" proceeding is currently pending. A second Court has similarly rejected such allegations. A copy of the ruling of Judge Lopez-Toures has been presented to this court as one of the Debtor's Confirmation exhibits. |

1399024

# PROCEDURAL HISTORY

On December 4, 2009 (the **"Petition Date"**), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtor is authorized to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, or examiner or official committee of unsecured creditors has been appointed to date.

On December 18, 2009, the Court ordered on the record that the Debtor may use cash collateral to pay its regular monthly expenses, including the monthly charges due JBM Estates LLC, the property management company retained by the Debtor, and Bayard Views Condominium Association, and to make a payment to WFF. Pursuant to a further Order entered on January 13, 2010, the Bankruptcy Court approved and authorized the Debtor's continued use of cash collateral to pay its regular monthly expenses, including the monthly charges due to JBM Estates LLC and Bayard Views Condominium Association, and to make a payment to WFF. Subsequent Orders were entered on February 26, 2010, April 21, 2010 and June 1, 2010, pursuant to which the Bankruptcy Court approved and authorized the Debtor's continued use of cash collateral to pay its regular monthly expenses, including the monthly charges due JBM Estates LLC and Bayard Views Condominium Association, any fees due to the United States Trustee's Office, and to make a payment to WFF.

During the post-petition period and pursuant to several cash collateral stipulations, the Debtor has paid to WFF adequate protection payments from the collection of monthly rents on the Units (collectively, the "Adequate Protection Payments") as follows:

4

$62,500 in December 2009
$82,743 in January 2010
$108,211 in February 2010
$101,951 in March 2010
$102,312 in April 2010
$90,504 in May 2010
$95,466 in June 2010
$83,173 in July 2010
$119,546 in August 2010
$111,800 in September 2010

On January 22, 2010, the Debtor filed an application to establish a bar date for the filing of proofs of claim against the Debtor. By order dated February 26, 2010, the Court established April 1, 2010 (the **"Bar Date"**) as the last date by which creditors were to file their proofs of claim against the Debtor.

On May 13, 2010, the Debtor proposed a plan of reorganization pursuant to chapter 11 of the Bankruptcy Code, which generally provides for the reorganization of the Debtor's business, satisfaction of all Administrative Claims, satisfaction of all Secured Claims, and cash distributions to all holders of General Unsecured Claims. To effectuate and implement its reorganization, the Debtor filed its Plan and Disclosure Statement with the Court at Docket No. 95 and Docket No. 94, respectively.

On May 19, 2010, the Court entered an order approving the Disclosure Statement and authorizing the Debtor to solicit acceptances to the Plan (the **"Disclosure Statement Order"**). Pursuant to the Disclosure Statement Order, the Court established June 21, 2010 as the voting deadline with respect to the Plan and the deadline for parties in interest to object to confirmation of the Plan. Six classes of impaired creditor classes, classes 2 through 7 were entitled to vote. The Plan has been expressly accepted by classes 4, 5, 6 and 7. Class 3 did not vote. The Holder of Class 2 Claims, WFF, is the sole objector to the Plan.

1399024

On September 8, 2010, the Debtor received the Objection of WFF to the Plan. The Debtor remains open to discuss a consensual resolution of the Objection with WFF prior to the hearing scheduled for October 6, 2010 in connection with Confirmation of the Debtor's Plan (the **"Confirmation Hearing"**).[3]

On September 10, 2010, the Debtor filed its Notice of Modified Plan.

In further support of confirmation of the Plan and in opposition to the Objection, the Debtor is simultaneously filing herewith:

- Declaration of Martin Ehrenfeld in Support of Confirmation of the Third Amended Plan of Reorganization of 20 Bayard Views, LLC Under Chapter 11 of The Bankruptcy Code (the **"Ehrenfeld Declaration"**);
- Declaration of Maria Dermatis regarding tabulation and certification of votes in connection with Debtor's Plan (the **"Dermatis Declaration"**);
- Declaration of Irv Schwarzbaum in Support of Confirmation of the Third Amended Plan of Reorganization of 20 Bayard Views, LLC Under Chapter 11 of the Bankruptcy Code (the **"Schwarzbaum Declaration"**);
- Declaration of Richard J. DiGeronimo in support of Confirmation of the Third Amended Plan of Reorganization of 20 Bayard Views, LLC Under Chapter 11 of the Bankruptcy Code (the **"DiGeronimo Declaration"**); and
- Declaration of Paul Fried in Support of Confirmation of the Third Amended Plan of Reorganization of 20 Bayard Views, LLC Under Chapter 11 of the Bankruptcy Code (the **"Fried Declaration"**).

## STATEMENT OF FACTS

In 2007, the construction of a luxurious 62-unit residential complex located at 20 Bayard Street, Brooklyn, New York was completed (the **"Bayard Condominium Complex"**). The development of the Bayard Condominium Complex was financed by Fremont General, which was later acquired by iStar Loans, LLC (**"iStar"**). In addition to the Fremont/iStar financing, the Debtor invested approximately $16 million of its own funds in connection with the development of the Bayard Condominium Complex.

---

[3] The Debtors reserve the right to submit additional pleadings in response to the Objection or any other further submissions filed with respect to the Plan.

1399024

During the first quarter of 2008, the Debtor began closing on sales of some of the units and residents started moving in. While the Debtor enjoyed brisk initial sales of its condominium units, sale momentum slowed dramatically in the second half of 2008 due to the faltering economy and the attendant widespread residential real estate decline. By the third quarter of 2008, the Debtor had sold 24 of the 62 condominium units. Following the Lehman Brothers bankruptcy filing in mid-September 2008, and due to the severely depressed real estate market, the Debtor decided it would be best to pursue rentals of the existing unsold condominium units. The Debtor's lender at the time, iStar, although it had been paid down approximately $17 million of the $34 million funded, wanted to be replaced because of its intolerance to remaining a lender to a business relying upon a rental stream.

In an extremely difficult credit environment, the Debtor was forced to find a replacement lender. In October of 2008, WFF replaced iStar by virtue of the Agreement of Consolidation, Extension and Modification of Mortgage dated October 14, 2008 (the **"WFF Mortgage"**) which consolidated: (i) the mortgage and note in favor of WFF dated October 14, 2008 in the amount of $100,000.00; and (ii) the remaining balance on a pre-existing mortgage and note in favor of iStar for $17,300,000.00. In connection with the WFF Mortgage, the Debtor executed in favor of WFF the Consolidated, Amended and Restated Note dated October 14, 2008 in the principal amount of $17,400,000.00 (the **"WFF Note,"** together with the WFF Mortgage, the **"WFF Loan"**). Concurrent with the execution of the WFF Mortgage on October 14, 2008, the Debtor entered into an assignment of leases and rents, which was expressly "made for the purpose of securing" the WFF Loan.

7

The Debtor's equity holders are Jack Weingarten, LX Holdings, LLC (as holder of the Chaim Lax Interest), and Yitzchok Hager (collectively, the **"Equity Holders"**). Chaim Lax, Moshe Lax and Isaac Hager (collectively, the **"Guarantors"**) guaranteed performance of a portion of the Debtor's obligations under the Loan Documents pursuant to that certain Guaranty dated as of October 14, 2008 (the **"Guaranty"**). The Guaranty is limited to payment of $8,700,000 of the principal amount of the Loan, plus all accrued interest, fees and costs on the entire Loan.

WFF is further secured by a pledge of the Equity Holders' membership interests in the Debtor pursuant to that certain Pledge of LLC Interests (the **"Pledge Agreement"**) dated as of October 14, 2008, among WFF and Isaac Hager, Chaim Lax, and Jack Weingarten (collectively, the **"Pledgors"**).

The original maturity date on the Note was October 13, 2009. The Parties agreed to an extension and the Parties entered into that certain Loan Extension Agreement in October 2009 pursuant to which the maturity date of the Note was extended to January 13, 2010.

## A.    Appraisals

The Debtor's assets consist of its 37 condominium Units, storage units, 40 parking spaces and related contracts and income (collectively, the **"Property"**). There have been at least three valuations of the Property (one by the Debtor and two by WFF) using a discounted cash flow analysis premised upon (i) the Units being sold off over time and (ii) the rental revenue stream generated by the Units being used in the interim pending the sales. The chart below summarizes the discounted cash flow valuations contained in the appraisal of RD Geronimo dated as of March 4, 2010 (the **"RDG Appraisal"**), the appraisal of Blake & Iaccio dated as of February 3, 2010 (the **"B&I Appraisal"**), and in the loan extension book of WFF dated as of October 14,

2009 (the **"WFF Loan Extension Book"**).

|  | **RDG Appraisal-- Valuation as of March 4, 2010** | **B&I Appraisal- - Valuation as of February 3, 2010** | **WFF Loan Extension Book -- Valuation as of October 14, 2009** |
|---|---|---|---|
| Projected Sellout Price Per SF | 675.00 (Yr 1) 675.00 (Yr 2) 695.00 (Yr 3) | $600.00 (Yr 1) $622.00 (Yr 2) $630.00 (Yr 3) | $675.00 (Yr 3) |
| Sellout Period | 5 Years | 2.5 Years | 3 Years |
| Projected Expenses During Sellout Period | $3,839,000 | $3,631,407 | $3,212,033 |
| **Total Net Income Prior to Discounting (Sales & Rents)** | **$32,768,453** | **$27,171,291** | **$30,706,867** |
| Discount Rate | 15.00% | 26.75% | 8.00% |
| **Indicated Market Value** | **$21,890,000** | **$19,260,000** | **$24,653,638** |
|  |  |  |  |

The Debtor has relied upon the RDG Appraisal in structuring a confirmable Plan. The Plan is funded by rental revenues and projected Unit sales as anticipated by appraisers and management. Notably, even the most conservative WFF appraisal (See B&I Appraisal, above) derives a $27,171,291 sell out value over 2.5 years. It derives a present value of $19,260,000 only by using a discount rate significantly larger than any other, 26.75% (See above).

WFF presents the B&I Appraisal, which reaches an opinion on the market value of the Property, based upon the net-sell out of the Units over a projected time period. Using this methodology, as of February 3, 2010, the B&I Appraisal concluded that the market value of the Property is $19,260,000 premised upon the following: (i) in year one, two and three, the price per square foot of the Units are $600.00, $622.00 and $630.00, respectively; (ii) the sellout period for the Units is 2 ½ years; (iii) the projected expenses during the sellout period are $3,631,407; (iv) the total net income to be achieved from the Property over those two and one-half years prior to discounting for current market rate is $27,171,291; and (v) the appropriate discount rate to apply to the total net income from the Property as to determine the market value of the Property

9

1399024

after applicable reductions is 26.75%.

As support for its Plan, the Debtor relies upon the valuation of the Property as contained in the RDG Appraisal. The RDG Appraisal similarly reaches an opinion on the market value of the Property based upon the net-sell out of the units over a projected time period. Using this methodology, as of March 4, 2010, the RDG Appraisal concluded that the market value of the Property is $21,890,000 premised upon the following: (i) in year one, two and three, the price per square foot of the Units is $675.00, $675.00 and $695.00, respectively; (ii) the sellout period for the Units is 5 years; (iii) the projected expenses during the sellout period are $3,839,000; (iv) the total net income from the Property prior to discounting is $32,768,453; and (v) the appropriate discount rate to apply to the total net income from the Property so as to determine the market value of the Property after applicable reductions is 15%.

As further support for its Plan, the Debtor points to the WFF Loan Extension Book which again utilized the same valuation method as B&I and RDG (discounted cash flow analysis based upon a net-sell out of Units). In the WFF Loan Extension Book, the discounted cash flow analysis shows a market value for the Property of $24,653,638 premised upon the following: (i) the price per square foot of the Units is $675.00; (ii) the sellout period for the Units is 3 years; (iii) the projected expenses during the sellout period are $3,212,033; (iv) the total net income from the Property prior to discounting is $30,706,867; and (v) the appropriate discount rate to apply to the total net income from the Property as to determine the market value of the Property after applicable reductions is 8%.

The RDG Appraisal assumed a five (5) year sellout period of the Units to capitalize on the forecasted market recovery over the next 2-5 year period. Under the RDG Appraisal, the Units begin to be sold in the fifth quarter of the projected absorption period and all the Units are

10

projected as sold by the twentieth quarter, i.e., five years.

The B&I Appraisal "estimated that the full absorption period, or the time it will take to sell the 37 units on the open market, will be approximately two-and-a-half years from the date of value [and] this takes into consideration the rentals in place at the units, expected tenant turnover, and current and expected economic conditions, market conditions and available financing." B&I Appraisal, WFF0001777. Under the B&I Appraisal, Units begin to be sold in the fifth quarter and all the Units are projected as sold by the tenth quarter.

In the WFF Loan Extension Book, the discounted cash flow analysis assumes the Units are rented for two years and then all of the Units are sold in year 3. The following are quotes in the WFF Loan Extension Book: (i) "The sales market in Williamsburg declined during 2009 but has now stabilized. We are starting to see signs of new sales activity in the market and believe the best course of action would be to lease the units for two more years and then sell them in year 3" (page WFF 000388); (ii) "In year 3 we assume that the units will sell for $675 PSF, generating $29,837,000 of gross sales income. $675 PSF is a conservative estimate based on a market analysis discussed in Section 5" (page WFF 000388); and (iii) "The market appears to have reached its lowest at the end of 2009 and sales activity has since slowly picked up. We feel the best course of action would be to hold the units for several years and then sell them after the market has recovered. The original 25 units in the subject building sold at an average of $864 PSF. While it is doubtful the units will achieve those levels again in the medium term it is highly realistic that they will climb back to $600 + PSF in the next few years." (WFF 000390).

## B. <u>Interest Rate Expert Analysis</u>

WFF's interest rate expert, Stuart Bruck, concludes that a blended rate of 11.68% is the proper market rate for WFF's claim. According to Mr. Bruck's expert report, the blended rate is

11

reached as follows: (i) there is a market for lenders that would provide mortgage financing to an entity similarly situated to the Debtor up to 65% of loan to value (or $13,650,000 assuming a collateral value of $20.5 million) at an interest rate of 7.5%; (ii) there is another class of lenders, known as hard money lenders, that would finance the mezzanine debt up to 80% loan to value (or $3,150,000 assuming a collateral value of $20.5 million) at an interest rate of 13.5%; and (iii) any financing of the remainder of the debt up to 97.3% (or $3,628,682 assuming a collateral value of $20.5 million) would be considered an equity investment requiring a 22% interest rate.

Mr. Bruck is presented as an expert on interest rates, not as an expert on the Debtor. *See* Bruck Transcript, p. 48, lines 16-25. Mr. Bruck did not opine on: (1) the Plan projections; (2) risk of non-payment to WFF under the Plan; (3) risk profile of the Property; (4) the ownership and management of the Debtor; or (5) WFF's expenses to pursue remedies and liquidate the Property.

The Debtor's interest rate expert, Paul Fried, opines that there is no efficient market for loans on bulk unsold condo units with the characteristics of the Property and WFF's claim; his survey of lenders confirmed that. He concludes that the interest rate for WFF's claim should be 3.9%, which is the national prime rate (3.25%) plus a .65% risk premium. According to Mr. Fried's expert report, this is based upon: (1) the RDG Appraisal, the B&I Appraisal and the WFF Loan Extension Book, the most conservative of which opines to a sell-out value of the Property of $27,171,291 over two and one-half years; (2) the Plan projections; (3) risk of non-payment to WFF under the Plan; (4) risk profile of the Property; (5) the ownership and management of the Debtor; and (6) WFF's expenses to pursue remedies and liquidate the Property. In the body of Mr. Fried's report, he, among other things: (i) describes the "asset quality" of the Property as excellent; (ii) considers the Plan's projections regarding rental revenue and Unit sales as feasible;

12

(iii) finds that the risk of failure falls on the Debtor and its equity holder; and (iv) takes the position that should the Debtor's Plan fail, the only foreseeable "risk" to WFF is the cost of pursuing its remedies and liquidating the Property.

In the WFF Loan Approval Book dated September 25, 2008: (1) in Section 9 Risk Profile under Key Risks it reads, "As we are relying upon the borrower's ability to lease up the vacant units which is a requirement for a local thrift to refinance us out... In a worst case if we were to foreclosure we would realize a 7% cash on cash return and could hold this asset indefinitely until the sales market recovered." (WFF 000431); and (2) in Section 4 Underwriting it reads, "The stabilized [net operating income] is $1,300,454. This represents a 7.1% return on our loan assuming we foreclosed and owned the fee. This a very good number and infers we could hold this property indefinitely until the condominium sales market recovers strongly" (WFF 00425).

In the WFF Loan Extension Book dated October 14, 2009, under Section 1 Loan History it reads: "When we closed all 38 vacant units were vacant and the greatest risk we faced was if the borrower was unable to achieve our rental projections. Since closing the borrower has successfully leased 35 units at an average rent of $42.41 on a gross basis and $40.77 after factoring concessions." (WFF 00378). Under Section 4 Underwriting, it states: "The full taxes today are $199,471 which provides us with an [Net Operating Income] of $1,319,153. This represents a 7.8% return on our loan assuming we foreclosed and owned the fee. This is a very good number and infers that we could hold this property indefinitely, should we foreclose, until the condominium sales market recovers strongly." (WFF 000384).

1399024

# DESCRIPTION OF LEGAL AND FACTUAL ISSUES TO BE DECIDED BY COURT

The Court is asked to determine the following facts/legal issues raised by the Objection:

(a) Whether the Plan satisfies Section 1129(b)(2)(A) of the Bankruptcy Code.

(1) WFF argues that the Plan does not satisfy Section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code because the Plan's proposal to pay WFF's claim at a 3.5% Plan Interest rate over seven years is not a deferred cash payment totaling the present value of its claim. The Debtor argues that the Plan, as modified, increases the interest rate to 4.5%, equating to nearly $1 million in additional interest over the course of the Plan, and reduces the Plan period to five (5) years to coincide with the schedule of obtaining the highest and best use of the Units as opined in the RDG Appraisal, and argues that the 4.5% interest should be imposed in light of: (i) lack of an efficient market for this cram down loan; (ii) the national prime rate of 3.25%; (iii) a risk adjustment of 1.25% even though the Debtor's expert opined that a risk adjustment of .65% was adequate; and (iv) the sell out value of the Units as reflected in the RDG Appraisal, the B&I Appraisal and WFF's Loan Extension Book; and (v) the Debtor's stable rental income.

(2) WFF argues that the Plan fails to satisfy Section 1129(b)(2)(A)(i)(I) of the Bankruptcy Code because the Plan does not provide for retention of WFF's lien. The Debtor asserts that the Plan has been modified to deliver 95% Unit sale proceeds to WFF, whereas WFF's original loan agreement envisioned WFF retaining only 92% of the proceeds of the Unit sales in appropriate circumstances, and that WFF's lien is being continued in the remaining 5%. Moreover, the Debtor asserts that WFF's security interest in the membership interests of the Debtor shall continue.

(3) WFF argues that the Plan must comport with Section 1129(b)(2)(A)(ii) of the Bankruptcy Code and that the Plan fails to satisfy this requirement because it does not provide WFF with the right to credit bid on the alleged transfer of the membership interest contemplated in the Plan. The Debtor argues that Section 1129(b)(2)(A)(ii) is inapplicable because it is seeking confirmation pursuant to the other alternatives contained in Section 1129(b)(2)(A). Moreover, the Debtor states that this is not a new value Plan insofar as the unsecured creditors voted unanimously in favor of Confirmation. Thus, there is no sale of equity. Rather, in an effort to incentivize/coerce equity holders to financially support confirmation of the Plan, the Debtor made it a provision of its Plan that those equity holders not participating and contributing the funds necessary for confirmation would have their equity interests canceled.

14

(b) Whether the Plan satisfies Section 1129(a)(11) of the Bankruptcy Code. WFF argues that confirmation of the Plan is likely to be followed by liquidation or further financial reorganization because the sale of Units is speculative and the Debtor would not be able to make payments using the proper interest rate. The Debtor argues that its expert reports and related testimony with respect to these issues will demonstrate Plan feasibility.

(c) Whether the Plan satisfies Section 1129(a)(1) of the Bankruptcy Code. WFF argues that the Plan's includes an impermissible injunction protecting guarantors. The Debtor argues that the injunction is not a discharge of obligations and meets the standards for approval under applicable case law.

(d) Whether the Plan satisfies Section 1129(a)(3) of the Bankruptcy Code and is proposed in good faith and not by any means forbidden by law. The Debtor argues that this allegation is gratuitous and without merit.

## ARGUMENT

To obtain confirmation of the Plan, the Debtor must demonstrate that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence. *In re Cit Group*, 2009 Bankr. LEXIS 4026, 15 (Bankr. S.D.N.Y. Dec. 8, 2009). *See also In re Drug Fair Group, Inc.*, 2010 Bankr. LEXIS 2984, 5-6 (Bankr. D. Del. June 7, 2010) (stating that it is the debtor's "burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence").

Through filings with the Court and additional testimonial evidence which will be adduced at the Confirmation Hearing, the Debtor will demonstrate, by a preponderance of the evidence, that all applicable subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan, and thus, notwithstanding the sole Objection to the Plan filed by WFF, the Plan should be confirmed.[4]

---

[4] However, as noted in *Till v. SCS Credit Corp.* 541 U.S. 465, 479 (2004), *see infra*, it is the secured creditor's burden to establish that a higher interest rate may be required than the rate proposed by the debtor in the Plan.

## THE SOLE OBJECTION TO THE PLAN FILED BY WFF SHOULD BE OVERRULED

The Debtor's Plan satisfies the requirements of the Bankruptcy Code and applicable case law. At its core, WFF asserts in its Objection that the Plan contravenes legal requirements relating to "cram down," feasibility, injunctive relief and good faith. As demonstrated below, these bases for objecting to the Debtor's Plan should be overruled.

### A.    The Plan Satisfies The "Cram Down" Requirements With Respect To Class 2

Section 1129(b) of the Bankruptcy Code provides a mechanism for confirming a plan in circumstances where not all impaired classes of claims and equity interests have accepted a plan. In bankruptcy parlance, this mechanism is commonly known as a "cram down."

Section 1129(b) provides, in pertinent part, the requirements for a cram down:

> [I]f all of the applicable requirements of [section 1129(a) other than subsection 1129(a)(8), which requires that a plan be accepted by all impaired classes] are met with respect to a plan, on request of the proponent of the plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1) (the "cram down provision").  Thus, under section 1129(b), the Bankruptcy Court may cram down a plan over a rejection to a plan by an impaired classes of claims or equity interests so long as (i) the requirements of section 1129(a) are satisfied (other than section 1129(a)(8)), and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such impaired, dissenting classes. *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 441 (1999) (citing 11 U.S.C. § 1129(b)(1)); *see also In re Boston Post Rd Ltd. P'ship*, 21 F.3d 477, 480 (2d Cir. 1994) (same).

Here, only one creditor voted against the Plan, i.e., Class 2 (the **WFF Secured Claim**).[5] Thus, the Debtor seeks to confirm the Plan over the dissent of Class 2. *See* 11 U.S.C. § 1129(b)(1) ("the court, on request of the proponent of the plan, shall confirm the plan" if cram down requirements are met). While Class 2 has rejected the Plan, four impaired classes entitled to vote have accepted the Plan and as detailed below, all other requirements of section 1129(a) have been met. Hence, the first requirement in the cram down provision is satisfied. The second condition—that the Plan does not discriminate unfairly and is fair and equitable—is likewise satisfied, as detailed below.

### 1.    The Plan Does Not Discriminate Unfairly Against the Holders of Class 2

Section 1129(b)(1) prohibits a debtor's plan from discriminating unfairly against impaired, dissenting classes; but the Bankruptcy Code does not set forth a standard for determining when unfair discrimination exists. *See In re Johns-Manville*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y. 1986), *aff'd,* 843 F.2d 636 (2d Cir. 1988) ("The language and legislative history provides little guidance in applying the 'unfair discrimination' standard."). Although various tests have been applied—*see In re Armstrong World, Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (describing four-factor test, two-part test and rebuttable presumption test)—the underlying purpose of this prohibition is consistent among the courts: to "ensure[] that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Johns-Manville Corp.*, 68 B.R. at 636.

---

[5] Class 3 (Secured Mechanic Lien Claim of Karl Fischer Architecture) did not vote on the Plan; thus, Class 3 neither accepted nor rejected the Plan. 11 U.S.C. § 1126(c). Although Class 3 is impaired by definition, creditors of this class did not object to confirmation of the Plan. As such, the within cram down analysis is directed to Class 2, the dissenting class. Nevertheless, the analysis provided herein also demonstrates that the Plan satisfies the requirements of section 1129(a), does not unfairly discriminate and is fair and equitable with respect to Class 3.

1399024

Here, Class 2 is the Class rejecting the Debtor's Plan. Class 2 is a unique class comprised solely of the WFF Secured Claim, which, distinctively, is secured by a senior mortgage on the Pre-Petition Collateral. Class 2, therefore, differs in legal nature and priority from all other classes. Thus, the Bankruptcy Code allows for the Plan to provide different treatment for Class 2 than the other dissimilar classes; namely, that WFF will receive full payment of the allowed amount of its claim and will retain its liens on the Pre-Petition Collateral. Indeed, the treatment accorded to Class 2 is more favorable than other classes of Secured Claims that, significantly, have accepted the Plan. Therefore, because Class 2 is comprised of dissimilar claims or interests, the Plan does not discriminate unfairly against Class 2. The Plan also effectuates the priorities set forth in the Bankruptcy Code.

**2.     The Plan is Fair and Equitable With Respect to the Holder of Class 2 Claims**

Section 1129(b)(2) of the Bankruptcy Code defines the phrase "fair and equitable" with respect to holders of secured claims, in pertinent part, as follows:

(A)     With respect to a class of secured claims, the plan provides—

> (i)(I)     that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II)     that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property . . . .

11 U.S.C. § 1129(b)(2)(A)(i). Put differently, the "fair and equitable" rule is satisfied if (i) the holder of a secured claim retains its liens by which that claim is secured, and (ii) such holder receives payments over the life of the plan equal to the present value of the secured claim as of

the effective date. *See United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 377 (1988) (citing 11 U.S.C. § 1129(b)(2)(A)(i)(II) as basis for secured claimant's "right to receive under a plan the present value of his collateral"). In the instant case, the "fair and equitable" rule is satisfied as to the holder of Class 2 Claims, *i.e.*, WFF.

First, WFF will retain its liens on the Pre-Petition Collateral. *See* Plan, Art. III(A)(2)(b)(i) ("WFF shall retain its liens on the Pre-Petition Collateral . . . [and] shall retain its liens on the rents and leases related to the Pre-Petition Collateral"). Moreover, WFF will maintain its security interest in the membership interests of the Debtor. To accomplish the continuation of WFF's lien on the membership interests, the Debtor proposes either to modify the Plan to build in appropriate language or to add a provision to the order confirming the Plan. Accordingly, the first prong of the "fair and equitable" rule is satisfied.

As to the second prong, the Plan must provide for payment to WFF of a value, as of the effective date of the Plan, of its allowed claim. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 469 (2004) ("Plans that invoke the cram down power often provide for installment payments over a period of years rather than a single payment. In such circumstances, the amount of each installment must be calibrated to ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds that of the allowed claim."); *In re Milham*, 141 F.3d 420, 424 (2d Cir. 1998) ("Post-confirmation interest, or plan interest, is a function of the present value requirement of the cram-down provision."); *In re Marfin Ready Mix Corp.*, 220 B.R. 148, 157 (Bankr. E.D.N.Y. 1998) ("An oversecured creditor is entitled to receive interest pursuant to § 506(b) only until the effective date of the plan. At that time, the accumulated interest becomes part of the creditor's allowed secured claim and, pursuant to 11 U.S.C. § 1129, the plan must provide for payment to the creditor of at least the present value of such allowed claim.").

1399024

The Plan provides WFF with deferred cash payments equal to the present value of its claim as determined by the standard set forth in *Till*, which is consistent with Second Circuit precedent, *In re Valenti*, 105 F.3d 55 (2d Cir. 1997). While *Till* was in the context of a Chapter 13 reorganization, its "formula approach" to cram down interest rates (i.e., prime rate plus a risk adjustment) is applicable to Chapter 11 cases. *In re Am. Homepatient, Inc.*, 420 F.3d 559, 568 (6th Cir. 2005) (applying *Till*'s formula approach in Chapter 11 cram down); *Mercury Capital Corp. v. Milford Conn. Assocs.*, 354 B.R. 1, 12 (D. Conn. 2006) (bankruptcy court did not err by applying *Till* in Chapter 11 case); *see also In re Marfin Ready Mix Corp.*, 220 B.R. at 158 n.8 (noting that cram down language in section 1129 is "substantively identical" to cram down language in section 1325, and that "most courts interchangeably apply the analysis used under one section to the other").

### (a)  *Till v. SCS Credit Corp.*—Controlling Law

In *Till,* the Supreme Court held that the formula approach is to be used when determining the cram down rate of interest. Under *Till* and its progeny, the cram down interest rate that the Debtor proposes for WFF in its Plan should be approved.

In *Till,* the secured claim that was subject to cram down arose from an installment contract, which included a finance charge of 21% per annum. *Till*, 541 U.S. at 470. The debtors' Chapter 13 plan proposed to pay interest on the secured claim at a rate of 9.5% per annum. *Id.* at 471. The debtors arrived at this figure by using the formula approach, i.e., augmenting the national prime rate which at that time was approximately 8% with a 1.5% risk adjustment. *Id.* The holder of the claim objected to the plan, arguing that the appropriate cram down rate was 21%, which was the rate the creditor asserted that it would obtain if it foreclosed and reinvested the proceeds in loans of equivalent duration and risk as the loan originally made to the debtors.

*Id.* At the evidentiary hearing, the creditor presented testimony regarding loans to borrowers with poor credit ratings (subprime loans); specifically, the creditor's expert testified that the creditor "uniformly charges 21% interest on so-called 'subprime' loans, or loans to borrowers with poor credit ratings, and that other lenders in the subprime market also charge that rate." *Id.* The debtors' expert testified that the 9.5% "formula" rate of interest was "very reasonable" given that the plan was "financially feasible." *Id.* at 471-72. The bankruptcy court approved the plan at the rate at 9.5%. *Id.* at 472.

The creditor appealed the decision and the district court reversed, requiring 21% as the proper cram down interest rate. *Id.* The debtors then appealed to the Seventh Circuit, which concluded that the contract rate of 21% should operate as the presumptive cram down interest rate, and that the inquiry should focus on the interest rate that the creditor in question would obtain in making a new loan in the same industry to a debtor who is similarly situated. *Id.* at 473. Thus, the Seventh Circuit's majority decision implemented the so-called "coerced loan" approach (favored by WFF here) for determining cram down interest rates, and remanded the case. *Id.*

As noted by the Supreme Court, the Seventh Circuit's decision also included a dissenting opinion (Rovner, J., dissenting), which contended that the cram down interest at the 21% rate overcompensated the secured creditor. Significantly, the Supreme Court recognized Judge Rovner's view "that the rates produced by either the formula or the cost of funds approach might be a 'piddling' relative to the coerced loan rate, [however] courts should 'consider the extent to which the creditor has already been compensated for . . . the risk that the debtor will be unable to discharge his obligations under the reorganized plan . . . in the rate of interest that it charged to the debtor in return for the original loan.'" *Id.* at 473.

On appeal, the Supreme Court noted that the Bankruptcy Code provides little guidance on the interest rate methodology that Congress had in mind when it adopted the cram down provisions. The Supreme Court recognized, however, that three important considerations govern the cram down interest rate methodology choice. First, the Bankruptcy Code includes numerous provisions (citing §§ 1129, 1325) that, like the cram down provision, require a court to discount a stream of deferred payments back to their present dollar value to ensure that a creditor receives at least the value of its claim. On the first consideration, the *Till* Court stated: "We think it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions. Moreover, we think Congress would favor an approach that is familiar in the financial community and that minimizes the need for expensive evidentiary proceedings." *Id.* at 474-75.

The second consideration noted by the *Till* Court is that the Bankruptcy Code expressly authorizes a bankruptcy court to modify the rights of a secured creditor. The third consideration was explained as follows:

> [F]rom the point of view of a creditor, the cram down provision mandates an objective rather than a subjective inquiry. That is, although § 1325(a)(5)(B) entitles the creditor to property whose present value objectively equals or exceeds the value of the collateral, it does not require that the terms of the cram down loan match the terms to which the debtor and creditor agreed prebankruptcy, nor does it require that the cram down terms make the creditor subjectively indifferent between present foreclosure and future payment. Indeed, the very idea of a "cram down" loan *precludes* the latter result: By definition, a creditor forced to accept such a loan would prefer instead to foreclose. Thus, a court choosing a cram down interest rate need not consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative loans it could make if permitted to foreclose. Rather, the court should aim to treat similarly situated creditors similarly, and to ensure that an objective economic analysis would suggest the debtor's interest payments will adequately compensate all such creditors for the time value of their

money and the risk of default.

*Id.* at 476-77.

Against the backdrop of those considerations, the *Till* Court rejected the "coerced loan,"
presumptive contract rate and cost of fund approaches because each of those approaches "is
complicated, imposes significant evidentiary costs, and aims to make each individual creditor
whole rather than to ensure the debtor's payments have the required present value." *Id.* at 477.
The *Till* Court provided the following explanation for why the coerced loan approach is
improper, which is significant because WFF is seeking to utilize such an approach:

> [T]he coerced loan approach requires bankruptcy courts to
> consider evidence about the market for comparable loans to similar
> (though nonbankrupt) debtors—an inquiry far removed from such
> courts' usual task of evaluating debtors' financial circumstances
> and the feasibility of their debt adjustment plans. In addition, the
> approach overcompensates creditors because the market lending
> rate must be high enough to cover factors, like lenders' transaction
> costs and overall profits, that are no longer relevant in the context
> of court-administered and court-supervised cram down loans.

*Id.* (emphasis added).

Similarly, the Supreme Court found defects in: (i) the "presumptive contract rate
approach," *see id.* ("Like the coerced loan approach, the presumptive contract rate approach
improperly focuses on the creditor's potential use of the proceeds of a foreclosure sale"); and (ii)
the "cost of funds approach," *see id.* at 478 ("The cost of funds approach too is improperly
aimed. Although it rightly disregards the now-irrelevant terms of the parties' original contract, it
mistakenly focuses on the creditworthiness of the creditor rather than the debtor.") (emphasis
added).

In selecting the formula approach, the *Till* Court explained that the formula approach
"has none of these defects." *Id.* In the words of the Court,

Taking its cue from ordinary lending practices, the [formula] approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. The court must therefore hold a hearing at which the debtor and any creditors may present evidence about the appropriate risk adjustment. . . . [M]any of the factors relevant to the adjustment fall squarely within the bankruptcy court's area of expertise.

Thus, unlike the coerced loan, presumptive contract rate, and cost of fund approaches, the formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings. <u>Moreover, the resulting "prime-plus" rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor.</u>

*Id.* at 478-79 (emphasis added).

The Court further noted that a bankruptcy court must "select a rate high enough to compensate the creditor for its risk <u>but not so high as to doom the plan.</u>" *Id.* at 480 (emphasis added).[6] While not ruling on the appropriate risk adjustment, the Court recognized that such risk adjustments are generally approved at 1-3%. *Id.* As for burdens of proof, the *Till* Court noted that the creditor bears the burden of showing that a proposed risk adjustment needs to be higher. The *Till* Court recognized that the dissent identified the following factors as bearing on the risk

---

[6] *See* Richard E. Mikels, *The Developing Impact of Till v. SCS on Chapter 11 Reorganizations*, 24-10 AM. BANKR. INST. J. 12, 12, (December/January 2006) (The *Till* Court "refers specifically to a proper cram down interest rate that is 'high enough to compensate the creditor for its risk, but not so high as to doom the plan.' ...This can be taken as an indication that the Court is prepared to see secured creditors receive less-than-market rates in cram down loans, a supposition borne out by its finding in *Till* of 9.5 percent cram down interest rate on a loan that was originally 21 percent.").

adjustment: "(1) the probability of plan failure; (2) the rate of collateral depreciation; (3) the liquidity of the collateral market; and (4) the administrative expenses of enforcement." *Id.* at 484 (citing Scalia, J. dissenting). The Court found that consideration of these factors supports placing the burden of proof on creditors because creditors will have "readier access" to information such as the "liquidity of the collateral market." *Id.* at 479.

In footnote 19 of *Till*, 541 U.S. at 480, the Supreme Court specifically invited Congress to revisit the interest formula issue if the Court had misunderstood legislative intent. Since May 17, 2004, the date of the *Till* decision, Congress has amended the Bankruptcy Code every year without exception but has not disturbed *Till's* holding.

Section 1325(a) (setting forth the requirements for plan confirmation under Chapter 13) was amended in 2005 with five separate amendments, including the addition of a new paragraph and amendments specifically related to the liens of secured creditors, and was amended again in 2006. Section 1322 (setting forth necessary and permissible provisions in a Chapter 13 plan) was amended in 2005 with two separate amendments, including one amendment limiting the bankruptcy court's ability to extend a repayment schedule and another limiting the court's ability to alter the terms of a loan in certain circumstances. None of these amendments altered the Supreme Court's *Till* decision. The analogous provisions of Chapter 11 were also amended after May 2004. Sections 1123 (contents of a Chapter 11 plan) and 1124 (impairment of claims or interests under a plan)—the provisions analogous to section 1322—were amended in 2005 with three separate amendments, including the addition of a new paragraph to section 1123. Section 1129 (confirmation of a chapter 11 plan) was amended in 2005 with five separate amendments. Despite all of these changes, *Till* remains the law.

**(b)** **Pre-*Till* and Post-*Till* Law Requires Utilization of Formula Approach**

The *Till* formula approach is the appropriate cram down methodology because: (a) pre-*Till,* the Second Circuit Court of Appeals and the Bankruptcy Court for the Eastern District of New York endorsed the formula approach; and (b) post-*Till,* courts have consistently recognized that the *Till* formula approach applies in the Chapter 11 context.

(i)    Pre-*Till*: The Second Circuit and Bankruptcy Court for the Eastern District of New York Utilized the Formula Approach

Before the *Till* decision, the Second Circuit applied a remarkably similar version of the formula approach for determining the applicable rate of interest in a cram down.   In *In re Valenti*, the Second Circuit held that the rate of post-confirmation interest "should be fixed at the rate on a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan. . . . [plus] a premium to reflect the risk to the creditor in receiving deferred payments under the reorganization plan." 105 F.3d 55, 64 (2d Cir. 1997).  The Second Circuit reached this holding after conducting a similar analysis to that performed in *Till*, and after rejecting the other cram down methodologies similarly discarded in *Till*. *Id.* at 64. Thus, with the sole exception that the base rate is a United States Treasury instrument instead of the prime rate, the "settled" *Valenti* standard is virtually identical to that established by the Supreme Court in *Till*.   *See also Milham*, 141 F.3d at 425 (holding that "present value is achieved by the payment of interest at a rate calculation in accordance with our holding in *In re Valenti*.  Because the post-confirmation rate in the confirmed plan at issue was so calculated, the bankruptcy court decision confirming the plan, and the decision of the Bankruptcy Appellate Panel affirming the confirmation, are affirmed.").

Similar to *Till's* progeny, although *Valenti* was decided in a Chapter 13 case, the Bankruptcy Court for the Eastern District of New York applied the *Valenti* standard in chapter

26

11 cases. In *In re Marfin Ready Mix Corp.*, Judge Cyganowski held that it is "settled in this Circuit that the market rate of interest 'should be fixed at the rate on a United States Treasury instrument with a maturity equivalent to the repayment schedule under the debtor's reorganization plan.'" 220 B.R. at 158 (emphasis added). Judge Cyganowski similarly required the parties to add the risk premium pursuant to *Valenti*. *Id.*

        (ii)     Post-*Till*: Formula Approach Applies in Chapter 11

As noted earlier, numerous courts, including a District Court within the Second Circuit, have held that the *Till* formula approach is the appropriate methodology for determining a cram down rate in a Chapter 11 plan. *Mercury Capital Corp.*, 354 B.R. at 12 (bankruptcy court did not err by applying *Till* in chapter 11 case); *In re Am. Homepatient, Inc.*, 420 F.3d 559, 568 (6th Cir. 2005) (applying *Till*'s formula approach in chapter 11 cram down); *In re Cantwell*, 336 B.R. 688, 693 (Bankr. D.N.J. 2006) (applying *Till*'s formula approach to Chapter 11); *In re Prussia Assocs.*, 322 B.R. 572, 589 (Bankr. E.D. Pa. 2005) (interpreting *Till* to mean that "other things being equal, the formula approach should be followed in Chapter 11 just as in Chapter 13").

As was properly recognized by Chief Judge Judith Wizmur of the United States Bankruptcy Court for the District of New Jersey, the three considerations identified by the *Till* Court as supporting the formula approach are "equally applicable" in Chapter 11:

> The *American HomePatient* and *Prussia Associates* decisions confirm that the three considerations identified in *Till* are equally relevant in the Chapter 11 context. As *Till* noted, the present value provisions of Chapter 13 carry over to section 1129. Likewise, just as Chapter 13 debtors may modify secured claims under section 1322(b)(2), Chapter 11 debtors may modify creditors' rights under section 1123. Finally, the "objective economic analysis required under Chapter 13" to treat "similarly situated creditors similarly," and to ensure that "the debtor's interest payments will adequately compensate all such cases for the time value of their money and the risk of default," is equally applicable to Chapter 11 cases.

*Cantwell*, 336 B.R. at 692.

1399024

Despite the *Till* decision's attempt to homogeneously interpret the cram down provisions of the Bankruptcy Code, courts have noted a practice of first checking to see if there is an "efficient market" for the cram down loan because of "footnote 14" in the *Till* case which reads: "[w]hen picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *See Mercury Capital Corp.*, 354 B.R. at 13 (stating "on remand, the [b]ankruptcy [c]ourt should consider: (1) does an efficient market exist for the type of loan [the secured creditor] is forced to give the debtor under the competing plans; (2) if there is no efficient market rate and it is thus appropriate to apply the *Till* formula, what was the national prime rate on the relevant date . . ."); *Am. Homepatient, Inc.*, 420 F.3d at 568 (applying *Till*'s formula approach in chapter 11 cram down in absence of efficient market); *Brice Road Developments, L.L.C.*, 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008) (stating "where no 'efficient market' exists, the formula approach endorsed by the Supreme Court in *Till* should be employed"); *Cantwell*, 336 B.R. at 693 (after finding that evidence did not establish that "efficient market" existed, court employed formula approach).

In assessing whether an "efficient market" exists, the analysis must begin with understanding that a court is assessing whether an "efficient market" exists for the particular "cram down loan" under consideration. *See Mercury Capital Corp.*, 354 B.R. at 12 (remanding case to bankruptcy court because, *inter alia*, "there is not enough evidence in the record to determine whether an efficient market exists for the type of loan that [the secured creditor] will give the debtor" under the debtor's plan) (emphasis added); *In re Nw. Timberline Enter., Inc.*, 348 B.R. 412, 434 (Bankr. N.D. Tex. 2006) ("This court concludes it must fall back to the *Till* formula approach as being the controlling test, since there appears to be no 'efficient market' of lenders willing to provide an exit loan identical to what is being offered to [the secured creditor]

<u>here.</u>") (emphasis added).

Approaches that have not focused on a market for the specific "cram down loan" being proposed by a debtor have properly been criticized and rejected. *See Am. Homepatient*, 420 F.3d at 568-69; *Brice Road*, 392 B.R. at 280-81. In *American Homepatient*, the Sixth Circuit criticized the lender because the lender's argument was "centered on the composite interest rate that a new loan (including 'mezzanine' debt and equity) would command in the market, <u>not what their loan to the [the debtor] which was all senior debt would require.</u>" 420 F.3d at 568 (with emphasis). The *American Homepatient* court noted that the blended rate (which WFF also relies upon in its Objection) was improper because: (a) the cram down was not a "new loan" with "new funds" but the sanctioning of a workout between the debtor and secured creditor; and (b) the proposed blended rate would result in a "windfall" to the secured creditor because it would provide the creditor with more than the present value of its claims. *Id.* at 568-69.

Similarly, in *Brice Road*, the Bankruptcy Appellate Panel for the Sixth Circuit rejected the secured creditor's attempt to contend that there is an efficient market based upon a complete refinancing under a tiered financing. 392 B.R. at 281 (citing *American Homepatient* with approval and noting inclusion of other types of financing—mezzanine debt and equity—is a pure hypothetical suggested by the lender). In so doing, the *Brice Road* court approved of the bankruptcy court's criteria for evaluating a proposed efficient market rate: "the priority of the lien securing the loan; whether there exists an open, well-developed market for loans of the kind between the debtor and secured creditor; the type of collateral involved; the quality, age, and life expectancy of the collateral; short or long term nature of the proposed terms of loan; and the amount financed." *Id.* at 280-81.[7]

---

[7] The *Till* Court's emphasis on developing a methodology that is readily ascertainable and uncomplicated supports
...Continued

1399024

**(c)** **Applying _Till_: No Efficient Market Exists For The "Cram Down Loan" And WFF Has Failed To Meet Its Burden Of Demonstrating That A Rate Higher Than 4.5% Is Required**

      (i)    No Efficient Market for WFF's "Cram Down Loan"

The Debtor's interest rate expert, Paul Fried, opines that there is no efficient market for loans on bulk unsold condo units with the characteristics of the Property and WFF's Secured Claim. In the course of preparing his expert report, Mr. Fried (along with his colleagues) consulted with a number of real estate lenders, both agency and private, including funds and non-traditional lenders concerning the current market and rate environment for loans on bulk condominium units. In doing so, Mr. Fried and his colleagues described the Property and its profile, provided cash flow projections, and other basic information necessary for refinancing to determine whether such lenders had an "appetite" for providing financing. Mr. Fried has reported (and will testify) that none of the lenders that were contacted would make such a loan. Likewise, Mr. Fried will testify that most of the contacted lenders were currently not lending at all, and none would consider making a traditional loan on assets similar to the Property. Therefore, Mr. Fried concluded that there is no efficient market for a loan similar to the WFF "cram down loan" contained in the Debtor's Plan.

Mr. Fried's conclusion about the lack of an efficient market is consistent with the testimony provided by WFF's David Heiden on July 23, 2010. As was noted by the Court in its

---

...Continued

the notion that the "efficient market" analysis should be focused on a relatively straight-forward, simple review of whether an immediate, readily ascertainable market is available for the same cram down loan under consideration. *See* Richard E. Mikels, *The Developing Impact of Till v. SCS On Chapter 11 Reorganizations*, 24-10 Am. Bankr. Inst. J. 12, 12 (December/January 2006) ("[W]hile those with a creditor orientation will look to [*Till's*] footnote 14 to justify the view that *Till* does not need to be applied in a Chapter 11 context...there is a reading of the case that reconciles this seeming internal inconsistency. The Court chose the formula rate approach, or footnote 14's efficient-market approach, because each one, based on the facts and circumstances of a given case, is readily ascertainable, uncomplicated, involves less in litigation costs and focuses on insuring that payments equal the required present value, rather than insuring that each creditor is made whole based on the individual circumstances of that creditor....").

decision on WFF's pendency interest,[8] Mr. Heiden testified that "[t]he banks are not lending" and are "still very hesitant to make real estate loans." *See* July 23, 2010 Transcript, page 30, Line 1-4.

As set forth in WFF's Opposition, WFF is relying upon Stuart Bruck to establish that there is an efficient market for similar loans (Opposition ¶34). That statement falls flat when WFF explains that Mr. Bruck did not find a market for a loan similar to the WFF "cram down loan," instead WFF and Mr. Bruck assert that there is a market for a "tiered" financing model. As was explained earlier, the Sixth Circuit in *Am. HomePatient* and the Bankruptcy Appellate Panel for the Sixth Circuit in *Brice Road* rejected lenders' attempts to establish an "efficient market" by relying upon the possible availability of tiered financing. As was held in *Am. HomePatient* and *Brice Road*, the need to go to a tiered financing model does not represent an efficient market because: (1) it shows there is no open, well-developed market for loans of the kind proposed for WFF in the Plan; (2) the "cram down loan" is a "workout loan," whereas the tiered financing is mistakenly premised upon new funds being injected for new loans; (3) the "cram down loan" is one loan with terms set in the Plan, whereas WFF's tiered financing involves three loans with different terms, e.g., Mr. Bruck's mezzanine debt assumes a 2-year loan at 12% with 3 points; and (4) WFF's inclusion of other types of financing—mezzanine debt and equity—is purely hypothetical.

Thus, no efficient market exists for the WFF "cram down loan" set forth in the Debtor's Plan.

     (ii)    <u>Debtor's Proposed 4.5% Interest Rate is Appropriate and WFF Has Failed to Meet Its Burden of Demonstrating That A Higher Rate is Required</u>.

Since there is no "efficient market" for the WFF "cram down loan," the *Till* formula

---

[8] *See* August 11, 2010 Transcript, p. 15, lines 10-12.

approach applies. Thus, the appropriate interest rate is the national prime rate of 3.25%, plus a risk premium.

Consistent with the *Till* analysis, the Debtor will present the expert testimony of Mr. Paul Fried to address the various criteria identified by the Supreme Court for assessing the risk premium. As is provided in Mr. Fried's Report and Declaration (submitted herewith), he concludes that the interest rate for WFF's claim should be 3.9%, which is the national prime rate (3.25%) plus a .65% risk premium. According to Mr. Fried's expert report, this is based upon, *inter alia*: (1) the Plan projections; (2) sell-out values contained in the appraisals; (3) virtual absence of any risk of non-payment to WFF under the Plan; (4) risk profile of the Property; (5) the ownership and management of the Debtor; and (6) WFF's expenses to pursue remedies and liquidate the Property. In the body of Mr. Fried's report, he, among other things: (i) describes the "asset quality" of the Property as excellent; (ii) considers the Plan's projections regarding rental revenue and Unit sales as feasible; (iii) finds that the risk of non-payment under the Plan falls on the Debtor; and (iv) takes the position that should the Debtor's Plan fail, the foreseeable "risk" to WFF is the cost of pursuing its remedies and liquidating the Property.

While Mr. Fried concludes that 3.9% is an appropriate interest rate, the Debtor has proposed to pay WFF at a rate of 4.5%. WFF continues to object that the rate is too low but there are several considerations to counter that view. First, the *Till* formula approach begins with a higher base rate than what was required by *Valenti*, i.e., national prime rate (3.25%) versus "risk free" U.S. Treasury Rate (1.31%).[9]  Additionally, the 4.5% rate utilizes a 1.25% risk premium which puts it within the range of generally approved risk premiums. *See Till*, 541 U.S. at 480 (noting "courts have generally approved adjustments of 1% to 3%") (citing *In re Valenti*,

---

[9] See Statement of U.S. Treasury Rate as of September 28, 2010.

105 F.3d at 64). Moreover, 4.5% is consistent with Fannie Mae's best rates for 5 year loans. *See* Stuart Bruck Report, at 4 (noting Fannie Mae's best rates for 5 year loans range from 4.3% - 4.7%), and the Debtor presents a five-year repayment plan. Further, while WFF may want a higher rate based upon the "coerced loan" theory rejected by the Supreme Court in *Till*, WFF should recognize that it would be receiving a lower rate of interest if the "cost of funds" approach were the law of the land. Under that approach, WFF would only be entitled to an interest rate of 3.33% because WFF has previously acknowledged that it has a multi-million dollar undrawn credit line with M&T Bank which bears interest at LIBOR plus 300 basis points (3.33% on July 23, 2010). *See* July 23, 2010 Transcript, p. 22, lines 3-7, pp. 47-48, lines 21-25 and 1-2. Lastly, as noted earlier, the *Till* Court recognized the view that courts should consider the rates the lender has already benefited from. *See Till* at 473. As shown by the below chart, when such an analysis is performed with WFF, assuming a Plan interest rate of 4.5%, the composite interest rate WFF would receive is **8.66%**:

|  | Date | Interest Rate |
|---|---|---|
| Origination of Loan to Chap 11 Filing | 10/14/2008 to 12/4/2009 | 12.0% |
| Pendency Interest during Chapter 11 | 12/5/2009 to 10/1/2010 | 24.0% |
| Plan Rate of Interest (a) | 10/1/2010 to 9/30/2015 | 4.5% |
| Average Rate of Interest (b) |  | 8.66% |
| On loan balance of $17 million loan |  |  |

(a)  Interest expense is calculated on a loan balance of $20.2 million
Includes pendency interest less cash payments made during Chapter 11
And Secured Lender Professional Fees
(b)  Does not include extension fee paid of $84,875.
(c)  Including extension fee average rate of interest is 8.73%

WFF's interest rate expert does not opine on the applicable risk premium or any of the criteria identified by the *Till* Court.[10]  Instead, Mr. Bruck presents a hypothetical tiered

---

[10] WFF cites *Northwest Timberline* to show that the Debtor's Plan does not pass muster under the formula approach. *In re Nw. Timberline Enter., Inc.*, 348 B.R. 412 (Bankr. N.D. Tex. 2006).  As discussed above, the Debtor has
...Continued

financing to arrive at a blended rate of 11.68%. This approach should be rejected because it's a variation of the coerced loan theory that the *Till* Court rejected.[11] Moreover, the Sixth Circuit in *Am. HomePatient* and the Bankruptcy Appellate Panel for the Sixth Circuit in *Brice Road* criticized and rejected the lenders' expert testimony which sought to employ the blended rate through a tiered financing analysis. Thus, this Court should find Mr. Bruck's analysis unpersuasive and irrelevant and conclude, as the *Brice Road* court did, that the lender (WFF) has failed to meet its burden of establishing that the Debtor's proposed interest rate is not high enough.

None of the cases cited by WFF should alter the Court's analysis.[12] WFF cites *In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010) for the proposition that the "court determined there was a market for loans in the hotel casino industry . . . ." Opposition, ¶ 37. This assertion is both incorrect and irrelevant. It is incorrect because in *TCI 2 Holdings*, Chief Judge Wizmur did not "determine[]" that an efficient market existed; rather, "the parties <u>agreed</u> that an efficient market exist[ed] for the loan of the kind proposed by the [Plan]." *Id.* at 163

---

...Continued

shown that, under *Till*, the Plan's proposed cram down interest rate is legally sufficient. Notwithstanding that *Northwest Timberline* is not binding on this Court, the case is also distinguishable in that there, (i) the collateral was not oversecured, and (ii) no first lien would be given to the secured creditor.

[11] In support of its blended rate approach, WFF cites but one post-*Till* case, e.g., *In re N. Valley Mall, LLC*, 432 B.R. 825 (Bankr. C.D. Cal. 2010). Although the court in *North Valley Mall* did apply a blended rate approach that was because both the debtor and the objecting secured creditor presented and accepted the blended rate approach. *Id.* at 832-33. Neither party argued in favor of the formula approach, nor did their corresponding experts. *Id.* Moreover, unlike the present case, the debtor and objecting secured creditor struggled between whether the blended rate should be either two or three tranches. *Id.* at 834. Additionally, the court in *North Valley Mall* was not bound by Second Circuit precedent such as *In re Valenti* or *In re Milham* (and *In re Marfin Ready Mix*), which apply an analogous rendition of the formula approach using a U.S. Treasury instrument as the base interest rate. Accordingly, to the extent that this Court even considers the *North Valley Mall* case, it is plainly distinguishable from the instant case.

[12] WFF cites *In re DBSD N. Am., Inc.*, 419 B.R. 179, 210 (Bankr. S.D.N.Y. 2009) presumably to persuade this Court against relying on the formula approach. But Judge Gerber's discussion regarding cram down and interest rates is arguably dicta. Before addressing the applicable cram down interest rate, Judge Gerber expressly remarked that the cram down requirements against DISH "don't need to be satisfied here. But in any event, they have been." *Id.* at 63. Moreover, while it appears that Judge Gerber imposed the contract interest rate of 12.5% for cram down, the existing contract rate on the subject loan was actually 16% because of a forbearance agreement. *Id.* at 11 n.8.

(emphasis added). This is a significant distinction when considering that *Till* and *American Homepatient* appear to require that a court <u>finds</u> that no efficient market exists. Further, just because an efficient market may exist in the hotel casino industry, does not equate to an efficient market for the "cram down loan" on Brooklyn real estate proposed in the Debtor's Plan.

WFF next argues that the Plan's proposal to "stretch" WFF's payments over the course of the Plan is impermissible, relying predominantly on *In re Peterson*, 95 B.R. 663 (Bankr. W.D. Mo. 1988). The Debtor addresses this point in stages.

First, the Debtor amended the Plan and reduced the time period for repaying WFF's Claim in full to five years. Insofar as WFF still opposes the Plan's duration period at five years, the Debtor submits that no provision in the Bankruptcy Code prevents the Debtor from "stretching" out the terms of the WFF Loan. Indeed, as recognized by the *Peterson* court, "the principle of extension is the quintessential substance of chapter 11 reorganization." *Id.* at 664.

Next, of the cases cited by WFF, none of them contain facts similar to those presented before this Court. For instance, the court denied confirmation in *Manion* not because it was concerned over the time-period proposed to repay a particular claim, but because the plan was "wholly speculative," the debtor provided insufficient evidence to establish the financial ability to execute the plan, and the viability of the plan relied solely on the debtor resigning a contract with the state's department of housing and rehabilitative services. *In re Manion*, 127 B.R. 887, 890-91 (Bankr. N.D. Fla. 1991). Here, there are almost no factual similarities to *Manion*. The Debtor's property is completely constructed and virtually fully tenanted; the Debtor's projections show the financial wherewithal to support the Plan, as do each of the appraisals and valuations performed by WFF and the Debtor. Nor is the Debtor awaiting any state agency's approval to continue conducting business.

And in *Peterson*, while the subject contract become due shortly *after* the bankruptcy filing, the contract was also entered shortly *before* the bankruptcy filing itself. *In re Peterson*, 95 B.R. at 664. Moreover, the "illegality" that the court referred to was the debtors' plan to re-amortize the loan over five years without including post-confirmation interest for the time-value of money. *Id.* The absence of any interest obviously ran counter to section 1129(a)(7), and this, in conjunction with the extended time-period, made the treatment of this claim unreasonable under the circumstances. *Id.* *Peterson* explicitly recognized that "the cases hold that section 1129 does not per se prohibit long term payments." *Id.* (citations and quotation marks omitted). Based on the absence of any post-confirmation interest, the *Peterson* court then limited the debtors period of extended indebtedness for two years, as that extension of time was a "reasonable limit."

Therefore, based on the foregoing, the Plan interest rate and term satisfy both prongs of the "fair and equitable" rule. Accordingly, the Debtor has met the statutory requirements to impose the cram down provision of section 1129(b), and the Plan can be confirmed notwithstanding WFF's opposition to confirmation.

### 3. The Plan Provides for the Continuation of WFF's Security Interest

In the Objection, WFF argues that the Plan does not satisfy Section 1129(b)(2)(A). WFF asserts that the Plan fails to comport Section 1129(b)(2)(A)(i) because (i) WFF will not retain its liens in membership interests, and (ii) WFF will only be paid 85% of the net proceeds of the future sales of Units. *See*, Objection at ¶¶45-47. The Debtor has resolved WFF's Objection with respect to lien retention because the Modified Plan now expressly provides for the continuation of WFF's security interest in the membership interests of the Debtor pursuant to the Pledge Agreement.

With regard to the appropriate percentage of the net proceeds of future sales of Units, WFF argues that section 1129(b)(2)(A)(i) requires that it receive one-hundred percent (100%) of the net proceeds. To support its aggressive argument, WFF cites dicta from a decision from the United States Bankruptcy Court for the Central District of California, *In re N. Valley Mall, LLC*, 432 B.R. 825 (Bankr. C.D. Cal. 2010). Here, however, WFF's lien is not at all abrogated but rather will attach to the net proceeds of the sale in a manner consistent with section 1129(b)(2)(A)(i) and (iii). Specifically, the Plan provides that upon each Unit sale, WFF will be immediately paid ninety-five percent (95%) of the proceeds, with five percent (5%) of the proceeds to be held in a reserve to facilitate the Debtor's compliance with the distribution scheme outlined in the Plan, subject to WFF's continuing lien in that 5%. This 95%/5% split provides WFF with more favorable treatment than the contractual standard set forth in the WFF Mortgage, which under certain circumstances entitled WFF to just ninety-two percent (92%) of the gross sales price of each Unit. *See* WFF Mortgage p. 27, Section 56 "Partial Releases from the Mortgage."

**4.**     **WFF is Not Entitled to Credit Bid**

WFF asserts that the Plan fails to comport with section 1129(b)(2)(A)(ii) because the Plan does not permit WFF to credit bid on the "sale" of the Debtor's membership interests. *See* Objection, at ¶¶48-50. However, section 1129(b)(2)(A)(ii) does not apply in this case. As described in the statute itself, section 1129(b)(2)(A) is comprised of three alternative methods by which a plan may satisfy the fair and equitable requirement with respect to a class of secured claims:

> (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363 (k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A). Because section 1129(b)(2)(A)(ii) is one of three alternative examples of fair and equitable treatment, WFF does not have an unconditional right to credit bid. As explained above, the Plan satisfies the requirements of section 1129(b)(2)(A)(i) and therefore does not need to satisfy section 1129(b)(2)(A)(ii).[13] Notwithstanding the inapplicability of section 1129(b)(2)(A)(ii), WFF improperly relies on, and mischaracterizes, a decision out of the United States District Court for the District of Massachusetts, *Beal Bank, S.S.B. v. Waters Edge Ltd., P'ship,* 248 B.R. 668 (D. Mass. 2000) in support of its argument. WFF's reliance on *Beal* is misplaced, however, because the plan in *Beal* was based on the sale of the entire debtor partnership to an outsider. In sharp contrast to *Beal*, the Plan does not propose to "sell" collateral to an outside third party. Instead, the Plan merely provides that the reorganized Debtor will continue to be led by Jack Weingarten, who is already a member and Equity Interest Holder of the Debtor. Moreover, this Objection is rendered moot because the liens securing WFF's claims are retained under the Plan, which satisfies the fair and equitable requirements of section 1129(b)(2)(A)(i) "whether the property subject to such liens is retained by the debtor or transferred to another entity." 11 U.S.C. § 1129 (b)(2)(A)(i). Finally, in *Beal* the ruling went the

---

[13] The proposed payment plan is sufficient to provide WFF with the indubitable equivalent of its claim and therefore also satisfies 11 U.S.C. § 1129(b)(2)(A)(iii).

1399024

other way, i.e., against WFF's position. The court ultimately found that because the transaction was not a sale of property, but only a sale of an equity interest, it did not improperly frustrate the secured lender's alleged "credit bid" right, and that the plan could be confirmed under section 1129(b)(2)(A)(i). *Id.* at 679-80.

## B. The Plan is Not Likely to be Followed by Liquidation or the Need for Further Reorganization

Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition to confirmation, the bankruptcy court determine that a plan is feasible. Specifically, the bankruptcy court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11). As articulated by the Second Circuit, "[t]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). Even cases cited by WFF in its Objection describe the feasibility standard as establishing "a relatively low threshold of proof necessary to satisfy the feasibility requirement." *See Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apts. (In re Sea Garden Motel & Apts.)*, 195 B.R. 294, 298 (D.N.J. 1996)(quoting *In re Eddington Thread Mfg. Co., Inc.*, 181 Bankr. 826, 832-33 (Bankr. E.D. Pa. 1995) (citations omitted)).

Courts have identified the following factors to be considered in determining feasibility:

> (1) the adequacy of the capital structure;
> (2) the earning power of the business;
> (3) the economic conditions;
> (4) the ability of management;
> (5) the probability of the continuation of the same management;
> (6) the availability of prospective credit, both capital and trade;

(7) the adequacy of funds for equipment replacements;
(8) the provisions for adequate working capital; and
(9) any other matter bearing on the successful operation of the business to enable performance with the provisions of the plan[.]

*In re Leslie Fay Cos.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997)(finding the plan economically feasible based on the financial forecasts of its management team) (citing 7 L. KING, COLLIER ON BANKRUPTCY, P 1129.LH[2] at 1129-82 (15th ed. rev. 1996)). "To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations." *Id.* Simply put, feasibility is demonstrated if the relevant projections are reasonable and show that the plan is workable.

## 1. The Plan is Feasible

As set forth in the projected statements of cash flows and projected income statements, attached as Exhibit "B" to the Disclosure Statement (the **"DS Projections"**), and the Schwarzbaum Declaration, which includes as Exhibit A updated projections (**"Revised Projections"** and together with the DS Projections, the **"Projections"**), and the Ehrenfeld Declaration, the Debtor has affirmatively established its satisfaction of the feasibility requirement of section 1129(a)(11).

In analyzing the sufficiency of the Debtor's proffer, one important indication of the reasonableness of the projections is management's input into the creation of the projections. *Iridium IP LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 347 (Bankr. S.D.N.Y. 2007) (citing *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del. Ch. 1991)). Courts have found testimony relating to projections were credible where they were "(a) prepared by management; (b) took into account anticipated events and expectations; (c) prepared in a reasonable manner; (d) based on supportable assumptions about growth and performance; and (e)

40

contained logically consistent computations." *In re Citadel Broad. Corp.*, 2010 Bankr. LEXIS 1606 (Bankr. S.D.N.Y. May 19, 2010); *In re Duplan Corp.*, 9 B.R. 921, 926 (S.D.N.Y. 1980) (an "informed judgment from management" regarding projected earnings was a reasonable valuation where it took into account anticipated events and expectations).

Another indicator of reasonableness is an "analysis by an independent accounting firm of the projections that affirms their validity." *In re Fiberglass Indus., Inc.*, 74 B.R. 738, 745-746 (Bankr. N.D.N.Y. 1987) (in the context of valuing a secured creditor's collateral valuing). Here, the role played by J.H. Cohn in independently analyzing and confirming the validity of management's Projections is such an indicator of reasonableness. Furthermore, the Projections' economic forecast is consistent with the RDG Appraisal, which valued the Property.

Finally, even where alternative projections are presented by objectors, courts have stated that "alternative projections of future operations" should be rejected when those prepared by management were prepared in "a reasonable manner, using supportable assumptions and logically consistent computations," such that it "constitutes a fair, reasonable projection of future operations." *In re Iridium Operating LLC*, 373 B.R. 283, 348 (Bankr. S.D.N.Y. 2007) (citing *In re Mirant Corp.*, 334 B.R. 800, 825 (Bankr. N.D. Tex. 2005) (rejecting alternative projections because they disregarded the deliberative process that produced the Debtor's projections)).

## 2.     The Objection to Feasibility is Without Merit

WFF argues in its Objection that the Debtor will not generate sufficient future income to support the required Plan payments and that the Projections are "speculative." *See* Objection at p.24-25. On the contrary, all of the valuations, including two by WFF show sufficient projected cash flow to easily make all Plan payments. Indeed, the Debtor takes the most conservative, selling units rationally over a period of five (5) years to obtain a more reasonable sales price as

projected in the RDG Appraisal. But even WFF's B&I Appraisal, which projects an expedited sell-out in half that time, projects $27 million in cash flow.

WFF's Objection relies upon *In re 8315 Fourth Ave. Corp.,* which involved a hotel, saddled with tremendous debt far exceeding its market value. The debtor there defaulted on its obligations during the bankruptcy, failed to live up to its monthly profit projections, demonstrated it would operate at a loss of $200,000 each year, and proposed a negative amortization plan entirely dependent on an anticipated refinancing, wherein all classes of creditors were impaired, and all of the mortgagees and the unsecured creditors rejected the plan with vociferous objections. 172 B.R. 725, 733 (Bankr. E.D.N.Y. 1994). The court found the plan not feasible based on its reliance on an impossible future refinancing, which required (i) the value of the hotel to "skyrocket" or "more than double" over the first five years, an appreciation that was not reflected in the debtor's projections, and (ii) the agreement of more than $2.7 million in junior mortgages to be subordinated. *Id.* at 734. In the only other case cited in the Objection relevant to this issue, the debtor prepared financial projections showing negative cash flow of $136,474 and $44,842 in the plan's first two post-confirmation years and similarly likewise had to appreciate substantially in order to secure a refinancing anticipated in the plan. *In re Investors Fla. Aggressive Growth Fund*, 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994).

Unlike the debtors in those cases, the Debtor has continued to satisfy its obligations,[14] and the Debtor's Plan is not reliant on some spontaneous generation of value and the mythical prospects of necessary refinancing, i.e. "veritable pot of gold at the end of rainbow." Instead, the

---

[14] *See Berkeley Fed. Bank & Trust v. Sea Garden Motel & Apts. (In re Sea Garden Motel & Apts.)*, 195 B.R. 294, 305-307 (D.N.J. 1996) (the District Court approved the Bankruptcy Court's finding of feasibility even though "throughout the Chapter 11 case, the Debtor 'was unable to even meet current operating expenses,'" and in doing so, relied on the occupancy projections supported in part by testimony of a member of the partnership that owned and operated the motel).

Projections rely on conservative sale and cash flow projections derived from financial reality, based upon reasonable assumptions consistent with the RDG Appraisal, the B&I Appraisal and WFF's Loan Extension Book as summarized in the chart, *supra*.

### 3.     The Projections are Reasonable

As described in the Revised Projections, the Debtor projects that it will sell zero units in year 2, three units in year 2, four units in year 3, five units in year 4, and thirteen units in year 5. These Projections are reasonable, as demonstrated by the Debtor's appraiser, Richard DiGeronimo, who opined that the Units can all be sold over a 5-year period and that the best course of action would be to rent the units for 12 to 24 months before commencing selling. The projected sale of Units is based in part on the fact that the Debtor has suffered from the temporarily depressed real estate market and has concentrated all of its efforts on this reorganization, while its principals have been focused on two state court litigations initiated by WFF. Upon Confirmation, the Debtor will have time to devote to the marketing and sale of Units. Moreover, the real estate market has stabilized.

Even WFF confirms, in large part, the accuracy of the Debtor's projections. First, WFF's appraiser concedes that a prudent owner will choose to relet the units with leases for at least one more year before selling the units, and predicts the "normal absorption" to be 2.5 to 3 units per month, which would require only 18 months to sell all 37 units – which ends up being only 1.5 year sellout period from the Confirmation Hearing. Specifically, the WFF's appraiser states:

> We are of the opinion that a prudent owner will choose to relet the units with leases expiring in 2010 to either a new tenant or the existing one for at least one more year to await the absorption of the existing inventory as well as allow the financing options for prospective purchasers to reset themselves.

> We have reviewed the rate of sale at several local competitive condominium projects in an effort to ascertain the rate of expected sale in a "normalized" market . . . . The projects ranged in size from 12 units to 183 units. Two of the projects

43

were delivered to the market in 2009 while the remaining 4 were all delivered in 2008. Average sales per month including the 2008 period (arguably a better year for sales than 2009) were 2.16 per month. It is our opinion that in a more normal market absorption would approximate 2.5 to 3 units on average per month.

The subject property has 37 residential units to deliver to the market.

Based on the above data as well as a review of the general market it is expected to take a total of 18 months to sell out the complex. However it is likely that the distribution of sales over that period will be somewhat bell shaped with slower sales initially (in part a result of residual market weakness and financing criteria), more robust sales as units are absorbed and diminished sales as prices rise and the lesser desirable units in the complex are marketed.

*See* B&I Appraisal, at p. WFF000237 (emphasis added). Additionally, the results of WFF's due diligence review reflected in the WFF Loan Extension Book also confirms the validity of the Projections. In the WFF Loan Approval Book (dated September 25, 2008), an internal loan committee approval memo, which is attached to the Schwarzbaum Declaration as Exhibit B, WFF states:

In year 3 we assume that the sponsors will sell 50% of the units for $750 PSF, generating $16,824,375 of gross sales income, while continuing to rent the remaining units. $750 PSF is a conservative estimate based on a market analysis discussed in Section 5. In year 4 we assume that the remaining units will be sold. We assume a 6% sales cost which is above market to remain conservative. We utilized a 10% discount rate to the 4 years of cash flow yielding a present value of $24,318,637 for the building today.

*See*, Schwarzbaum Declaration, Exhibit B, WFF Loan Approval, at WFF000422. Additionally, in WFF's Loan Extension Book (dated less than one year ago, October 14, 2009), WFF states:

The sales market in Williamsburg declined during 2009 but has now stabilized. We are starting to see signs of new sales activity in the market and believe the best course of action would be to lease the units for two more years and then sell them in year 3. We utilized the current income and expense for the two year rental period. In Year 3 we assume that the units will sell for $675 PSF, generating $29,837,700 of gross sales income. $675 PSF is a conservative estimate based on a market analysis discussed in Section 5. We utilized an 8% discount rate to the 3 years of cash flow yielding a present value of $24,653,638 for and LTV of 69% as a condominium."

44

1399024

*See* Schwarzbaum Declaration, Exhibit C, WFF Loan Extension Book, at WFF000388. Clearly, the Debtor's Projections, which are validated by no less than three of WFF's own documents, are reasonable.

The Projections show that the Debtor will have sufficient funds to administer and consummate the Plan and to close the chapter 11 cases. The Projections incorporate the relevant significant factors impacting the Plan, including the Debtor's payment of secured claims over time, the Debtor's payment to general unsecured creditors, and the marketing and sales of the Debtor's Units as necessary to comply with the Plan's payment scheme. Additional factors weighing in the analysis also include, *inter alia*, the performance of similar enterprises, the historical performance of the Bayard Condominium Complex, the recovering economy, the restructuring of the Debtor's obligations, and the skill and capability of the Debtor's management.

With this framework, the Debtor, with the assistance of its advisors, has produced objectively reasonable and realistic projections which are consistent with the RDG Appraisal and the Debtor's rental income history. Thus, the Projections represent the Debtor's informed judgment, confirmed by experts, as to future performance and the expected results of operations and cash flows, and are therefore the most competent and reliable estimate of the Debtor's future performance available.

In sum, the Projections establish that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtor, thereby fully satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

## C.    The Plan's Injunctive and Exculpatory Provisions Are Valid

Section 1123(b)(6) is a "catchall" provision, which permits the Plan to include any other appropriate provision, so long as such provision is consistent with applicable sections of the

45

Bankruptcy Code. 11 U.S.C. § 1123(b)(6). In accordance with this subsection, Article XI of the Plan contains injunctive and exculpatory provisions that are consistent with the applicable provisions of the Bankruptcy Code and case law in the Second Circuit.

### 1. <u>Injunction Related to the Discharge</u>

One component of the Debtor's Plan seeks to impose an injunction related to the discharge (the "Injunction") against "all Entities that have held, currently hold or may hold Claims or other debts or liabilities against the Debtor or other right of an Equity Security Holder" from taking action on account of such Claims. Plan, Article XI.C. The Injunction specifically identifies the Guaranty Action as one such action. *Id.* Significantly, the Injunction is limited in scope and expressly declares that "[n]othing herein shall be deemed to discharge or release WFF's claims against the Guarantors [in the Guaranty Action]." *Id.* Rather, the Injunction seeks to temporarily enjoin prosecution—but not release—the Guarantors or the Guaranty Action. Put differently, while the confirmed Plan will enjoin WFF from pursuing the Guarantors for those sums being paid to it under the Plan, the Guarantors' guaranty of the Debtor's obligations and WFF's security interests in the equity interests in the Debtor remain and can be immediately pursued in the event of any plan default.

Since, the Plan does not discharge debts or obligations and rather just seeks to enjoin them, the Injunction is therefore consistent with section 524(e) of the Bankruptcy Code. *See* 11 U.S.C. § 524(e) (pronouncing that a debtor's discharge "does not" extend to non-debtors).[15]

---

[15] Notably, a plain and natural reading of section 524(e) does not necessarily preclude a non-debtor's release from a creditor's claim, because Congress used the phrase "does not," instead of "shall not" or "will not." *In re Airadigm Commc'n, Inc.*, 519 F.3d 640, 656 (7th Cir. 2008).

## 2.     The Injunction Is Valid Under Section 1123(b)(6)

The Injunction at issue is legally distinguishable from a non-debtor release, as it operates as a stay and, in fact, a reaffirmation of the Guarantors' guaranty of the Debtor's obligations. In essence, the Injunction controls the timing of the Guaranty Action, and facilitates a successful reorganization of the Debtor for the benefit of all of the Debtor's creditors.

As the Injunction is not a full release for third parties, it is consistent with applicable provisions of the Bankruptcy Code, namely, section 524(e). *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992) (third-party injunctions may be approved if "important" to debtor's reorganization), *accord In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141; *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) ("Under certain circumstances, a bankruptcy court has discretion to enjoin a civil proceeding against a non-debtor under section 105."); *see also In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 118 (Bankr. N.D. Tex. 2002) (enjoining action against enforcing guaranty so long as debtor complied with plan); *In re Seatco, Inc.*, 259 B.R. 279, 289 (Bankr. N.D. Tex. 2001) (plan confirmed because guarantor's liability to lender unaffected, and guarantor remained liable if debtor defaulted under the plan). Accordingly, the Plan can be confirmed under section 1123(b)(6) with the Injunction included as a binding provision.

The enjoined claims in the Guaranty Action will be redirected and paid through the Plan, much like a channeling injunction (albeit on a lesser scale than that in asbestos related bankruptcies). Notwithstanding the Plan's express preservation of WFF's right to collect under the Guaranty, the Debtor's Plan provides for WFF's Claim to be paid by the Debtor in full. While WFF's instrument, i.e., its note, will be superceded by the Plan, its Claim will be paid in full. Plan, Article XI.C. The Guaranty Judgment WFF holds is limited to $8.5 million in

principal. Further, interest on Guaranty Judgment will run at the New York judgment rate. Courts have approved non-debtor releases when "the plan otherwise provided for the full payment of the enjoined claims." *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142. Thus, with pendency interest running at 24%, currently the Plan will pay twice as much principal and more interest than can be collected under the Guaranty Judgment.

It should also be noted that the release considered in *Metromedia* was broad and afforded the debtors' insiders "blanket immunity," specifically granting them "a full and complete release, waiver and discharge" from virtually all claims relating to the debtor. *Id.* at 141-42. Here, in contrast, the Injunction is not a release; rather, it is specific and narrowly tailored deferral, preserving WFF's rights, and facilitating the Debtor's ability to pay the WFF Claim in full under the Plan. Thus, the temporary Injunction in the Plan is distinguishable from the release in *Metromedia*, and, therefore, *Metromedia* does not preclude this Court's confirmation of the Plan.

In the event that the Court is not persuaded that the proposed Injunction is valuable or appropriate to the Plan, the Debtor is prepared to proceed to confirmation without the benefit of the requested Injunction.

**D.     THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW**

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." The Second Circuit has defined the good- faith standard as requiring a showing that "the plan was proposed with honesty and good intentions." *In re Johns-Manville Corp.* 843 F.2d at 649 (internal citation omitted). In the context of a chapter 11 plan, courts have held that wherein a debtor "honestly believed that it was in need of reorganization and that the plan was negotiated and proposed with the intention of accomplishing

48

a successful reorganization," the good faith requirement of Section 1129(a)(3) is satisfied. *In re Manville Corp.*, 843 F.2d at 649. Moreover, "[w]here the plan is proposed with a legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *Id.*

In the Objection, WFF suggests that a 7-year plan at 3.5% presents such a "hard bargain" for WFF that the Plan is not presented in good faith. Even assuming that were true, the Debtor has modified its Plan to a 5-year term at a 4.5% interest rate, despite the fact that the Debtor's expert remains firm in his conclusion that the appropriate interest rate should be no more than 3.9%.

WFF also suggests that the Guarantors are "shielding assets" and that this represents bad faith. First, WFF brought an action in State Court leveling such allegations based on an attorney's affidavit. Based upon that evidence, WFF obtained a temporary restraining Order ("TRO") against the Guarantors on no notice. Once a hearing was held, however, and the Guarantors had the opportunity to present competent evidence regarding WFF's allegations of "asset stripping," Judge McCarthy rescinded the TRO he had previously entered without a hearing and declined to enter the preliminary injunction requested by WFF. A copy of the Affidavit of Martin Ehrenfeld filed in state court action has been presented to this Court as one of the Debtor's Confirmation exhibits. A motion to dismiss WFF's action is pending.

Second, a creditor in close contact with WFF, Beta Capital (WFF strangely lists Beta Capital's litigation counsel as one of its potential confirmation witnesses) recently moved before the Surrogate Court to disqualify and remove Moshe Lax as executor of the Chaim Lax estate,

again on grounds of "asset stripping." In a somewhat blistering opinion, Surrogate Judge Lopez-Torres refused even to accept Beta's application for filing. A copy of Judge Lopez-Torres's decision has been presented to this Court as one of the Debtor's Confirmation exhibits.

WFF has tossed around serious accusations about the Guarantors assets and their behavior. These accusations have been rejected by both courts to which they have been presented, and further have no place in connection with confirmation of the Debtor's Plan. The Plan contemplates and is premised upon using all of the Debtor's assets to create value for the Debtor's stakeholders. Through the Plan, the Debtor achieves one of the primary objectives underlying a Chapter 11 bankruptcy: the equitable distribution of value to creditors for amounts owing, and a breathing spell to prevent a quick liquidation by a secured creditor at a depressed prices. Inasmuch as the Plan promotes the objectives and purposes of the Bankruptcy Code, the Plan and the related documents have been filed in good faith and the Debtor has satisfied its obligations under section 1129(a)(3).

## CONCLUSION

For all the foregoing reasons, the Objection of WFF to Confirmation of the Plan, to the extent not resolved by the Plan, as modified, should be overruled. The Plan complies with and satisfies all of the requirements of section 1129 of the Bankruptcy Code and should therefore be confirmed.

Dated: September 28, 2010
New York, New York

/s/ John S. Mairo
John S. Mairo
Robert M. Schechter
PORZIO, BROMBERG & NEWMAN, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ 07962
Telephone: 973-538-4006
Facsimile: 973-538-5146

Attorneys for Debtor
and Debtor- in-Possession

1399024