HERRICK, FEINSTEIN LLP
*Attorneys for W Financial Fund, LP*
Andrew C. Gold
Hanh V. Huynh
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
agold@herrick.com
hhuynh@herrick.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| 20 BAYARD VIEWS, LLC, | Case No. 09-50723 (ESS) |
| Debtor. | |

-------------------------------------------------------x

### REPLY OF W FINANCIAL FUND, LP TO SUPPLEMENTAL MEMORANDUM OF LAW IN RESPONSE TO THE OBJECTION OF W FINANCIAL FUND, LP AND IN SUPPORT OF CONFIRMATION OF THE DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION <u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AS MODIFIED</u>

W Financial Fund, LP ("WFF"), by its counsel Herrick, Feinstein LLP, as and for its reply (the "Reply") to 20 Bayard Views, LLC's (the "Debtor") supplemental memorandum of law (the "Brief") in further support of the proposed chapter 11 plan of reorganization (as amended and modified, the "Plan") filed by, respectfully represents as follows:

### **PRELIMINARY STATEMENT**[1]

1. The Debtor's filing of a fourth modified plan, along with modified projections and the Brief, are wholly inappropriate and should be ignored by the Court. Surely the Debtor was aware that its filing of the Brief and the post-trial modifications to its Plan was

---

[1] Capitalized terms not defined in the Preliminary Statement shall have the meanings ascribed to them herein.

contrary to the express directions of the Court. Indeed, in the case of *In re Griswold Building, LLC*--extensively relied on by the Debtor in the Brief--the court admonished counsel for precisely the same type of misconduct committed by Debtor's counsel here. The *Griswold* court stated:

> In closing argument, counsel for the Debtors tried valiantly to improve the third amended plan in the hope of gaining confirmation. … Moreover, **on the day after the conclusion of the confirmation hearing on the third amended plan, after the Court had taken under advisement the Debtors' request for confirmation of the third amended plan and the Lender's objections to confirmation of the third amended plan, the Debtors filed yet another plan, a fourth plan** … . There are several points that need to be made about both the Debtors' counsel's efforts to try to sweeten the third amended plan during closing arguments, and the Debtors' filing of yet a fourth plan after the completion of the trial with respect to the Debtors' request for confirmation of the third amended plan and the Lender's objections to it.
>
> First, the Court construes all of these actions as good faith efforts to try to improve the third amended plan in the hope of gaining confirmation. The Debtors' counsel's modifications at closing argument to the third amended plan should be and are considered by the Court. **But the Court considers it improper to file another amended plan *after* the Court has conducted a five day trial, plowed through mountains of briefs, listened to numerous witnesses, inspected numerous documents, and has taken the Debtors' request for confirmation of that plan and the Lender's objections to it. The Court's ruling should not have to hit a moving target. The issues that were joined by the Debtors' proposal of the third amended plan and the Lender's objections to it were properly and fully developed before the Court at the conclusion of the trial …, and need to be adjudicated by the Court before the Court will consider some other plan. The Court therefore disregards for purposes of this opinion the fourth amended plan filed by the Debtors** … .

*In re Griswold Building, LLC*, 420 B.R. 666, 709-10 (Bankr. E.D. Mich. 2009) (emphasis added).

      2.     This Court has already held eleven separate days of hearings in connection with the trial on the confirmation of the Debtor's Plan. The Debtor and WFF have filed numerous pleadings, including memoranda of law, in support of and in opposition to the Plan.

During the course of the confirmation trial, the Debtor and WFF presented direct testimony and cross-examined eight witnesses. The parties have submitted several large binders of exhibits with respect to the trial.

3. For the Debtor to then file, two weeks after the close of the trial, the Brief when none of the parties requested, and the Court did not require, post-trial briefing on any issues with respect to the confirmation of the Debtor's Plan, is truly astounding. The Debtor's filings are in direct contravention to the Court's statement and the Debtor's acknowledgement that the record on the confirmation of the Debtor's Plan is closed. As with the *Griswold* case, the Court here also should disregard the Brief and the post-trial modifications to the Plan.

4. Notwithstanding the impropriety of the Debtor's filing of the fourth modification to the Debtor's Plan and the Brief, because the Court may consider the Debtor's inappropriate post-trial filings, WFF is compelled to file this Reply in order to address the additional cases cited by the Debtor in the Brief. Those cases do not support confirmation of the Plan, and in fact, provide further support that confirmation of the Plan should be denied.

**RELEVANT BACKGROUND**

5. On December 4, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate and manage its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed.

6. On May 25, 2010, the Debtor filed its Third Amended Plan of Reorganization of 20 Bayard Views, LLC Under Chapter 11 of the Bankruptcy Code [Docket No. 95], which was modified on September 10, 2010, on October 26, 2010 [Docket No. 211],

3

and on December 1, 2010 [Docket No. 258]. WFF objected to the confirmation of the Plan, and the trial on the confirmation of the Plan was held over eleven days between October 6, 2010 and January 4, 2011.

7. At the Plan confirmation trial, the parties took testimony from eight witnesses, including the Debtor's interest rate expert, Mr. Paul Fried, the Debtor's chief restructuring officer ("CRO"), Mr. Martin Ehrenfeld, and WFF's interest rate expert, Mr. Stuart Bruck.

8. At the January 4th hearing on Plan confirmation, the Court requested an acknowledgment from Debtor's counsel that the Debtor had rested its case, and the Debtor so confirmed:

> THE COURT: I need to know whether you stand by the plan presently before the Court. The evidentiary record is closed I take it subject to any clarifications and one or two questions the Court had. But I think at some point we need closure on this process or you need to embrace the concept of negotiating a consensual plan with your best effort so that you are no longer asking the Court whether this plan can be confirmed. *But the record, I take it, is closed on this plan today*. Is that right? I can give you a decision orally. I can mark it, submit it, I may need to schedule an adjourned date but I--the plan may be amended until confirmed. The Bankruptcy Code provides that plainly. *But I think your opportunity, and it is a window that is closing, may well be here and now to see what you can do. And I take it the evidence is complete in support of the plan before the Court and no other plan.* … It is not among my options to provide to you the plan that I believe is confirmable. I have to confirm this plan or not based on this record before me.
>
> …
>
> THE COURT: We are before the Court and the debtor's proposed plan. The evidentiary record in support of confirmation is complete. *The debtor has rested. Is that right?*
>
> MR. MARTIN: *Yes, Your Honor.*

Transcript of January 4, 2011 Hearing on Plan Confirmation, p. 114, 115 (emphasis added).

4

9. Notwithstanding this clear direction from the Court, and the Debtor's own acknowledgement that the record on the trial of the confirmation of the Plan was closed[2] and that it had rested its case, on January 18, 2011, two weeks after the conclusion of the Plan confirmation trial, the Debtor filed the Brief and a fourth modification to the Plan [Docket No. 297].

10. Among other things, the modifications to the Plan moves the goal posts once again, by changing the interest rate to be paid to WFF from a woefully insufficient 4.5% to a slightly less woefully insufficient 4.75% and by modifying the schedule for the sale of units, including to provide for the sale of one unit in year one of the Plan. The Brief addresses the issues of (i) the effect of loan to value ratio ("LTV") on the appropriate cramdown interest rate under section 1129(b)(2)(A) of the Bankruptcy Code, and (ii) whether the liquidation value of the Debtor's property at 20 Bayard Street, Brooklyn (the "Property") may be considered as part of the risk premium component of a cramdown interest rate. As discussed further below, the additional cases cited by the Debtor (none of which are from courts within the Second Circuit, and therefore not precedential) do not support confirmation of the Debtor's Plan.

**REPLY**

11. The Debtor's Brief addresses the propriety of using LTV as a factor to consider in determining the risk premium component of a cramdown interest rate, without first fully considering the more fundamental question of whether the prime rate plus risk premium methodology set forth in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), is appropriate in this chapter 11 case. The Debtor's knee-jerk reaction in applying the formula approach used in *Till* ignores the jurisprudence of those cases cited by the Debtor itself. As the Debtor agrees, those

---

[2] *See also* Brief, fn. 19 ("Since the record is closed, it is now too late for [Mr. Bruck to calculate lender transaction costs in his proposed interest rate].").

cases conclude that the *Till* approach should only be used in chapter 11 cases where an efficient market for loans of the type in dispute do not exist. In this case, Mr. Bruck competently testified to the availability of first mortgage loans at 65% LTV, with mezzanine and equity financing to cover the LTV gap on a 100% LTV property. *See* Transcript of December 2, 2010 Plan Confirmation Hearing, pp. 49-52. Mr. Bruck has over 30 years of experience arranging real estate financing, and has closed over $1.5 **billion** of loans in the last five years alone. *See* Response of W Financial Fund, LP to Motion in Limine for an Order Excluding the Testimony and Written Report of Stuart A. Bruck [Docket No. 251]. Mr. Fried, on the other hand, who has arranged three loans in the last five years, purportedly spent "ten/fifteen minutes, tops" on the phone with two financial institutions,[3] inaccurately presented a hypothetical scenario for a loan on *rentals*,[4] and was then able to conclude that there was no market. Indeed, it is no surprise that this would be Mr. Fried's conclusion, because **Mr. Fried admitted that he applied the *Till* formula approach in his interest rate analysis because he was instructed to do so**. *See* Transcript of November 1, 2010 Plan Confirmation Hearing, pp. 100-03.

12. The Debtor also does not fully address the threshold issue of whether *Till* should be applied in chapter 11 cases at all. The post-*Till* caselaw does not uniformly reject the band of investment methodology, as the Debtor would have us believe. *See, e.g., In re N. Valley Mall, LLC*, -- B.R. --, 2010 WL 2632017 at *7 (Bankr. C.D. Cal. June 21, 2010) (applying a blended rate to determine proper cramdown rate by referring to (i) a senior tranche loan at market rate of 6.25% on 65% LTV loan, (ii) a mezzanine tranche for additional 20% of loan at

---

[3] *See* Transcript of Oct. 28, 2010 Plan Confirmation Hearing, pg. 107 ("THE COURT: And you estimated approximately how long you told us those calls took? THE WITNESS: I know the ones that I made tended to be maybe ten/fifteen minutes, tops. THE COURT: Could they have been shorter? THE WITNESS: I thought ten/fifteen minutes was short. But, yes, they could have been very short.").

[4] *See id.*, pg. 106 ("Q. But when you gave the institutions that you spoke to, the scenario with regard to 20 Bayard you didn't give them a scenario of sales, you said you gave them a scenario of rentals, correct? A. That's correct.").

11.18%, and (iii) an equity tranche for the remainder of the loan at 25.18%, and deriving a blended rate of 8.5%). Nor has the Debtor cited to any precedential case law in the Second Circuit to settle the issue. *Cf. In re DBSD N. Am., Inc.*, 419 B.R. 179, 210 (Bankr. S.D.N.Y. 2009) ("In determining the appropriateness of a proposed cramdown interest rate, courts in this district have looked to the market interest rate for loans with similar terms. Still other courts have considered the prepetition contract rate in determining whether the cramdown interest rate is sufficient. There is arguably relevant law, under chapter 13 of the Bankruptcy Code [referring to *Till*], but I consider reliance on these two bases to be preferable.") (internal footnotes omitted).

13. In fact, Mr. Fried in his only other expert engagement (for a secured lender in a 2008 post-*Till*, Western District of Michigan bankruptcy case), applied the same blended rate band of investment methodology used by Mr. Bruck. Accordingly, even the Debtor's own interest rate expert does not subscribe to the Debtor's position that a band of investment approach is prohibited in post-*Till* chapter 11 cases. However, even if we were to apply the *Till* analysis (and setting aside for the moment that there is an efficient market and the issue of whether we are required to apply *Till* in a chapter 11 case), the Debtor's application of *Till* is flawed.

14. The court in *Griswold* (a case that the Debtor relies on heavily in its Brief) noted that, in addition to the factors described in *Till* (the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan), "[o]ther risk factors to consider include the debt service coverage ration, *the loan-to-value ratio*, and the quality of guarantors."[5] *In re Griswold Building, LLC* 420 B.R. at 693 (emphasis added). The Debtor's own citation to *Griswold*, a case that recognizes LTV as a risk factor, is noteworthy, because the

---

[5] The two main guarantors in this case, Moshe Lax and the Estate of Chaim Lax, have apprised this Court that have insignificant or no net worth.

7

Debtor's interest rate expert did not consider LTV a risk *at all*. Indeed, the only risk identified by Mr. Fried was the risk of a foreclosure in the event of default by the Debtor, and such risk was quantified as $525,000 in fees associated with such foreclosure, calculated to be 65 basis points to be added to the risk-free prime rate. *See* Expert Report of Paul M. Fried, dated September 10, 2010 [WFF Plan Confirmation Trial Exh. 17] ("The Debtor's Plan reflects *no quantifiable risk* to [WFF]; … However, … should the Debtor's plan fail, the foreseeable 'risk' to [WFF] is still the cost of pursuing its remedies and liquidating the Collateral.") (emphasis added).

15. In the *Griswold* case, the court agreed with a 2% risk premium for "the circumstances of the case" based on the lender's interest rate expert's observations regarding the lack of equity contributions, the absence of funds for tenant alterations (as is the case here) or leasing commissions, and the 100% LTV. 420 B.R. at 694. The *Griswold* court also found an additional 3% risk premium reasonable, stating that:

> The final risk adjustment made by Ferrell was 3% because of the substantial risk in the feasibility of the Debtor's third amended plan. Ferrell considered the Debtor's projections to be overly optimistic and, therefore, there is a risk of nonpayment. He identified a number of facts supporting his conclusion in that regard. The Court agrees that Ferrell's testimony and the other evidence in the record demonstrates a significant risk of nonpayment, especially with respect to the balloon payment in five years.[6] The Court is persuaded that a 3% risk adjustment to the Lender's entire claim is appropriate to compensate for the risk of nonpayment.

420 at 695.

16. Accordingly, in the Griswold case, the Court found that an aggregate 5% risk premium should be added to the 3.25% prime rate.[7] Here, if just the 2% risk premium was

---

[6] There is an approximately $11 million balloon payment due to WFF in year five of the Debtor's Plan. This amount represents more than 50% of WFF's stipulated claim amount. *See* Debtor's Plan Confirmation Trial Exh. 6.
[7] Importantly, the court in *Griswold* noted that the 8.25% cramdown interest rate was within the an acceptable range, "greater than the 6 to 6-1/2 % that [a certain bank] had been recently charging for commercial real estate loans, according to the Debtors' expert witness …, but still less than the financing for other debtors in Chapter 11 real estate reorganizations that the Lender's expert, Ferrell, described as being at 12 to 13% interest rates." 420 B.R. at

8

added to the prime rate to account for the 100% LTV loan proposed under the Plan (and generously not even allowing for additional feasibility risks identified in the *Griswold* case--optimistic projections and a balloon payment in year five), the cramdown interest rate would be 5.25%, which is 75 basis points more than the interest rate proposed in the Plan, and 50 basis points more than the fourth modified Plan, if the Court were to consider those inappropriately filed modifications. Adding an additional 3% risk premium, as the *Griswold* court did, to account for speculative sales and risk of nonpayment, would bring the interest rate to 8.25%, a rate WFF believes still to be inadequate, but nevertheless is far in excess of the rate proposed by the Debtor. As this Court has made clear, it is not among the Court's tools to modify the Plan; the Court may only confirm or deny the Plan in the form proposed by the Debtor. Accordingly, even under the most generous analysis the Court cannot confirm this Plan, because (as *Griswold* confirms) the Debtor's proposed interest rate does not contain an adequate risk premium to provide an interest rate sufficient to pay WFF the present value of its secured claim. On this basis alone, the Court may, and should, deny confirmation of the Plan.

17. With respect to the other cases cited by the Debtor in its Brief, in one case, *In re Crosscreek Apartments, Ltd.*, the court confirmed the *secured lender's* liquidating plan and denied the plan proposed by the debtor's general partners. *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521 (Bankr. E.D. Tenn. 1997). The remaining cases cited by the Debtor stand for the unremarkable proposition that the formula approach set forth in *Till* is to used where no efficient market for similar loans exists.

18. Lastly, the Debtor disputes the relevance of using its liquidation analysis as part of any assessment regarding the costs associated with the risk of nonpayment under the

---

698. The *Griswold* court's observation regarding interest rates in other chapter 11 real estate cases nullifies the Debtor's suggestion in this case that the interest rate proposed by WFF is somehow extraordinary.

9

Plan. As discussed above, the Debtor's own interest rate expert identified WFF's cost of "pursuing its remedies and liquidating the collateral" as a foreseeable risk if the Plan fails. WFF is merely taking Mr. Fried's assumption to its logical conclusion by determining what the risk premium would be, <u>using Mr. Fried's own methodology</u>, if the shortfall were taken into account between WFF's claim and the value of a liquidation of the Property were achieved. *See* WFF Plan Confirmation Trial Exhibit 36.

19. While Mr. Fried may contend that a shortfall would not have to be accounted for in his "war chest" scenario because no lender would ever liquidate the Property, the Court was quite correct to query "[w]ould some lenders be more interested in money recovery sooner and some be more interested in recoveries later?" Transcript of November 1, 2010 Plan Confirmation Hearing, pg. 73-74. No party can fairly dispute that the secured lender has in its arsenal of rights the ability to foreclose and liquidate the collateral in order to satisfy its debt in the way it deems appropriate. In this case, as one of WFF's principals pointed out on cross-examination, liquidating the Property at $16.1 million would be an option to WFF because "a bird in the hand is worth more than two in the bush." Transcript of January 4, 2011 Plan Confirmation Hearing, pg. 64.

20. The Plan in this case is simply not confirmable. Furthermore, WFF needs to emphasize to the Court the overarching theme that exposes the Plan's fundamental flaws. What the Court should not lose sight of is that none of the Debtor's or WFF's experts in this case has indicated that there will be a remarkable increase in the sale price of the units going forward in year one, two, three, four or five. Both parties' appraisers assigned the same 3% percent growth in price per square foot of the units to take into account inflation. Indeed, at such a low rate of growth, taking into account the time-value of money, the price per square foot increase

actually represents a net *decrease* in value for the seller. So why would the Debtor propose a Plan that requires WFF to take all of the risk of holding on to the units and selling them out over five years? The Debtor's own CRO, Martin Ehrenfeld, provided the answer in his trial testimony:

> Q. So in years two through four, Mr. DiGeronimo is showing a total of twenty-eight units sold, and in years two through four on the debtor's projections, you're only projecting that you're going to sell twelve units. Is that about right?
>
> A. Correct.
>
> Q. Okay. And isn't the reason that you're selling units slower is so that **equity at the end of the day can put more money in its pockets**, because while you're selling the units over a longer period of time, you're also attempting to get the loan from W Financial at four and a half percent?
>
> …
>
> A. **Correct, that is absolutely right.**

Transcript of November 3, 2010 Plan Confirmation Hearing, pg. 85.

21. As Mr. Ehrenfeld's testimony makes clear, the Debtor would have WFF subsidize a Plan that would pay it a paltry 4.5% interest rate on its claim, and extend its already-matured loan for another *five years*, so that the Debtor can engage in some sort of high wire act with no safety net. All so that equity can enjoy the upside of any speculative sales at pie-in-the-sky prices.

## **CONCLUSION**

22. For all the reasons set forth herein, WFF respectfully requests that the Court ignore the Brief and the post-trial modifications to the Plan, deny the Plan, and grant WFF such other and further relief as the Court deems just and proper.

11

Dated: New York, New York
January 24, 2011

        HERRICK, FEINSTEIN LLP
        *Attorneys for W Financial Fund, LP*

        By:   */s/ Andrew C. Gold*
            Andrew C. Gold
            Hanh V. Huynh
        2 Park Avenue
        New York, New York 10016
        (212) 592-1400
        (212) 592-1500 (fax)
        agold@herrick.com
        hhuynh@herrick.com