UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

20 BAYARD VIEWS, LLC,                                    Chapter 11
                                                        Case No. 09-50723-ess

                        Debtor.
-----------------------------------------------------------------x


MEMORANDUM DECISION ON CONFIRMATION OF THIRD
AMENDED PLAN OF REORGANIZATION


Appearances:

John S. Mairo, Esq.                         Leslie A. Berkoff, Esq.
Warren J. Martin Jr., Esq.                  Lia M. Pistilli, Esq.
Porzio, Bromberg & Newman, P.C.             Moritt Hock Hamroff & Horowitz LLP
100 Southgate Parkway                       400 Garden City Plaza
Morristown, NJ 07962                        Garden City, NY 11530
    *Attorneys for the Debtor*                  *Conflicts Counsel for the Debtor*

Andrew C. Gold, Esq.                        Avrum J. Rosen, Esq.
Hanh V. Huynh, Esq.                         The Law Offices of Avrum J. Rosen, PLLC
Frederick E. Schmidt, Esq.                  38 New Street
Herrick, Feinstein LLP                      Huntington, NY 11743
2 Park Avenue                                   *Attorney for Bayard Views Condominium*
New York, NY 10016                              *Association*
    *Attorneys for W Financial Fund, LP*

William E. Curtin, Esq.
Office of the United States Trustee
271 Cadman Plaza East (Suite 4529)
Brooklyn, NY 11201
    *Office of the United States Trustee*

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

Before this Court is the confirmation of the Third Amended Plan of Reorganization, as

modified (the "Plan"), filed by 20 Bayard Views, LLC in this Chapter 11 case.  The Debtor

developed a 62-unit residential condominium complex in Williamsburg, Brooklyn, and

beginning in 2007, sales of these luxury units beginning were strong.  But as the economy

faltered in the second half of 2008, these sales declined dramatically.  The Debtor shifted its

strategy from one based on sales to one based on rentals, and new financing was put in place.

But this too proved unsuccessful, and in late 2009, this Chapter 11 bankruptcy case followed.

The Debtor's Plan is premised on the sale of 27 of the 37 unsold condominium units over

five years.  W Financial Fund, LP ("WFF"), the Debtor's largest secured creditor, objects to

confirmation.  WFF argues the Plan should not be confirmed primarily because it does not

satisfy the cramdown requirements of Bankruptcy Code Section 1129(b).  WFF also argues the

Plan does not satisfy the feasibility requirement of Bankruptcy Code Section 1129(a)(11), and

was not proposed in good faith as required by Section 1129(a)(3).

A confirmation hearing was held over eleven days, commencing in October 2010 and

concluding in January 2011, at which the Debtor and WFF, by counsel, appeared and were heard

and evidence was received.  The record was closed on January 4, 2011, and the matter was

submitted for decision on March 7, 2011.

Based on the entire record, including the testimony, exhibits, and arguments of counsel,

and for the reasons set forth below, this Court concludes that the Plan cannot be confirmed

because it does not satisfy Section 1129(b)'s cramdown requirements.  Specifically, the Debtor

has not established by a preponderance of the evidence that the Plan treats WFF fairly and

equitably by providing it with the present value of its claim as required by Bankruptcy Code

Section 1129(b)(2)(A)(i)(II).

## Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

## Background

*Procedural History*

The Debtor filed a voluntary petition for relief under Chapter 11 on December 4, 2009.  The Debtor is a debtor in possession and no trustee, examiner, or official committee of unsecured creditors has been appointed.  On March 3, 2010, this Court entered an Order establishing April 1, 2010, as the deadline for creditors to file a proof of claim.  WFF filed a timely proof of claim asserting that it holds a secured claim of $18,163,756.85, plus any interest, fees and costs that continue to accrue.  WFF included post-petition interest at the contract default rate of 24 percent as part of its claim.

The Debtor filed an objection to WFF's proof of claim on April 19, 2010, challenging the 24 percent post-petition interest rate.  On August 16, 2010, following an evidentiary hearing, this Court overruled the Debtor's objection, and fixed the pendency interest for WFF's secured claim at 24 percent.  The Debtor filed a Notice of Appeal to the District Court on August 25, 2010.  That appeal remains pending.

On May 20, 2010, the Debtor filed a Third Amended Plan of Reorganization and Disclosure Statement, both dated as of May 13, 2010.  The Disclosure Statement was approved by a Consent Order entered on May 20, 2010.

WFF filed an objection to confirmation of the Plan on September 8, 2010 (the "WFF

Objection") arguing, among other things, that the Plan is not fair and equitable with respect to WFF's claim, the Plan is not feasible, and the Plan has not been proposed in good faith.  On September 10, 2010, the Debtor filed a modified Third Amended Plan of Reorganization which reduced the length of the Plan from seven years to five years, increased the interest rate paid to WFF from 3.5 percent to 4.5 percent, and increased the amount of condominium unit sale proceeds to be delivered to WFF from 85 percent to 95 percent.

The parties filed a Joint Pre-Trial Statement on September 28, 2010, which describes the issues before the Court and lists the Debtor's and WFF's anticipated witnesses.  The next day, the Debtor filed a response to the WFF Objection (the "Debtor Reply") and certification of the votes cast in connection with the Plan (the "Certification of Votes").  The Certification of Votes states that WFF is the only impaired class to vote against confirmation of the Plan, and that the other impaired classes either voted in favor of confirmation or abstained.

The Debtor filed a second modified Plan on October 26, 2010, which provides that WFF will receive 25 percent of all distributions made by the newly reorganized Debtor to the property's equity holders.  On December 1, 2010, the Debtor filed a third modified Plan which amends the definition of "Managing Member" and removes language that provided an injunction with respect to lawsuits against the guarantors of the WFF mortgage.  Finally, the Debtor filed a fourth modified Plan on January 18, 2011, which restates certain Plan terms and increases the interest rate to be paid to WFF from 4.5 to 4.75 percent.  The Debtor also filed a supplemental memorandum of law in support of confirmation.  On January 24, 2011, WFF filed a reply asking the Court not to consider the fourth modified Plan and the supplemental memorandum of law since they were submitted after the record was closed.

3

Pursuant to the Stipulation and Order entered on November 10, 2010, the parties agreed, and this Court ordered, that for purposes of confirmation of the Plan, the value of WFF's pre-petition collateral is $20,575,000. The parties also agreed, and this Court ordered, that the amount of WFF's claim is fixed at $20,575,000.

*Factual Background*

In 2007, the Debtor completed construction on a 62-unit luxury residential condominium complex located at 20 Bayard Street in Williamsburg, Brooklyn (the "Property"). The development project was originally financed by a loan from Fremont General, which was later acquired by iStar Loans, LLC ("iStar"). The Debtor also invested approximately $16 million of its own funds in the project. Although the sales of the condominium units proceeded well at the outset, the "sale momentum slowed dramatically in the second half of 2008 due to the faltering economy and the attendant widespread residential real estate decline. By the third quarter of 2008, the Debtor had sold 24 of the 62 condominium units." Ehrenfeld Dec. at 3.

In light of the prevailing economic conditions, the Debtor decided to rent the unsold units. But under the terms of the iStar loan agreement, the Debtor could not rent the units without first obtaining a waiver from iStar. iStar declined to waive the prohibition against leasing the units, and as a result, the Debtor began to search for a new lender.

Unable to locate a conventional lender to refinance the iStar loan, the Debtor entered into a one-year loan with WFF to provide additional time to locate long-term financing. WFF is a bridge lender that makes short-term loans, generally for a term of one year or less. On October 14, 2008, the Debtor and WFF executed an Agreement of Consolidation, Extension and Modification of Mortgage, which substituted WFF for iStar as the mortgagee. The Debtor also

executed in favor of WFF a Consolidated, Amended and Restated Note (the "Note") in the principal amount of $17.4 million (the "Loan").

The Note is secured by collateral including the 37 unsold condominium units and 40 parking spaces located at the Property, as well as the related rents and leases. The Note is also supported by a Guaranty (the "Guaranty") executed on October 14, 2008, by Chaim Lax, Moshe Lax and Yitzchok (a/k/a Isaac) Hager (the "Guarantors") in the amount of $8.7 million of the Loan's principal amount, plus any accrued interest, fees, and costs. And the Note is supported by the Pledge Agreement, dated October 14, 2008, entered into by the Debtor's equity holders, Jack Weingarten, LX Holdings, LLC, and Mr. Hager (the "Equity Holders"), in which they pledge their membership equity interests in the Debtor as security for the payment and performance of all obligations under the Guaranty and the Note.

Before the Note's original maturity date of October 13, 2009, the Debtor and WFF agreed to extend the maturity date for three months, to January 13, 2010. As consideration for the extension, WFF was paid a fee of $84,875.36, as well as its legal fees.

In the spring of 2009, the Debtor began contacting banks to refinance the Loan. On April 21, 2009, the Debtor received a loan application letter from Capital One Bank, N.A. for a five-year first mortgage loan of $13.5 million at a loan-to-value ratio of 70 percent. The proposed interest rate, to be finalized upon the issuance of a loan commitment, was 6.125 percent.

A few months later, the Debtor received two loan application letters from Manufacturers and Traders Trust Company ("M&T Bank"), dated June 22, 2009, and June 25, 2009. Both letters stated that M&T was willing to consider providing the Debtor a five-year first mortgage loan up to the lesser of $15 million or 75 percent of the value of the Property. The first letter

fixed the interest rate on the proposed loan at 250 basis points above the five-year Cost of Funds Index and a minimum rate of 6.25 percent.  M&T Bank also required the Debtor to deposit $5 million and to maintain an account balance of at least $1 million during the term of the loan. The second letter included substantially similar terms, with a proposed interest rate of 250 basis points above the five-year Cost of Funds Index and a minimum rate of six percent. And the second letter also required the Debtor to deposit $5 million at M&T Bank and to maintain a balance of $1 million for the duration of the loan, and further specified that the $1 million would serve as additional collateral for the proposed loan.

The Debtor continued its efforts to refinance the Loan, and on October 5, 2009, the Debtor received a third executed loan application letter from M&T Bank.  This letter proposed a five-year first mortgage loan up to the lesser of $15 million or 75 percent of the value of the Property.  The proposed interest rate was set at 375 basis points above the five-year Cost of Funds Index and a minimum rate of seven percent.  This amount was some $2 million less than the amount then owed to WFF.  M&T Bank also required the Debtor to deposit $5 million for at least six months from closing and maintain a balance of at least $2 million throughout the term of the loan.  M&T Bank required the $2 million to be held as additional collateral for the proposed loan.  The Debtor could not meet the requirement to maintain the $5 million deposit as required by the bank, and did not refinance the Loan with M&T Bank.  On December 4, 2009, before the Note matured, the Debtor commenced this bankruptcy case.

*The Plan*

The Plan provides for payment to seven classes of claims and interests, and separately provides for payment in full of all allowed administrative claims, priority tax claims, and

compensation to professionals.  Payment of administrative claims, priority claims, and compensation to professionals will be funded by contributions from the Equity Holders and the Guarantors.  One of the Equity Holders, Mr. Weingarten, will contribute these funds to the Plan.

The Plan creates several classes including Class 1- priority claims, Class 2- WFF's secured claim, Class 3- the secured mechanic lien claim of Karl Fischer Architecture, Class 4- the secured mechanic lien claim of S&S Socius Inc., Class 5- the secured mechanic lien claim of ADD Plumbing, Inc., Class 6- general unsecured claims, and Class 7- equity security holders. All of the classes are impaired, except for Class 1.

Class 1 – Priority Claims  The Plan provides that allowed priority claims are paid in full on the Plan's effective date or on the distribution date immediately after a priority claim becomes an allowed claim, excluding payment of any interest accruing from the petition date.

Class 2 – Secured Claims  WFF is the sole holder of a Class 2 claim.  The Plan provides that WFF retains the liens on its pre-petition collateral and receives an additional lien on any leases related to the condominium storage units.  The Plan also provides that during the payout period, the Debtor will provide WFF with proof of tax payments and insurance.  And the Plan provides for monthly interest payments of 4.75 percent on the principal, with the first payment to be made in the month in which the Plan becomes effective.

The Plan further provides that the Debtor will begin to pay down the principal within one year of the effective date, with an initial payment of $700,963.  The Debtor will continue to make principal paydowns on or before the second, third, fourth, and fifth anniversary of the Plan's effective date in the amounts of $2,803,853, $4,331,953, $5,205,564, and $7,415,656, respectively.  With the final principal payment of $7,415,656, the Debtor will pay off the

remaining principal balance of WFF's claim.  The principal paydowns may also be made earlier than required without any prepayment penalty.

As an alternative source of principal paydowns, the Plan provides that for five years following the effective date, the Debtor will calculate its excess net cash flow, as defined in the Plan and remit any excess funds to WFF.  These payments will be credited against the required annual principal paydowns.

The Plan further provides that for five years following the effective date, the Debtor will not sell any condominium units for less than $500 per square foot, and that when a condominium unit is sold, 95 percent of the net proceeds will be deposited in an interest-bearing account for the benefit of WFF to be applied to a principal paydown.  The remaining five percent of proceeds will be deposited in an interest-bearing account as a reserve for Plan payments to WFF, the secured mechanic lien holders, and the general unsecured creditors.  And the Plan provides that WFF will receive 25 percent of all distributions made by the reorganized Debtor to holders of any equity security interests.

Classes 3, 4, and 5 – Other Secured Claims   Classes 3, 4, and 5 receive the same treatment under the Plan.  These claimants retain their liens and are paid in full within three years of the effective date.  These claimants will receive 33.3 percent of their allowed claim plus accrued interest at a rate of 3.5 percent on the first, second, and third anniversaries of the Plan's effective date.  All payments are subject to the "WFF Allowed Claim Contingency, " which provides that if the District Court confirms that the pendency interest is 24 percent or the Plan's confirmation interest rate is above 3.5 percent, the Debtor may "defer each of the payments to the [claimants in Classes 3, 4, and 5] . . . for one year so that the payments . . . would occur in

8

years two, three and four following the Effective Date." Plan Art. I(B)(98).

Class 6 – General Unsecured Creditors  The Plan provides that treatment of Class 6 general unsecured creditors is contingent upon the outcome of the Debtor's appeal of this Court's determination that WFF is entitled to pendency interest at a rate of 24 percent.  If the pendency interest is set at 12 percent, then the general unsecured creditors will receive 50 percent of their allowed claims.  And if WFF's pendency interest remains at 24 percent, then general unsecured creditors will receive seven percent of their allowed claims.  The Plan provides that the distribution to unsecured creditors will be made in three equal payments on or before the second, third, and fourth anniversary of the Plan's effective date.  And in either circumstance, holders of related party claims, specifically Bayard Park LLC, Mr. Weingarten, LX Holdings, and South 4th Street, do not receive a distribution under the Plan.

Class 7 – Equity  The Plan provides that Equity Holders retain their equity interest and receive an equal equity interest in the reorganized Debtor, but only if they contribute to the funding of the Debtor's payment of administrative and priority claims and compensation to professionals.  At the confirmation hearing, Mr. Weingarten testified that he is the only Equity Holder contributing to the Debtor's exit financing and accordingly, he will become the sole Equity Holder and the managing member (the "Managing Member") of the reorganized Debtor.

Although the Plan does not require the sale of condominium units to fund the Plan payments, Exhibit B to the Disclosure Statement sets forth the Debtor's projections for the sale of the condominium units and the Debtor's projected income for the duration of the Plan.  As the Plan has been modified by the Debtor, these projections have been revised to correspond to the modified Plan.  The most recent projections, filed in connection with the fourth modified Plan

(the "Projections"), reflect that the Debtor aims to sell one condominium unit in year one, four units in year two, six units in year three, seven units in year four, and nine units in year five. After the completion of the Plan, the Debtor will retain ten condominium units and all of the parking spaces.

*The Confirmation Hearing*

Trial on the confirmation of the Plan took place over eleven days commencing on October 6, 2010. The Court heard the testimony of eight expert and fact witnesses and received more than fifty exhibits into evidence. WFF objects to confirmation of the Plan for three reasons. First, WFF argues that the Plan does not satisfy the fair and equitable requirements of Bankruptcy Code Section 1129(b). Next, WFF argues that the Plan is not feasible, as required by Bankruptcy Code Section 1129(a)(11). And finally, WFF argues that the Debtor has not satisfied the good faith requirement of Bankruptcy Code Section 1129(a)(3).

The Debtor called five witnesses to testify in support of the Plan. The Court heard testimony from Richard DiGeronimo, a certified general real estate appraiser and President/Founder of R. D. Geronimo Ltd. Mr. DiGeronimo testified as an expert in real estate valuation. The Court also heard testimony from Irving Schwarzbaum, a certified public accountant and director at J.H. Cohn LLP, an accounting, consulting, financial and restructuring firm. Mr. Schwarzbaum testified as to the Debtor's financial projections and liquidation analysis. The Debtor also offered the expert testimony of Paul Fried, a Managing Director at Traxi LLC, an advisory firm that provides financial analysis and arranges financing for distressed properties. Mr. Fried testified on risk and interest rates in real estate workout situations. The Court received testimony from Mr. Weingarten, who testified as to his financial contributions to the Plan and the

Debtor's post-confirmation management strategy.  Finally, the Court heard testimony from Martin Ehrenfeld, the Debtor's Restructuring Officer, who testified as to the Plan's terms and matters relating to the restructuring of the Debtor.

WFF called three witnesses to testify in opposition to confirmation.  The Court heard expert testimony from Anthony Iaccio, a certified general real estate appraiser and principal at Blake & Iaccio LLC, who testified about the value of the property.  The Court also heard expert testimony from Stuart Bruck, a Director of Funding and Mortgage Brokerage at Time Equities, Inc., on interest rates and risk with respect to residential buildings.  And finally, the Court heard the testimony of David Heiden, a principal at WFF, who testified regarding WFF's claim, the Debtor's projections, and the condominium sales market.

## Discussion

As the proponent of the Plan, the Debtor must establish by a preponderance of the evidence that each of the confirmation requirements set forth in Bankruptcy Code Section 1129 has been met.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (observing that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown"); *In re WorldCom, Inc.*, 2003 WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *Briscoe*, 994 F.2d at 1165).  The Court considers each of these requirements in turn.

### *Bankruptcy Code Section 1129(a)(1)*

Bankruptcy Code Section 1129(a)(1) requires that "[t]he plan compl[y] with the

applicable provisions of this title." 11 U.S.C. § 1129(a)(1).  Courts interpret this language to

mean that a plan must meet the requirements of Bankruptcy Code Sections 1122 and 1123.  *See,*

*e.g.*, *In re EnviroSolutions of New York, LLC*, 2010 WL 3373937, at *2-3 (Bankr. S.D.N.Y. July

22, 2010).

Section 1122 addresses the classification of claims or interests.  In particular, Bankruptcy

Code Section 1122(a) provides that "a plan may place a claim or an interest in a particular class

only if such claim or interest is substantially similar to the other class or interest of such class."

11 U.S.C. § 1122(a).  Section 1122(a) is satisfied "when a reasonable basis exists for the

structure, and the claims or interests within each particular class are substantially similar."  *In re*

*PC Liquidation Corp.*, 2006 Bankr. LEXIS 4638, at *13 (Bankr. E.D.N.Y. Nov. 13, 2006).  *See In*

*re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987).

Here, in accordance with Section 1122(a), Article III of the Plan classifies the claims and

interests into seven classes, each containing substantially similar claims and interests.  Thus, the

Debtor has established by a preponderance of the evidence that the Plan satisfies Section 1122(a).


Section 1123(a)(1) addresses the contents of a plan.  This Section requires that a plan

designate classes of claims and interests.  11 U.S.C. § 1123(a)(1).  Here, consistent with this

requirement, Article III of the Plan adequately classifies the claims and interests.  Administrative

claims and priority tax claims do not require designation under Section 1123(a)(1).  *PC*

*Liquidation*, 2006 Bankr. LEXIS 4638, at *12.  Thus, the Debtor has established by a

preponderance of the evidence that the Plan satisfies the requirements of Section 1123(a)(1).

Sections 1123(a)(2) and (a)(3) require that a plan specify which classes are unimpaired

and which classes are impaired under the plan.  11 U.S.C. § 1123(a)(2)-(3).  Here, Article III of

the Plan clearly provides that Class 1 is unimpaired and Classes 2 through 7 are impaired under

the Plan.  Therefore, the Debtor has established by a preponderance of the evidence that Sections

1123(a)(2) and (3) are satisfied.

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or

interest of a particular class, unless the holder of a particular claim or interest agrees to a less

favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  Here, in

accordance with Section 1123(a)(4), Article III of the Plan provides the same treatment for each

claim or interest of a particular class.  As a result, the Debtor has established by a preponderance

of the evidence that the requirements of Section 1123(a)(4) are met.

Section 1123(a)(5) requires that "a plan . . . provide adequate means of implementation of

the plan."  *PC Liquidation*, 2006 Bankr. LEXIS 4638, at *14.  Here, Article VI of the Plan sets

forth several provisions to facilitate the implementation of the Plan, including the continued

corporate existence of the Debtor, the operations of the reorganized Debtor, the post-effective

date management of the reorganized Debtor, the effectuation of the transactions contemplated by

the terms and conditions of the Plan, and the vesting of the Debtor's estate in the reorganized

Debtor and the release of all liens, except for WFF's claim and the secured claims of Classes 3, 4,

and 5.  Accordingly, the Debtor has established by a preponderance of the evidence that the Plan

satisfies Section 1123(a)(5).

Section 1123(a)(6) "requires a plan to provide for the inclusion in the charter of the

debtor, if the debtor is a corporation . . . a provision prohibiting the issuance of non-voting equity

securities."  *PC Liquidation*, 2006 Bankr. LEXIS 4638, at *16.  Consistent with Section

1123(a)(6), the Plan does not provide for the issuance of any equity securities.  Rather, the Equity Holders will retain their equity securities only if they comply with the capital call to fund the administrative claims/priority account and professional fees account.  As a result, the Debtor has established by a preponderance of the evidence that the requirements of Section 1123(a)(6) are met.

Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan . . . ."  11 U.S.C. § 1123(a)(7).  Pursuant to Article VI of the Plan, the operation, management, and control of the reorganized Debtor will be the responsibility of Mr. Ehrenfeld, the Restructuring Officer, and Mr. Weingarten, the Managing Member.  The Plan notes that it is not contemplated that Mr. Ehrenfeld and Mr. Weingarten will receive compensation for their roles with the newly reorganized Debtor. This appears consistent with the interests of creditors and equity security holders.  Accordingly, the Debtor has established by a preponderance of the evidence that the Plan satisfies the requirements of Section 1123(a)(7).

### *Bankruptcy Code Section 1129(a)(2)*

Bankruptcy Code Section 1129(a)(2) requires that "[t]he proponent of the plan compl[y] with the applicable provisions of this title."  11 U.S.C. § 1129(a)(2).  Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code Sections 1125 and 1126.  *See, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986).  The Debtor, as proponent of the Plan, has substantially complied with the Bankruptcy Code and Rules provisions regarding disclosure,

notice, and solicitation with respect to the Plan, the Disclosure Statement, and other matters in

connection with this Chapter 11 case.  As noted above, the Court entered a Consent Order

approving the Disclosure Statement on May 20, 2010.  Thus, the Debtor has established by a

preponderance of the evidence that the requirements of Section 1129(a)(2) are met.

*Bankruptcy Code Section 1129(a)(3)*

Bankruptcy Code Section 1129(a)(3) requires that "[t]he plan has been proposed in good

faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Courts interpret good

faith to mean that "there exists 'a reasonable likelihood that the plan will achieve a result

consistent with the objectives and purposes of the Bankruptcy Code.'"  *Matter of Madison Hotel*

*Assocs.,* 749 F.2d 410, 425 (7th Cir. 1984) (quoting *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.

S.D. Cal. 1982)).  A plan is proposed in good faith only if it has "a legitimate and honest purpose

to reorganize the debtor."  *Mercury Capital Corp. v. Milford Conn. Assocs.*, 354 B.R. 1, 7 (D.

Conn. 2006) (internal quotation marks omitted).  In addressing the good faith requirement, the

Second Circuit noted, "[t]he good faith test means that the plan was proposed with honesty and

good intentions and with a basis for expecting that a reorganization can be effected."  *Kane v.*

*Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (quoting *Koelbl v. Glessing (In re*

*Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)).

As several courts have observed, the good faith requirement should be viewed in light of

the totality of the circumstances surrounding the plan, and "the requirement of Section 1129(a)(3)

'speaks more to the process of plan development than to the content of the plan.'"  *In re*

*Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (quoting *In re Bush Indus.*, 315 B.R.

292, 304 (Bankr. W.D.N.Y. 2004)).  Section 1129(a)(3) makes clear "that the proposal of the plan

of reorganization [is] to be done in good faith and not in a way that was forbidden by law." *In re Sovereign Grp., 1984-21 Ltd.*, 88 B.R. 325, 328 (Bankr. D. Colo. 1988). Similarly, the good faith requirement addresses the "conduct manifested in obtaining the confirmation votes of a plan of reorganization and not necessarily on the substantive nature of the plan." *In re Sovereign Grp.*, 88 B.R. at 328 (citing 5 COLLIER ON BANKRUPTCY ¶ 1129.02 (15th ed. 1984)). It does not require the bankruptcy judge to determine whether the ends achieved in the plan contravene non-bankruptcy law. *See In re Ocean Shores Cmty. Club, Inc.*, 1991 WL 184827, at *2 (9th Cir. Sept. 19, 1991) (observing that "Bankruptcy Code section 1129(a)(3) bars confirmation of plans proposed in violation of law, not those that contain terms that may contravene law").[1]

WFF argues that the Debtor's Plan does not satisfy the good faith requirement of Section 1129(a)(3). WFF notes that the Debtor received an executed application letter from M&T Bank to refinance and replace WFF as the mortgage holder. Yet, rather than refinance with M&T Bank, the Debtor filed for bankruptcy with the intention of cramming down WFF at an interest rate that is lower than what it could obtain from a conventional lender.

WFF also asserts that "the Plan doesn't smell right." WFF Objection ¶ 66. WFF points to the August 16, 2010, hearing on the Debtor's motion for a temporary restraining order and injunction to enjoin WFF from state court collection activities against the Guarantors, where it was disclosed that "Mr. Moshe Lax stood to gain membership interests in the Debtor through

---

[1] Other sections of the Bankruptcy Code permit a court to review the legality of plan provisions. *See In re Food City*, 110 B.R. 808, 812 n.10 (Bankr. W.D. Tex. 1990) (noting that "[t]his is not to say that a potentially illegal provision is not a relevant consideration in the confirmation process. For example, the legal consequences which might flow from the implementation of a substantive provision which is prohibited by law could affect the plan's feasibility under section 1129(a)(11)").

non-disclosed side agreements with Mr. Weingarten in exchange for his contribution to the Professional Fees Account." WFF Objection ¶¶ 65-66. Since Mr. Lax is not an Equity Holder, he is not entitled to receive equity interests under the Plan.

WFF also argues that the Plan is "proposed by a forbidden means" because it requires that the Debtor "amend its Operating Agreement to modify, among other things, the composition of the members of the Debtor without the consent of WFF." WFF Objection ¶ 65. As WFF explains, the Plan provides that two of the three Equity Holders lose their interests in the Debtor, and accordingly, the Debtor's operating documents must be amended to reflect this change. At the same time, the Pledge Agreement requires WFF's consent to modifications to the operating agreement. Thus, WFF argues that the "Plan runs afoul of section 1129(a)(3)." WFF Objection ¶ 65.

In response, the Debtor asserts that the Plan is proposed in good faith with the expectation that a reorganization can be effected. The Debtor notes that it "has modified its Plan to a 5-year term at a 4.5% [now 4.75 percent] interest rate, despite the fact that the Debtor's [interest rate] expert remains firm in his conclusion that the appropriate interest rate should be no more than 3.9%." Debtor Reply at 49. In addition, the Debtor notes that allegations that the Guarantors are shielding assets have been rejected by other courts. Finally, the Debtor argues that the Plan "achieves one of the primary objectives underlying a Chapter 11 bankruptcy: the equitable distribution of value to creditors for amounts owing, and a breathing spell to prevent a quick liquidation by a secured creditor at depressed prices." Debtor Reply at 50.

Here, the record shows that the Debtor proposed the Plan with "a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville*, 843 F.2d at 649. The Debtor's failure

to proceed with the M&T Bank transaction does not taint the proposal of the Plan with bad faith, or amount to a means forbidden by law.  The Debtor has identified other, credible reasons for not completing that transaction, including its inability to secure the $5 million cash collateral required by M&T as security, and the prevailing conditions for loans of this type at the time.  Accordingly, the Debtor elected to commence this bankruptcy case with the expectation that it could reorganize successfully in Chapter 11.

At the same time, the record does not show that the Debtor engaged in improper conduct to obtain votes in favor of the Plan.  Mr. Weingarten testified that he does not have any undisclosed side agreements with the Equity Holders, the Guarantors, or any other party, concerning equity ownership of the reorganized Debtor.  Any need to amend the Debtor's operating documents in order to take account of a change in equity ownership does not amount to a means "forbidden by law."  11 U.S.C. § 1129(a)(3).  And the Debtor has proposed several modifications to the Plan to improve the treatment of WFF's claim, and if possible, to obtain WFF's consent to confirmation.

For these reasons, and based on the entire record, the Debtor has established by a preponderance of the evidence that it has proposed the Plan in good faith and not by any means forbidden by law, and therefore, that the requirements of Section 1129(a)(3) are satisfied.

*Bankruptcy Code Section 1129(a)(4)*

Bankruptcy Code Section 1129(a)(4) provides:

Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

18

11 U.S.C. § 1129(a)(4).

Here, the Plan provides that "[t]he Bankruptcy Court must rule on and allow all Professional Fee claims before the fees will be owed and paid." Plan Art. II(C). Accordingly, the Debtor has established by a preponderance of the evidence that the Plan satisfies the requirements of Section 1129(a)(4).

*Bankruptcy Code Section 1129(a)(5)*

Under Bankruptcy Code Section 1129(a)(5), a debtor must:

[D]isclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and to show that the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy. Section 1129(a)(5) also requires the disclosure of the identity of any insider that will be employed by the reorganized debtor, and the nature of any compensation for such insider.

*PC Liquidation*, 2006 Bankr. LEXIS 4638, at *21-22.

Following the Plan's effective date, the reorganized Debtor will be managed by Mr. Ehrenfeld, who will continue to serve as the Restructuring Officer, and Mr. Weingarten, who will be the Debtor's Managing Member. The Plan specifically states that it is not contemplated that Mr. Ehrenfeld and Mr. Hagar will receive compensation for their roles with the reorganized Debtor. As a result, the Debtor has established by a preponderance of the evidence that the Plan complies with Section 1129(a)(5).

*Bankruptcy Code Section 1129(a)(6)*

Bankruptcy Code Section 1129(a)(6) requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned

19

on such approval." 11 U.S.C. § 1129(a)(6). Upon confirmation of the Plan, the Debtor's business will not involve rates subject to the approval of any governmental regulatory commission. Accordingly, Section 1129(a)(6) does not apply to this case.

*Bankruptcy Code Section 1129(a)(7)*

Bankruptcy Code Section 1129(a)(7) is commonly referred to as the "best interests test." This Section requires that each impaired class of claims either accept the plan or receive "not less than the amount such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A).

WFF holds the sole claim in Class 2, an impaired class, and voted against confirmation of the Plan. As a result, Section 1129(a)(7) requires that the Plan must provide WFF with more than it would receive if the Debtor is liquidated under Chapter 7. Based on the Debtor's amended liquidation analysis, each impaired class, including Class 2, receives more under the Plan than it would receive in a liquidation scenario. As the Debtor's accountant and financial advisor Mr. Schwarzbaum testified, in a liquidation scenario the secured creditors would receive 78.7 percent of their claims, while the administrative and unsecured claim holders would receive no distribution. Mr. Schwarzbaum's expert report provided that if the Property is liquidated, it would generate only $16,151,630, resulting in a $4,423,370 loss to WFF.

Therefore, based on the liquidation analysis and Mr. Schwarzbaum's testimony, the Debtor has established by a preponderance of the evidence that the Plan satisfies the "best interests test" and the requirements of Section 1129(a)(7) are met.

*Bankruptcy Code Section 1129(a)(8)*

Bankruptcy Code Section 1129(a)(8) provides that "[w]ith respect to each class of claims

or interests (A) such class has accepted the plan; or (B) such class is not impaired under the plan."

11 U.S.C. § 1129(a)(8).  According to the Certification of Votes, Class 2, WFF's class, was the

only impaired class to vote against confirmation of the Plan.

But this is not the end of the inquiry.  Bankruptcy Code Section 1129(b) permits a plan

proponent to "cramdown" a plan over a dissenting class if the plan does not "discriminate

unfairly" and provides "fair and equitable" treatment to the dissenting classes that are impaired

under the plan.  *In re The Leslie Fay Cos.*, 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997).  Before a

plan proponent may cramdown a plan, it must establish that all of the other requirements of

Section 1129(a) are met.  *Id.*  Accordingly, the Court will address the remaining requirements of

Section 1129(a) before discussing the cramdown requirements of Section 1129(b).

*Bankruptcy Code Section 1129(a)(9)*

Bankruptcy Code Section 1129(a)(9) provides for the mandatory treatment of certain

priority claims.  As to administrative claims, the statute states:

> Except to the extent that the holder of a particular claim has agreed to a different
> treatment of such claim, the plan provides that . . . with respect to a claim of a
> kind specified in section 507(a)(2) [administrative expense claims] . . . on the
> effective date of the plan, the holder of such claim will receive on account of such
> claim cash equal to the allowed amount of such claim.

11 U.S.C. § 1129(a)(9)(A).

Here, the Plan provides that the administrative claims will be paid in full "on (i) the

Effective Date or (ii) the Distribution Date immediately following the date on which the

Administrative Claim becomes an Allowed Administrative Claim . . . ."  Plan Art. II(B).

Accordingly, the Debtor has established by a preponderance of the evidence that the Plan meets

the requirements of Bankruptcy Code Section 1129(a)(9)(A).

Section 1129(a)(9)(B) addresses the treatment of other priority non-tax claims.  The

statute provides that each holder of a priority non-tax claim will receive:

> (i) if such class has accepted the plan, deferred cash payments of a value, as of the
> effective date of the plan, equal to the allowed amount of such claim; or (ii) if
> such class has not accepted the plan, cash on the effective date of the plan equal
> to the amount allowed of such claim[.]

11 U.S.C. § 1129(a)(9)(B).

Under the Plan, priority non-tax claims are unimpaired Class 1 claims and holders of such

claims are paid in full, in cash, on the effective date or on the distribution date immediately after

the Class 1 claim becomes an allowed claim, unless less favorable terms are agreed to in writing.

Thus, the Debtor has established by a preponderance of the evidence that the Plan satisfies the

requirements of Section 1129(a)(9)(B).

Finally, the Bankruptcy Code provides for similar treatment for unsecured and secured

priority tax claims.  For unsecured priority tax claims, the Bankruptcy Code requires:

> [T]he holder of such claim will receive . . . regular installment payments in cash -
> (i) of a total value, as of the effective date of the plan, equal to the allowed
> amount of such claim; (ii) over a period ending not later than 5 years after the
> date of the order for relief . . . and (iii) in a manner not less favorable than the
> most favored nonpriority unsecured claim provided for by the plan . . . .

11 U.S.C. § 1129(a)(9)(C).

As to secured priority tax claims, Bankruptcy Code Section 1129(a)(9)(D) states that

claimholders will receive cash payments "in the same manner and over the same period" as

required for unsecured priority tax claims.  11 U.S.C. § 1129(a)(9)(D).

Here, the Plan states that holders of allowed priority tax claims shall receive cash equal to

the unpaid portion of the claim, on the Plan's effective date or the distribution date following the

date on which the priority tax claim becomes an allowed claim.  Since the Plan provides that the

priority tax claim holders will have their claims satisfied in full on the effective date, the Debtor

has established by a preponderance of the evidence that the Plan meets the requirements set forth

in Sections 1129(a)(9)(C) and (D).

### *Bankruptcy Code Section 1129(a)(10)*

Bankruptcy Code Section 1129(a)(10) requires that "at least one class of claims that is

impaired under the plan has accepted the plan . . . without including any acceptance of the plan by

any insider." 11 U.S.C. § 1129(a)(10). According to the Certification of Votes, impaired Classes

4, 5, and 6, which do not include insiders, have voted to accept the Plan. Accordingly, the Debtor

has established by a preponderance of the evidence that the Plan satisfies the requirements of

Section 1129(a)(10).

### *Bankruptcy Code Section 1129(a)(11)*

Bankruptcy Code Section 1129(a)(11) is commonly referred to as the "feasibility"

requirement. The Bankruptcy Code requires that confirmation may proceed only if

"[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further

financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in

the plan." 11 U.S.C. § 1129(a)(11). The Second Circuit has interpreted the feasibility standard to

mean "whether the plan offers a reasonable assurance of success. Success need not be

guaranteed." *Kane v. Johns-Manville*, 843 F.2d at 649. *See In re Adelphia Bus. Solutions, Inc.*,

341 B.R. 415, 421-22 (Bankr. S.D.N.Y. 2003) (finding that "[i]n making determinations as to

feasibility, . . . a bankruptcy court does not need to know to a certainty, or even a substantial

probability, that the plan will succeed. All it needs to know is that the plan has a reasonable

likelihood of success."). Bankruptcy courts consider factors including "the earning power of the

business, its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business after confirmation" when assessing whether a plan is feasible. *In re D&G Invs. of West Fla., Inc.*, 342 B.R. 882, 886 (Bankr. M.D. Fla. 2006). *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 589 (6th Cir. 1986) (listing six factors relevant to determining feasibility).

In determining if a plan is feasible, the "inquiry is peculiarly fact intensive and requires a case by case analysis, using as a backdrop the relatively low parameters articulated in the statute." *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995). "A 'relatively low threshold of proof' will satisfy the feasibility requirement." *Mercury Capital*, 354 B.R. at 9 (quoting *Computer Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (9th Cir. 2003)). And as the Second Circuit recently observed, "[i]n most situations, the time immediately following bankruptcy will call for fairly specific proof of the company's ability to meet its obligations . . . . As one moves further away from the time of confirmation, . . . the proof will necessarily become less and less specific." *Dish Network Corp. v. DBSD N. Am. Inc. (In re DBSD N. Am. Inc.)*, 2011 WL 350480, at *22 (2d Cir. Feb. 7, 2011).

WFF argues that the Plan is not feasible because it hinges on speculative future sales of condominium units. WFF also argues that based on the cramdown interest rate of 11.68 percent necessary to treat its claim fairly and equitably, as indicated by WFF's expert Mr. Bruck, the Plan will fail within the first year. This is because, based on the earlier plan projections, the Property's projected rental income for the first year is $1,112,443, which is significantly less than the

$2,403,160 interest payment that would be due to WFF.[2]  And WFF notes that it is unlikely that this shortfall can be cured, since the Managing Member testified that he is uncertain whether he or anyone else will contribute additional funds to the Debtor.  Viewed another way, WFF argues that the Plan is not feasible using *any* interest rate higher than approximately 5.4 percent, even if WFF receives all of the net proceeds from condominium units sales because, as WFF's principal Mr. Heiden testified, at a 5.4 percent interest rate, there would remain an unpaid balance due to WFF of approximately $500,000 to $600,000 after five years.

The Debtor asserts that based on the Projections, the Plan is feasible in accordance with Section 1129(a)(11).  The Debtor argues that the Projections are reliable and reasonable because they were prepared with management's input and independently validated by J.H. Cohn LLP.  Moreover, the Projections are based on condominium unit sales that are not speculative.  Rather, "the Projections rely on conservative sale and cash flow projections derived from financial reality, based upon reasonable assumptions consistent with the [DiGeronimo] Appraisal, the [Blake & Iaccio] Appraisal and WFF's Loan Extension Book . . . ."  Debtor Reply at 42-43.  The Debtor notes that WFF's own appraiser supports the feasibility of the Plan and the Projections by estimating that after leasing the unsold condominium units for one more year, the market could absorb the 37 unsold units in 18 months.  The Projections clearly "show that the Debtor will have sufficient funds to administer and consummate the Plan" while providing WFF with 4.75 percent

---

[2]  As discussed above, after the evidentiary record was closed, the Debtor filed a fourth modified Plan and new Projections, and that Plan is the subject of this decision.  These Projections indicate that the Debtor will sell a total of 27 condominium units earlier in the Plan and as a result, the interest payments owed to WFF would be slightly less than previously calculated.  But the projected rental income in the first year would still be significantly less than the interest payments due to be made in that year, and the Plan would still fail in the first year.

interest.  Debtor Reply at 45.

In the context of Section 1129(a)(11) and feasibility, the question to be addressed is not whether the Plan offers adequate treatment of WFF's claim.  Rather, it is whether the Plan, *as proposed*, has a reasonable prospect of success.  Viewed another way, this Section requires a debtor to show that it can accomplish what it proposes to do, in the time period allowed, on the terms set forth in the plan.  And a finding that a plan is feasible does not mean that it satisfies the other requirements of confirmation, including the requirement to treat the claims of dissenting creditors fairly and equitably.  Nor does it mean the risk that the reorganization may fail should not be taken into account in other ways, including in determining a cramdown interest rate.

The Projections indicate that the Debtor will have a positive cash flow during the five-year term of the Plan, with 95 percent of the net proceeds from the sale of condominium units being paid to WFF.  The remaining five percent of net proceeds will be used towards the payment of the unsecured claims, the secured mechanic liens, and, in year five, the final payment to WFF.

While the sale of condominium units is not required by the Plan, the Debtor proposes to fund the Plan through the sale of condominium units over a five-year sellout period.  The Debtor's five-year Projections in support of the Plan, as modified by the Debtor's post-hearing amendment to the Plan, call for one condominium unit to be sold in year one, four units in year two, six units in year three, seven units in year four, and nine units in year five.

The testimony of the Debtor's expert Mr. DiGeronimo supports the feasibility of the Debtor's projected condominium unit sales to fund the Plan.  In particular, Mr. DiGeronimo testified that in view of "the cloud of the bankruptcy" and the potential difficulties a buyer may face in obtaining financing to purchase a unit in a "fractured condo," it would be "very difficult to

sell any units until a plan of reorganization is approved." Oct. 6 Tr. at 86:9-20.  Accordingly, Mr.

DiGeronimo based his appraisal on a five-year sellout period, beginning with a year of no

condominium unit sales, followed by a "sellout of approximately two units per quarter [which]

then accelerated . . . to three units per quarter in the later quarters, over a five-year period."  Oct.

6 Tr. at 94:22-25.  Therefore, based on Mr. DiGeronimo's appraisal, the Debtor can sell all 37

unsold units over the five-year duration of the Plan, at a faster rate than anticipated by the

Projections.

The testimony of WFF's expert Mr. Iaccio is also consistent with the feasibility of the

Debtor's projected condominium unit sales.  Mr. Iaccio bases his appraisal of the Property on a

two and a half year absorption period for the 37 unsold condominium units, commencing one year

after the Plan's effective date.  Mr. Iaccio's appraisal projects that in the second year of the

sellout period, the Debtor can sell 24 condominium units, and in the following six months, the

remaining twelve units can be sold.  That is, Mr. Iaccio based his appraisal of the Property on an

assumption that the unsold condominium units can be sold, beginning one year after the Plan's

effective date, at a significantly more rapid rate than the rate reflected in the assumptions

underlying Mr. DiGeronimo's appraisal and the Debtor's Projections in support of the Plan.

Mr. Iaccio further testified that a prudent investor would sell the condominium units as

expeditiously as possible.  He indicated that the Williamsburg real estate market can absorb the

sale of two condominium units per month:

> Q:    Do you know how many sales of condo units have occurred in the last
>        twelve months in the Williamsburg area?
> A:    Approximately, yes.  In the past ten months of this year there have been
>        about 440 condo units conveyed.  In prior years, in 2008 and 2009 the
>        average was about 550 a year.  So we're basically still on track for that
>        amount.

> . . .
>
> Q:    Mr. Iaccio, do you believe that the Williamsburg market will be able to absorb an additional twenty-five units as contemplated in your [first] sellout period?
>
> A:    I do, and we don't necessarily consider them as additional; they're part of the inventory and they're just being brought to the market at that point in time.
>
> Q:    And do you believe that the Williamsburg market will be able to absorb an additional twelve units that you contemplate will be sold in the remaining six-month period in your appraisal?
>
> A:    Yes, and again, that works out to two units per month.

Nov. 18 Trial Tr. at 15:6-11; 16:24-17:9.

Both the Iaccio and DiGeronimo appraisals note a three percent growth rate, which is offset by the discount rate or an "internal rate of return . . . [which] reflects time, value, money, risk and profit." Oct. 6 Trial Tr. at 98:6-9. *See* Nov. 18 Trial Tr. at 18:19-25. Mr. Iaccio estimated that selling the condominium units over a five-year period, versus over two and a half years, would result in approximately $1.4 million in additional income. Yet, Mr. Iaccio asserts that the additional revenue is not worth the risk associated with holding the remaining condominium units for an additional two and half years.

> Q:    So in your view, is that a risk worth taking?
>
> A:    No.
>
> Q:    Why not?
>
> A:    Because you're gaining five percent of the total sellout . . . but the risk of holding it for two and a half years, the unknown, is a bigger risk to gain only five percent in total present value return. Not worth it.

Dec. 1 Trial Tr. at 53:9-15.

Here, the Projections indicate that the Debtor will have sufficient excess net cash flow to pay WFF's claim at the 4.75 percent interest rate proposed in the fourth modified Plan. Both the DiGeronimo and Iaccio appraisals reflect their expert assumption that the Williamsburg real estate market can absorb the proposed condominium unit sales as set forth in the Projections. In

fact, WFF's own appraiser stated that there is a market for the condominium units in Williamsburg and recommended selling the remaining units faster than proposed by both the DiGeronimo appraisal and the Debtor.

For these reasons, and based on the entire record, the Debtor has established by a preponderance of the evidence that the Plan is feasible and that the requirements of Section 1129(a)(11) are satisfied.

*Bankruptcy Code Section 1129(a)(12)*

Bankruptcy Code Section 1129(a)(12) requires that "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." 11 U.S.C. § 1129(a)(12).  Here, the Plan states that "all fees payable under 28 U.S.C. § 1930 that have not been paid, shall be paid on or before the Effective Date."  Plan Art. II(B).  Accordingly, the Debtor has established by a preponderance of the evidence that the Plan meets the requirements of Section 1129(a)(12).

*Bankruptcy Code Section 1129(a)(13)*

Bankruptcy Code Section 1129(a)(13) requires that a plan provide for "the continuation of payment of all retiree benefits, at the level established pursuant to section 1114 of the Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits."  *PC Liquidation*, 2006 Bankr. LEXIS 4638, at *27. Therefore, to comply with Section 1129(a)(13), a plan must allow for the continued payment of retirement benefits either at "(1) the level originally provided by the debtor . . . or (2) at the modified level established pursuant to the requirements of section 1114 of the Bankruptcy Code

by court order, or by agreement between the debtor in possession or trustee and the authorized

representative of the persons entitled to receive retiree benefits."  7 COLLIER ON BANKRUPTCY

¶ 1129.02[13] at 1129-56 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).

Here, Article VI(D) of the Plan states that "[t]he Debtor has no retirement benefit

agreements with past or current employees."  Plan Art. VI(D).  As a result, Section 1129(a)(13)

does not apply to this case.

*Bankruptcy Code Section 1129(d)*

Bankruptcy Code Section 1129(d) requires that "on request of a governmental unit, the

court may not confirm a plan if its principal purpose is the avoidance of taxes or the avoidance of

the application of section 5 of the Securities Act of 1933, as amended."  *PC Liquidation*, 2006

Bankr. LEXIS 4638, at *28.  There has been no request under this Section or objection to the Plan

by any governmental unit on these grounds.  Accordingly, Section 1129(d) does not apply to this

case.

*The Cramdown Requirements*

The cramdown requirements under Bankruptcy Code Section 1129(b) present the most

significant obstacle to the Debtor in connection with the confirmation of the Plan.  Section

1129(b)(1) provides that if the requirements of Section 1129(a) are satisfied, but the plan has not

been accepted in accordance with Section 1129(a)(8), then "the court, on request of the proponent

of the plan, shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and

equitable, with respect to each class of claims or interests that is impaired under, and has not

accepted, the plan."  11 U.S.C. § 1129(b)(1).  *See Bank of Am. Nat'l Trust and Sav. Ass'n v. 203

N. LaSalle St. P'ship*, 526 U.S. 434, 441 (1999) (noting that the "objection of an impaired creditor

class may be overridden only if 'the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan'") (quoting 11 U.S.C. § 1129(b)(1)). This Court will address each of these cramdown elements in turn.

Unfair Discrimination   The Bankruptcy Code does not set forth a standard to determine whether a plan discriminates unfairly in a cramdown scenario. Courts agree that the purpose underlying this requirement is to "ensure[ ] that a dissenting class will receive value equal to the value given to all other similarly situated classes." *In re Johns-Manville*, 68 B.R. at 636. *See In re Young Broad. Inc.*, 430 B.R. 99, 139-40 (Bankr. S.D.N.Y. 2010) (stating that "[u]nder 1129(b)(1), a plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment").

Here, Class 2, which is comprised solely of WFF's claim, is the only impaired class to vote against confirmation of the Plan. And there is no other class of claims or interests that is similarly situated to WFF's Class 2. Accordingly, the Debtor has established by a preponderance of the evidence that the Plan does not discriminate unfairly against WFF's claim.

Fair and Equitable   Bankruptcy Code Section 1129(b)(2) sets forth the requirements to treat a dissenting impaired class fairly and equitably. These requirements establish a floor, and satisfaction of these statutory requirements does not guarantee that the plan will meet the fair and equitable standard. As one court observed:

> A plan which does not meet the standards set forth in § 1129(b)(2) cannot be "fair and equitable." However, technical compliance with all the requirements in § 1129(b)(2) does not ensure that a plan is "fair and equitable". . . . Section 1129(b)(2) sets minimal standards plans must meet.

*In re Matter of D&F Constr. Co.*, 865 F.2d 673, 675 (5th Cir. 1989) (internal citations omitted).

*See In re N. Outer Banks Assocs.*, 2010 WL 4630348, at *8 (Bankr. E.D.N.C. Nov. 8, 2010) (observing that "[e]ven if a plan meets the standards of 11 U.S.C. § 1129(b)(2), it can still be considered not 'fair and equitable' and therefore, nonconfirmable"); *In re Cellular Info. Sys.*, 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994) (noting that "[a]t minimum, a fully secured creditor is treated fairly and equitably if it retains the lien securing its claim and receives deferred cash payments which have a present value equal to the amount of its claim").

Here, the Debtor seeks to treat WFF's claim fairly and equitably under the standard set forth in Section 1129(b)(2)(A)(i).  This Section states that a plan is fair and equitable as to a dissenting class of secured claims if the plan provides:

> (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2)(A)(i).

### *Whether WFF retains its liens on its pre-petition collateral*

The first element of the fair and equitable standard requires that WFF retain the pre-petition liens securing its claim.  Article III(A)(2)(b)(i) of the Plan provides that WFF retains its liens on the 37 unsold condominium units and parking spaces at the Property, along with the related rents and leases.  WFF also receives a new lien on storage units located at the Property. And the Plan provides that WFF retains its lien on the Equity Holders' membership interest in the Debtor as provided by the Pledge Agreement.  As a result, the Debtor has established by a preponderance of the evidence that WFF retains its liens on its pre-petition collateral as required

by Section 1129(b)(2)(A)(i)(I).

### *Whether WFF receives the present value of its claim*

The second element of the fair and equitable standard requires that WFF receive deferred cash payments equal to the present value of its allowed claim under the Plan.  11 U.S.C. § 1129(b)(2)(A)(i)(II).  As the Supreme Court noted, "a creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments."  *Rake v. Wade*, 508 U.S. 464, 472 n.8 (1993).  *See Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns)*, 547 F.3d 763, 768-69 (7th Cir. 2008) (finding that a claim that is paid over time pursuant to Section 1129(b)(2)(A)(i)(II) requires the payment of interest).

Many courts look to the U.S. Supreme Court's Chapter 13 decision in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), for guidance in determining the appropriate interest rate in a Chapter 11 cramdown case.  In *Till*, the Chapter 13 debtors purchased a truck from Instant Auto Finance. *Till*, 541 U.S. at 469.  They financed the purchase with a secured retail installment contract with a 21 percent interest rate, and Instant Auto Finance promptly assigned that contract to SCS Credit Corporation ("SCS").  *Till*, 541 U.S. at 470.

In their Chapter 13 plan, the debtors proposed to pay 9.5 percent interest to SCS on the secured portion of its claim.  *Till*, 541 U.S. at 471.  The debtors derived this interest rate using the "prime-plus" or "formula rate" approach, beginning with the national prime rate of eight percent, and adding 1.5 percent to account for the risk of non-payment of the loan.  *Id.*

SCS objected to confirmation of the plan, arguing that 21 percent was the appropriate

interest rate because that was the rate it would have received if it had foreclosed on the truck and

reinvested the proceeds in loans of similar duration and risk. *Till*, 541 U.S. at 470-71.

The Supreme Court noted three considerations when evaluating different approaches,

including the "coerced loan," "presumptive contract rate," "cost of funds,"[3] and "formula"

approaches, to determine the appropriate interest rate for a Chapter 13 plan. First, the Court

stated that Congress "would favor an approach that is familiar in the financial community and that

minimizes the need for expensive evidentiary proceedings." *Till*, 541 U.S. at 474-75. Second,

the Court observed that "the court's authority to modify the number, timing, or amount of the

installment payments from those set forth in the debtor's original contract is perfectly clear." *Till*,

541 U.S. at 475. That is, the Court confirmed that a bankruptcy court may account for other

circumstances including the risk of default. Finally, the Court observed that "from the point of

view of a creditor, the cramdown provision mandates an objective rather than a subjective

inquiry." *Till*, 541 U.S. at 476. Consequently, a court "need not consider the creditor's

individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative

loans it could make if permitted to foreclose." *Till*, 541 U.S. at 476-77.

The Supreme Court concluded that defects were present in all but the formula approach.

In rejecting the coerced loan, presumptive contract rate, and cost of funds approaches, the

---

[3] The "coerced loan rate" is "the rate the creditor could obtain if it were permitted to foreclose and reinvest the proceeds in equivalent loans." Gerald F. Munitz, *The Chapter 11 Plan: Proposal, Confirmation and Effect of Confirmation*, 870 PLI/COMMERCIAL LAW AND PRACTICE COURSE HANDBOOK SERIES 515, 544 (Nov.-Dec. 2004). The "presumptive [contract] rate" looks to "the prepetition contract rate, subject to adjustment up or down based upon the particular facts of the case." *Id*. Finally, the "cost of funds rate" is the "cost the creditor would incur to obtain the cash equivalent of the collateral (i.e. the interest rate the creditor would have to pay on a loan in an amount equal to the value of the collateral)." *Id*. *See In re Prussia Assocs.*, 322 B.R. 572, 587 n.12 (Bankr. E.D. Pa. 2005).

Supreme Court noted that "[e]ach of these approaches is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value." *Till*, 541 U.S. at 477. By contrast, the "formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings." *Till*, 541 U.S. at 479. The formula approach uses the national prime rate, which is reported daily in the press, and adds an appropriate risk adjustment.[4] This is "[b]ecause bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers." *Id*. The Court noted that factors such as "the circumstances of the estate, the nature of the security and the duration and feasibility of the reorganization plan" are considerations in determining the size of the risk adjustment. *Id*.

The Supreme Court did not directly address the question of whether the formula approach should apply outside of the Chapter 13 context. The Court stated that it is "likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any . . . [cramdown] provision[]." *Till*, 541 U.S. at 474. At the same time, the Court contrasted Chapter 13, where there may be no discernible market interest rate for cramdown loans, and Chapter 11, where there may be lenders that will provide financing. As the Court explained, in Chapter 13 "every cramdown loan is imposed by a court over the objection of the secured creditor, [so] there is no free market of willing cramdown lenders." *Till*,

---

[4] Prior to *Till*, the Second Circuit in *General Motors Acceptance Corp. v. Valenti (In re Valenti)*, 105 F.3d 55 (2d Cir. 1997), applied a similar formula approach to determine the cramdown interest rate in a Chapter 13 case. The court held that the interest rate should be determined by combining "the rate on a United States Treasury instrument" with "a [risk] premium to reflect the risk to the creditor in receiving deferred payments under the reorganization plan." *Valenti*, 105 F.3d at 64. *See Till*, 541 U.S. at 504, 506 (citing *Valenti*, 105 F.3d at 64).

541 U.S. at 476 n.14.  As a result, the Court observed, "when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce."  *Id.*

In *Bank of Montreal v. Official Committee of Unsecured Creditors (In re American HomePatient, Inc.)*, 420 F.3d 559 (6th Cir. 2005), the Sixth Circuit "decline[d] to blindly adopt *Till's*. . . formula approach for Chapter 13 cases in the Chapter 11 context."  *Am. HomePatient*, 420 F.3d at 568.  Rather, the court found that in a Chapter 11 case, if an efficient market exists then the market interest rate should apply, but if there is no efficient market then *Till*'s formula approach should be used.  *Id.*  The court rejected the lenders' argument that a blended interest rate was appropriate, reasoning that this approach was "centered on the composite interest rate that a new loan (including 'mezzanine' debt and equity) would command in the market, not what their loan to [the debtor] (which was all senior debt) would require."  *Id.*  And the court noted that the lenders' proposed blended interest rate of 12.16 percent was almost 8 percent more than the national prime rate, resulting in a windfall for the lender.  *Am. HomePatient*, 420 F.3d at 569.

Courts in this Circuit have concluded that the two-step analysis described in *American HomePatient* is an appropriate way to determine the interest rate that should apply in a Chapter 11 cramdown situation.  For example, in *Mercury Capital Corp. v. Milford Connecticut Assocs.*, 354 B.R. 1 (D. Conn. 2006), the district court endorsed factors to determine the appropriate interest rate, including:

> (1) does an efficient market exists for the type of loan [the secured creditor] is forced to give the debtor under the competing plans; (2) if there is no efficient market rate and it is thus appropriate to apply the *Till* formula, what was the national prime rate on the relevant date . . . .

*Mercury Capital*, 354 B.R. at 13.

And similarly, in *In re DBSD North America, Inc.*, 419 B.R. 179 (Bankr. S.D.N.Y. 2009),

when considering what cramdown interest rate would provide a creditor with the indubitable equivalent of its claim under Section 1129(b)(2)(A)(iii), the bankruptcy court was guided by Second Circuit case law pertaining to cramdown under Section 1129(b)(2)(A)(i). The court observed that a market interest rate should be used as a benchmark when a market exists for a loan to a Chapter 11 debtor:

> In determining the appropriateness of a proposed cramdown interest rate, courts in this district have looked to the market interest rate for loans with similar terms. Still other courts have considered the prepetition contract rate in determining whether the cramdown interest rate is sufficient. There is other arguably relevant law, under chapter 13 of the Bankruptcy Code, but I consider reliance on these two bases to be preferable.

*In re DBSD N. Am.*, 419 B.R. at 209, *aff'd sub nom. Sprint Nextel Corp. v. DBSD N. Am. Inc.*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part sub nom. Dish Network Corp. v. DBSD N. Am. Inc.*, 2011 WL 350480 (2d Cir. Feb. 7, 2011). The bankruptcy court's decision was later affirmed by the district court, and affirmed in part and reversed in part by the Second Circuit on grounds unrelated to the bankruptcy court's cramdown interest rate analysis. *Dish Network Corp. v. DBSD N. Am. Inc.*, 2011 WL 350480, at *1, *12 (2d Cir. Feb. 7, 2011); *Sprint Nextel Corp. v. DBSD N. Am. Inc.*, 2010 WL 1223109, at *5 (S.D.N.Y. Mar. 24, 2010).

The majority of courts outside this Circuit to consider the issue have similarly applied the two-step analysis described by the Sixth Circuit in *American HomePatient* to determine the appropriate cramdown interest rate in a Chapter 11 plan. *See, e.g.*, *Gen. Elec. Credit Equities, Inc. v. Brice Rd. Dev., L.L.C. (In re Brice Rd. Dev., L.L.C.)*, 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008) (finding that "in a chapter 11 case where an 'efficient market' exists, the market rate should be applied, and where no 'efficient market' exists, the formula approach endorsed by the Supreme Court in [*Till*] . . . should be employed"); *SPCP Grp., LLC v. Cypress Creek Assisted*

*Living Residence Inc.*, 434 B.R. 650, 660 (M.D. Fla. 2010) (affirming the bankruptcy court's finding that "no efficient market existed" and the application of the *Till* formula approach to determine the cramdown interest rate); *Interim Capital, LLC v. Hank's Dock, Inc. (In re Seaspan Dev. Corp.)*, 2006 WL 2672298, at *2-3 (E.D. Tenn. Sept. 18, 2006) (affirming the four percent interest rate under the plan of reorganization because the bankruptcy court's rationale closely mirrors the framework set by the Sixth Circuit in *American HomePatient*); *In re L.B. Bryant*, 439 B.R. 724, 742 (Bankr. E.D. Ark. 2010) (adopting the two-step approach set forth in *American HomePatient*); *In re Bashas' Inc.*, 437 B.R. 874, 920 (Bankr. D. Ariz. 2010) (observing that "[f]or at least the last 20 years, the Ninth Circuit Court of Appeals has instructed the bankruptcy courts to assess, and whenever possible use a 'formula approach,' and consider the 'risks associated with a given debtor and the security associated with a specific debt'"); *In re Nw. Timberline Enters.*, 348 B.R. 412, 432, 435 (Bankr. N.D. Tex. 2006) (concluding that in the absence of an "'efficient market' of lenders willing to provide an exit loan identical to what is being offered" under the plan, the *Till* formula approach should be used); *In re Cantwell*, 336 B.R. 688, 693 (Bankr. D.N.J. 2006) (finding that where there is "no evidence produced to establish that an 'efficient market' exists," the *Till* formula approach applies); *In re Deep River Warehouse, Inc.*, 2005 WL 2319201, at *11 (Bankr. M.D.N.C. Sept. 22, 2005) (determining that "the formula approach is the best approach, under the facts and circumstances of this case"); *In re Prussia Assocs.*, 322 B.R. 572, 588-89, 604 (Bankr. E.D. Pa. 2005) (concluding "that adherence to the formula approach articulated in *Till* remains the most appropriate course to follow herein").  *See* Gary W. Marsh & Matthew M. Weiss, *Chapter 11 Interest Rates After Till*, 84 Am. Bankr. L.J. 209, 213 (2010).

This Court will follow the majority approach and consider first whether there is a market for the loan proposed in the Plan. If there is no such market, then the Court will consider next whether the interest rate proposed by the Plan applies an appropriate risk adjustment to the national prime rate in accordance with the *Till* formula approach.

<u>*Whether there is a market for the loan proposed in the Plan*</u>

To determine whether there is a market for the loan at issue, most courts look to expert evidence and evidence of actual loan offers. *See, e.g.*, *Deep River Warehouse*, 2005 WL 2319201, at *12. As one court observed before *Till*, consideration should be given to the "current market rates" for loans that are "similar in term, quality of security, and risk of repayment or financial condition of the borrower." *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 706 (Bankr. S.D.N.Y. 1993). As another court noted:

> The interest rate under an original loan agreement is informative as to a proposed cramdown interest rate's merits to the extent that the original rate was set near in time to a debtor's chapter 11 proceeding and in a period in which market conditions were substantially similar to present conditions.

*In re Cellular Info. Sys. Inc.*, 171 B.R. 926, 938 (Bankr. S.D.N.Y. 1994).

Other courts have looked to tiered financing to determine whether a market interest rate exists. The tiered financing or band of investment approach calls for the court to consider whether the debtor can obtain a loan through a combination of different tranches of financing. The interest rates of these tranches are then blended to determine the appropriate rate. *See, e.g.*, *Pac. First Bank v. Boulders on the River, Inc. (In re Boulders on the River, Inc.)*, 164 B.R. 99, 102-03, 107 (B.A.P. 9th Cir. 1994) (affirming the bankruptcy court decision applying a blended interest rate of nine percent); *In re N. Valley Mall, LLC*, 432 B.R. 825, 832-36 (Bankr. C.D. Cal. 2010) (applying a blended interest rate of 8.5 percent); *In re Cellular Info. Sys.*, 171 B.R. at 944

(applying the band of investment approach and denying confirmation because the plan's cramdown interest rate was lower than the blended rate).

The Debtor offered the expert testimony of Paul Fried, an experienced real estate finance professional, on the question of whether there is a market for the loan proposed in the Plan.  Mr. Fried stated that there is "no efficient market for loans on bulk, unsold condominium units with the characteristics of the Collateral and WFF's . . . claim."  Debtor Exh. 12 ¶ 37.  Mr. Fried contacted several real estate lenders to see if any would be interested in financing a loan similar to the one provided under the Plan.  None of the lenders indicated an interest in making a "traditional" loan on assets similar to WFF's collateral.  As Mr. Fried reported, "most of the contacted lenders were out of the real estate lending market altogether."  Debtor Exh. 12 ¶ 36.  Accordingly, Mr. Fried opined that there is no market for the loan provided under the Plan.

WFF offered the expert testimony of Stuart Bruck, also an experienced real estate finance professional, in support of its position that there is a market for a loan akin to the one proposed in the Plan.  To reach that conclusion, he proposed a three-tiered structure including a loan secured by a first mortgage, a mezzanine loan secured by a second mortgage, and an equity investment.  Specifically, Mr. Bruck found that there is an efficient market for a loan of $13.65 million secured by a first mortgage with a 65 percent loan-to-value ratio at a 7.5 percent interest rate, a mezzanine loan of $3.15 million secured by a second mortgage with an aggregate 80 percent loan-to-value ratio at a 13.5 percent interest rate, and an equity investment of $3,628,682.  He also estimated a rate of return on the equity investment of 22 percent.  Based on this structure, Mr. Bruck calculated a blended rate of return to derive an 11.68 percent interest rate, and concluded that this is the appropriate rate for WFF to receive under the Plan.

Here, the record shows that there is not a market for the loan proposed in the Plan. That is, as the Debtor's expert Mr. Fried stated, an efficient market does not exist for a loan of this size secured by collateral of this nature in the full amount of the value of the Property. This testimony was grounded in his years of experience in real estate finance as well as his inquiries to prospective lenders. Those inquiries indicate that participants in the loan market were not willing to make a loan of the nature proposed in the Plan.

The expert evidence advanced by WFF is consistent with this conclusion. WFF's expert Mr. Bruck acknowledged that it would be extremely difficult to obtain a loan in the present market for the full amount of the Property's value. He stated that there is no efficient market for a loan on the terms presented in the Plan:

> Q:    Mr. Bruck there is no traditional financing available for this project at 20.5 million, correct?
> A:    At 20.5 million, no.
> Q:    And there is no efficient market for [a] loan on this project of 20.5 million payable over five years?
> A:    No.
> Q:    In fact, Mr. Bruck, when you turn to nontraditional, private or hard money lending in your opinion it would be difficult to obtain a loan even from a private or hard money lender at that amount, is that correct?
> A:    If you're referring to a hundred percent loan-to-value ratio, yes.

Dec. 2 Trial Tr. at 33:25-34:11. And Mr. Bruck's three-tiered structure includes an equity contribution, reducing the total leverage to 80 percent.

Mr. Bruck also explained why a fully leveraged property contributes significantly to the risk associated with a loan, and is the "foremost" reason why there are no conventional loans available for the Property:

> Q:    Mr. Bruck, why are there no conventional loans for this property at twenty and a half million – 20,500,000 dollars?
> A:    Well foremost is the . . . hundred percent loan-to-value but there are other

risks associated with this debt.

Q:    When you say, I think you said primary is the loan-to-value, why is that an issue?

A:    Well at a hundred percent loan-to-value there's no margin of error for a lender if . . . value were to decrease, you know, there's no more equity in the building.  So at a hundred percent loan-to-value the borrower has no equity and there's no margin of error left.

Q:    And how does that no margin of error equate with an interest rate?

A:    Well as a hundred percent loan-to-value it would equate you a substantial premium on any rate, if available.

Dec. 2 Trial Tr. at 35:24-36:14.

The absence of a market for the loan described in the Plan is also consistent with the loan term sheets offered by WFF.  These terms sheets were procured from several banks and reflect terms for loans on property located in Manhattan.  But the loans described in those term sheets are different from the loan proposed in the Plan in several significant respects.  For example, the principal amount of the loans proposed ranges from $3 million to $13 million, far less than the $20.5 million loan under the Plan.  And each of these term sheets describes a prospective loan with total debt of 60 percent to 75 percent of the value of the subject property, so that a significant equity cushion would remain to protect the lender.  Here, by contrast, the contemplated leverage is 100 percent.

For these reasons, and based on the entire record, the Debtor has established by a preponderance of the evidence that there is not a market for the loan proposed in the Plan.

*Whether the Plan proposes an appropriate risk adjustment*

In the absence of a market for the loan proposed in the Plan, the Court must consider whether the cramdown interest rate proposed in the Plan includes an appropriate risk adjustment.  Since there is no applicable market interest rate, it is appropriate to consider the formula approach set forth in *Till*.  This approach provides that the cramdown interest rate may be

determined by adjusting the national prime rate to reflect the amount of risk associated with the loan at issue. The appropriate risk adjustment is determined by considering factors including "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. at 479.

Additional "risk factors to consider include the debt service coverage ratio, the loan-to-value ratio, and the quality of any guarantors." *In re Griswold Bldg. LLC*, 420 B.R. 666, 693 (Bankr. E.D. Mich. 2009). *See In re Gramercy Twins Assocs.*, 187 B.R. 112, 124 (Bankr. S.D.N.Y. 1995) (noting that "the relatively high loan to value ratio in this case, which is approximately 85%, increases the risk factor"); *Deep River Warehouse*, 2005 WL 2319201, at *11 (observing that "[r]isk is increased significantly when the loan to value ratio is 100%, but a high grade tenant positively affects that risk").

In *Till*, the Supreme Court noted that courts generally grant a one to three percent risk adjustment when applying the formula approach. *Till*, 541 U.S. at 480. Courts have also applied significantly higher risk adjustments to reflect the particular circumstances of a case. *See, e.g.*, *In re Griswold Bldg. LLC*, 420 B.R. at 696 (applying a five percent risk adjustment); *In re Nw. Timberline Enters.*, 348 B.R. at 434 (determining there was "no 'efficient market' of lenders willing to provide an exit loan identical to what is being offered to [the secured lender] here," and concluding that a 5.75 percent risk adjustment was appropriate).

The Debtor's expert Mr. Fried analyzed the appraisals, the Debtor's rent roll, the projections, and other information provided by the Debtor's professional advisors in order to determine the appropriate risk adjustment. Based on this review, Mr. Fried found that the Plan has a strong likelihood of success, and that the only "foreseeable 'risk' to WFF is the cost of

43

pursuing its remedies and liquidating its Collateral." Debtor Exh. 12 ¶ 35.

To account for this risk, Mr. Fried recommended a 0.65 percent risk adjustment. Mr. Fried concluded that together with the 3.25 percent prime rate, a 3.9 percent interest payment would provide WFF with a "war chest" of approximately $500,000 to pay for its litigation expenses if the Plan should fail. Debtor Exh. 12 ¶ 35.

In the fourth modified Plan, which was filed after the evidentiary record was closed, the Debtor increases the risk adjustment to 1.5 percent and the interest payment to WFF to 4.75 percent. The Debtor argues that there is little risk associated with the Plan, so that the 1.5 percent risk premium reflected in the Plan adequately compensates WFF for the present value of its allowed claim.

WFF argues that in the absence of a market, a 1.5 percent risk premium is not sufficient to compensate WFF for the risks associated with the Plan. WFF's interest rate expert Mr. Bruck identified several aspects of this risk, including the 100 percent loan-to-value ratio, the stigma of bankruptcy associated with the Property, the lack of Fannie Mae financing for potential buyers, and the oversupply of comparable properties in Williamsburg. Mr. Bruck testified that an eight to nine percent risk adjustment to the 3.25 percent prime rate would be appropriate to compensate WFF for these risks.

Here, there is greater risk associated with the Plan than the litigation costs that WFF will bear to pursue its legal remedies and liquidate its collateral if the Plan fails. Even if the only risk that WFF faces is the cost of enforcing its contract rights, and taking into account the Plan interest rate of 4.75 percent, WFF will receive the full benefit of the $500,000 "war chest" only after considerable time has passed. If the Debtor fails in its reorganization efforts at an earlier

44

date, WFF will receive less.

And there are other significant risks that are not accounted for by a risk premium of 1.5 percent.  If the Property is liquidated, WFF faces a significant risk that it will recover less than the amount that it is owed.  This is shown by the fact that the loan proposed by the Plan is for the full amount of the Property's value, and leaves no equity cushion to WFF in the event that the value of the Property declines or the proceeds of a sale are less than expected.  The proposed risk premium also does not provide a source of funds for the costs of a sale outside of the "war chest" for litigation expenses.

The risk of a diminished recovery if the Property is sold is also consistent with the Debtor's liquidation analysis as set forth in the Plan.  The Debtor correctly notes that this analysis was prepared for a different purpose than considering the appropriate risk premium to be applied in determining the cramdown interest rate, and also observes that a prompt liquidation would not result in the highest return for the Property.  But that does not make the analysis irrelevant.  And the Debtor's liquidation analysis indicates that if the Property is liquidated, it would yield $16.2 million, resulting in a loss of $4.4 million to WFF.

Another consideration in determining the appropriate risk premium is the risk that the Debtor's reorganization, which is based on sales of condominium units over a five-year period, may not succeed.  Threats to the success of the Debtor's reorganization include the lack of financing for potential purchasers of the condominium units and the lack of additional financial contributions from the Equity Holders.  If the condominium units cannot be sold as set out in the Projections, the Debtor will require other sources of funds to meet its obligations.  But the Equity Holders have not indicated a willingness to fund any shortfall, and the Debtor has not identified

any alternative source of funds.

In sum, there are other risks associated with the Plan, in addition to the litigation costs that WFF would bear to pursue its legal remedies in the event that the Debtor's reorganization does not succeed and the Debtor defaults under the Plan. The record does not show that the Plan's 1.5 percent risk adjustment is adequate to account for the potential shortfall WFF would face in a liquidation scenario, the other risks associated with fully leveraged property without any equity cushion, and the risk of nonpayment under the Plan.

For these reasons, and based on the entire record, the Debtor has not established by a preponderance of the evidence that the Plan proposes an appropriate risk adjustment to the cramdown interest rate to be paid to WFF.

*          *          *

Confirmation of the Plan requires the Debtor to establish by a preponderance of the evidence that each of the confirmation requirements of Bankruptcy Code Section 1129 has been met. Here, the Debtor has not established by a preponderance of the evidence that the Plan is fair and equitable to WFF's claim, because it has not shown that WFF receives the present value of its claim by satisfying the cramdown requirement of Section 1129(b)(2)(A)(i)(II). Accordingly, confirmation of the Plan is denied.

### Conclusion

For the reasons stated herein, and based on the entire record, confirmation of the Plan is denied.  An order in accordance with this Memorandum Decision shall be entered simultaneously herewith.

Dated: Brooklyn, New York
       March 7, 2011

*s/ Elizabeth S. Stong*
HONORABLE ELIZABETH S. STONG
UNITED STATES BANKRUPTCY JUDGE
